# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| **COUNTY OF EL PASO, TEXAS,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **EP-09-CV-00119-KC** |
| | § | |
| LUTHER JONES, DAVID ESCOBAR, MARTIE JOBE, ELIZABETH "BETTI" FLORES, ROBERT BOWLING III, ROBERT BOWLING IV, SARAH J. THOMAS, GREGORY W. COLLINS, ALAN ORTEGA, CHRIS JOHNSTONE, FRANK ARROYOS, CATALINA DEVELOPMENT, INC., TROPICANA HOMES, INC., CAREFREE HOMES INC., L.P., AMERICAS LOOP 375 L.P., TROFREE, LLC, CAREFREE HOMES I, and TROPICANA DEVELOPMENT, INC., | § | |
| | § | |
| Defendants. | § | |

## ORDER

On this day, the Court considered Defendant Robert Bowling, IV's, ("Bowling IV") "Motion to Dismiss Second Amended Complaint" ("Mot. to Dismiss") (Doc. No. 108). For the reasons set forth herein, the Motion is **DENIED**.

### I. BACKGROUND

The County of El Paso ("the County") alleges that certain Defendants were involved in a Racketeering Influenced and Corrupt Organization ("RICO"). *See generally* Pl's Second Am. Compl. ("Complaint") (Doc. No. 107). The alleged enterprise, through David Escobar ("Escobar"), Martie Jobe ("Jobe"), and Luther Jones ("Jones"), would provide "consulting

services" for clients–"individuals, businesses, or entities having or seeking to do business with El Paso County." *Id.* ¶ 89. To serve the needs of its clients, the alleged enterprise would offer bribes and other benefits to County officials to secure "favorable resolutions for clients doing, or seeking to do, business with the County." *Id.* Former El Paso County Commissioner, Elizabeth Flores ("Flores"), was one such County official. *Id.* ¶ 93. According to the County, Flores accepted money and other benefits in exchange for favorable votes in her official capacity as County Commissioner. *Id.* The County alleges that the eighteen defendants in the instant case took part in one or more of the following four racketeering episodes: Catalina Development, Fifteen-Minute Lawsuit, Fair Labor Standards Act 207(k) ("F.L.S.A. 207(k)"), and Digitization of Court Records. *See generally* Compl. For her part, Flores has pleaded guilty to her involvement in the alleged racketeering activities; however, all remaining Defendants maintain that they are innocent of the charges. *See id.* ¶¶ 24, 26-27, 85, 100-01, 106, 163, 166, 214, 238, 276. The County alleges that Robert Bowling IV ("Bowling IV") was involved in the Catalina Development conspiracy "individually and acting as an officer and agent for Tropicana Homes, Inc." ("Tropicana Homes") and the Joint Venture. *Id.* ¶¶ 239, 249.

On January 27, 1993, the El Paso County Commissioners Court ("Commissioners Court") passed a motion allowing for the sale of a 381.90-acre parcel of county of land by sealed bids.[1] *Id.* ¶ 30. In October 1994, the Commissioners Court accepted a bid submitted by Gregory W. Collins ("Collins") and Catalina Development, Inc. ("Catalina Development"). *Id.* Shortly thereafter, two commissioners and the County Judge-elect filed suit to enjoin the sale. *Id.* On

---

[1] The disputed land is located in Section 16, Township 3, Block 79 of the T&P Railroad Survey. Compl. ¶ 31.

December 20, 1994, the 34th Judicial District Court issued a temporary restraining order enjoining the sale of the land. *Id.* ¶ 31. On January 30, 1995, Collins and Catalina Development filed suit against the County for breach of contract and for specific performance ("Catalina Development lawsuit"). *Id.* The lawsuit was barred by sovereign immunity, and summary judgment was granted on behalf of the County. *Id.* ¶¶ 31-32.

Approximately nine years after the attempted sale, in fall 2003, Flores, Bowling IV, and four other defendants allegedly "discussed and began conspiring to defraud the County of El Paso and its citizens of the tract of land subject to the *Catalina Development* lawsuit." *Id.* ¶ 36. According to the County, the six defendants, including Bowling IV, had no legal interest in the property prior to these discussions. *Id.* ¶ 38. A joint venture ("Joint Venture"), consisting of Carefree Homes Inc., L.P. ("Carefree Homes") and Tropicana Homes, was formed around this time period. *Id.* ¶ 40. The president of Tropicana Homes, Defendant Robert Bowling III ("Bowling III"), negotiated the assignment of Collins's and Catalina Developments' interest in the land to the Joint Venture. *Id.* ¶ 39. In September or October 2003, Bowling III entered into a legal and consulting contract with Escobar and Jones in which Escobar and Jones were "to acquire for the Joint Venture the tract of land from the County." *Id.* ¶¶ 40-41.

On November 19, 2003, Escobar, acting as Trustee for the Joint Venture, submitted a settlement offer to the County, offering $10,000 for each of approximately 304 acres, along with reimbursement to the County of all fees and expenses paid by the County to its outside counsel. *Id.* ¶ 42. The County alleges that this offer was forwarded through the United States Postal Service and/or facsimile. *Id.* ¶ 115. On November 20, 2003, Collins and Catalina Development assigned their interest in the Catalina Development lawsuit to Escobar for $150,000, plus a

3

fifteen percent equity interest in a joint venture subsequently formed by the assignees of Collins and Catalina Development called Americas Loops 375, LP ("Americas Loop"). *Id.* ¶ 43. A later investor in Americas Loop, Christopher Johnstone ("Johnstone"), purchased a three percent interest in the joint venture for $200,000 on or about May 4, 2004. *Id.* ¶ 44. Based on this contribution, the County asserts that Americas Loop valued the 304.937 acres at approximately $6,600,000. *Id.* ¶¶ 45-46.

On or about November 21, 2003, Escobar, acting as an agent for the Joint Venture, entered into a consulting contract with Joel Guaderrama ("Guaderrama"), individually and in Guaderrama's role as President of CR Enterprises. *Id.* ¶ 116. Guaderrama had previously attempted to obtain the disputed land from the Commissioners Court, and his efforts continued until he entered into the consulting contract with Escobar. *Id.* ¶¶ 119-20. According to the County, the purpose of the contract was to eliminate Guaderrama's competing interest in acquiring the disputed land. *Id.* ¶ 117. Upon the Joint Venture's successful acquisition of the disputed land, Guaderrama would receive $100,000 from the Joint Venture. *Id.* ¶ 47.

On December 1, 2003, the County rejected the settlement offer submitted by Escobar. *Id.* ¶ 48. Three days later, on December 4, 2003, Escobar submitted a second settlement offer to the County. *Id.* ¶ 49. On or about December 9, 2003, the County alleges that Escobar, Jones and Flores met to discuss the second settlement offer. *Id.* ¶ 123. Around this time, Escobar and Jones "agreed to pay money and other benefits to [Flores] in exchange for her favorable vote." *Id.* ¶ 136. The County alleges that Escobar "knowingly misrepresented that the offer he submitted on behalf of the Joint Venture was [] made in good faith as he failed to disclose the conspiracy efforts of the enterprise to defraud the County of the tract of land." *Id.* ¶ 122. On

December 15, 2003, the Commissioners Court considered the second settlement offer, but it took no action on the offer at that time. *Id.* ¶ 52. Between December 15, 2003, and December 20, 2003, Flores "requested a special session of the El Paso County Commissioners Court to consider the second settlement offer." *Id.* ¶ 53. The County alleges that Flores requested this special meeting by email. *Id.* ¶ 128. A special meeting was held on December 22, 2003. *Id.* ¶ 54.

Prior to the vote of the Commissioners Court, Escobar and Jones appeared before the Commissioners Court "and made material misrepresentations to the Court in furtherance of their efforts to defraud the County. . . . [B]oth withheld from the Commissioners Court that they had offered[,] and Betti Flores agreed[,] to accept money and other consideration in exchange for her vote as an El Paso County Commissioners [sic]." *Id.* ¶ 132. Despite the El Paso County Attorney's recommendation to reject the second settlement offer, the offer was accepted by the Commissioners Court, with Flores voting in favor of accepting the offer. *Id.* ¶ 54. That same day, the County entered into an agreement with Escobar as Trustee of the Joint Venture assignees,

> whereby in consideration for the dismissal and release of all claims related to the tract of land and the promise not to seek a writ of certiorari from the United States Supreme Court, the County of El Paso agreed to sell a portion of the tract of land (approximately 304 acres) to the Joint Venture for $3,040,000.00 or the appraised value of the property, whichever is greater.

*Id.* ¶ 55.

In addition, the Joint Venture agreed to reimburse the County for all attorney fees and costs incurred in the Catalina Development lawsuit. *Id.*

Prior to the December 22, 2003, special meeting, the County alleges that Escobar and Jones met with then County Commissioner Charles Scruggs to coerce him to vote in favor of the Catalina Development settlement offer. *Id.* ¶ 51. Escobar and Jones "threatened Commissioner Scruggs with adverse political consequences should he not vote in favor of the settlement." *Id.*

The County further alleges that on or about January 16, 2004, Jones sent an email to Flores containing a letter addressed to Steve Hughes ("Hughes"), then outside counsel for the County. *Id.* ¶ 138. The letter, which was drafted for Flores's signature, asked Hughes about the appraisal status of the disputed land. *Id.* The email sent by Jones instructed Flores to sign the letter in her official capacity and to forward the letter via facsimile to Hughes. *Id.*

On or about April 9, 2004, Jones, "acting as principal decision maker and coordinator of the enterprise's activities," drafted a letter to Ted Houghton ("Houghton"), an individual who is allegedly familiar with the disposition of public lands. *Id.* ¶¶ 142-44. The letter threatened litigation as a result of Houghton's previous communications with Flores concerning how to maximize the County's profit in its sale of public lands through competitive bidding. *Id.* Jones emailed the letter to Escobar and instructed Escobar to sign the letter and forward it to Houghton. *Id.* ¶ 145. Escobar forwarded the letter on April 4, 2004.[2] *Id.* ¶ 146.

On May 24, 2004, the El Paso County Judge signed a warranty deed conveying the land to Escobar as Trustee for the Joint Venture. *Id.* ¶ 149. On November 15, 2004, Escobar conveyed the land to Americas Loop. *Id.* ¶ 150. In return, Escobar received $580,000 from the Joint Venture for his role as attorney and Trustee. *Id.*

---

[2] The dates in the Complaint appear incorrect, as the Complaint states that Jones drafted the letter on April 9, 2004, five days *after* Escobar supposedly forwarded the letter to Houghton on April 4, 2004.

On or about August 26, 2004, Bowling III and Bowling IV delivered campaign contributions to Flores totaling $2,500. *Id.* ¶¶ 151-53. The County claims that this money was "payment for her vote to settle the *Catalina Development* lawsuit" in violation of Texas Penal Code § 36.02(a)(1).[3] *Id.* ¶ 151. The County alleges that "the Bowling's [sic] collectively paid [Flores] $2,500.00" in order for the Joint Venture to acquire the disputed property. *Id.* ¶ 154. According to the County, these payments were arranged jointly by Jones and Escobar. *Id.* The County alleges that further sums of $2,500 "disguised as campaign contributions" were each paid by Jones and Escobar to Flores on December 16, 2004, for a total of $7,500. *Id.* ¶¶ 155-56.

The County asserts that the amount paid by the Joint Venture to the County, $3,200,000[4] plus attorneys' fees and release of all current and future claims concerning the land, was less than the tract's true value, which the County estimates to be $6,660,000. *Id.* ¶ 157. The County further alleges that the monetary injuries it sustained as a result of the land transaction were actually and proximately caused by "the enterprise's fraudulent and racketeering activities." *Id.* ¶ 158.

According to the County, Escobar "failed to disclose the conspiracy efforts of the enterprise to defraud the County of the tract of land." *Id.* ¶ 122. The County also alleges that "Flores purposely withheld critical information that would likely have prevented a vote on the

---

[3] Under the Texas Penal Code,
> [a] person commits an offense if he intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another: (1) any benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter.

TEX. PENAL CODE ANN. § 36.02(a)-(a)(1) (Vernon 2003).

[4] It is unclear from the County's Complaint how the parties agreed upon the $3,200,000 fee. The agreement states that the land would be sold for the greater of $3,040,000 or the appraised value of the property. *See* Compl. ¶ 55.

settlement offer." *Id.* ¶ 122. Had the Commissioners Court known that at least one of its members had been bribed to accept the settlement offer, the County asserts that it is unlikely that the Commissioners Court would have accepted the offer. *Id.* ¶ 130.

The County alleges that Bowling IV, individually and as an officer and agent for Tropicana Homes, conspired to defraud the County of Flores's honest services and conspired to defraud the County of its property. *Id.* ¶ 239. The County further seeks "equitable relief, pursuant to the doctrine of unjust enrichment." *Id.* ¶ 278. The County alleges that this Court has proper supplemental jurisdiction over its state-law claims under 28 U.S.C. § 1367. *Id.* ¶ 23. The County alleges financial injuries totaling $3,370,000, plus "monies and fringe benefits paid to Betti Flores." *Id.* ¶ 162.

Bowling IV filed a Motion to Dismiss the County's Complaint against him on July 15, 2009. *See generally* Mot. to Dismiss. On July 27, 2009, the County filed "Plaintiff's Response to Defendant Robert Bowling IV's Motion to Dismiss Plaintiff's Second Amended Complaint" ("Pl.'s Response") (Doc. No. 125). On July 28, 2009, Bowling IV filed "Defendant Robert Bowling, IV's Reply to Plaintiff's Response to Defendant's Motion to Dismiss Second Amended Complaint" ("Def.'s Reply") (Doc. No. 127).

## II.   DISCUSSION

Bowling IV seeks dismissal of the instant suit against him for failure to state a claim for which relief may be granted under Rule 12(b)(6) and/or lack of subject matter jurisdiction under 28 U.S.C. § 1367(a). In the alternative, Bowling IV motions the Court to decline to exercise supplemental jurisdiction over the County's state-law claims for reasons set forth in 28 U.S.C. §§ 1367(c)(1) and 1367(c)(4). The Court addresses these motions in turn.

### A. Motion to Dismiss

#### 1. Standard

A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, the court must accept well-pleaded facts as true and view them in a light most favorable to the plaintiff. *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002)*; Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Still, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted); *see also Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (stating that a court need not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions.").

Though a complaint need not contain "detailed" factual allegations, the "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555 (internal citation omitted). Thus, to survive a motion to dismiss, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Id.* at 570. Nevertheless, "a well-pleaded complaint may proceed even if its strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

When a plaintiff alleges fraud or fraudulent concealment, however, a plaintiff's complaint must meet a heightened pleading standard under Rule 9(b). *See* FED. R. CIV. P. 9(b). At a

minimum, Rule 9(b) requires a plaintiff to state particulars of "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he [or she] obtained thereby." *Tel-Phonic Servs. Inc. v. TBS Intern., Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992). The Rule 9(b) particularity requirement applies when fraud is alleged as a predicate act in a civil RICO claim. *Id.* at 1138.

### 2. Conspiracy to commit fraud

Bowling IV alleges that the County has failed to state its claim for conspiracy to commit fraud because its pleading fails to establish that 1) the County relied on Flores's vote to approve the settlement, and 2) Flores's vote was the proximate cause of the County's injuries. Mot. to Dismiss 2.

To state a claim for civil conspiracy in violation of Texas state law, a plaintiff must allege "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *See Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005); *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1990); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). Once a plaintiff has established the existence of a conspiracy, each co-conspirator "is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination." *State v. Standard Oil Co.*, 107 S.W.2d 550, 559 (Tex. 1937); *see also Bentley v. Bunton*, 94 S.W.3d 561, 619 (Tex. 2002); *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963) ("The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt acts

were committed in furtherance of common design, intention, or purpose of the alleged conspirators.").

The County alleges that Bowling IV, Jones, Escobar and Flores "discussed and began conspiring to defraud the County of El Paso and its citizens of the tract of land subject to the *Catalina Development* lawsuit" in fall of 2003. Compl. ¶ 34. The County further alleges that Bowling IV agreed to retain Jones and Escobar as agents for the Joint Venture, and that, on or about August 26, 2004, Bowling IV delivered $500 to Flores as "payment for her vote to settle the *Catalina Development* lawsuit." *Id.* ¶¶ 153, 240. The County claims that the conspiracy to commit fraud caused it injuries in excess of three million dollars. *Id.* ¶ 162. Thus, the County has sufficiently stated its claim for civil conspiracy. *See Tri*, 162 S.W.3d at 556.

Allegations of conspiracy alone, however, are insufficient to sustain the County's claims of conspiracy to commit fraud. The County must also state a claim for the underlying fraud offense. *See Tilton v. Marshall,* 925 S.W.2d 672, 681 (Tex. 1996) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable."). The County alleges that Flores committed fraud by material omission or fraud by non-disclosure. Compl. ¶¶ 161, 211; *see Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos., Inc.*, 217 S.W.3d 653, 670 (Tex. Ct. App. 2006) ("Fraud by omission is a subcategory of fraud because the omission or non-disclosure may be as misleading as a positive misrepresentation of fact where a party has a duty to disclose."). The elements of fraud by material omission are: (1) a party conceals or fails to disclose a material fact within his or her knowledge; (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the party intends to induce the other

party to take some action by concealing or failing to disclose the fact; and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact. *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001).

To be liable for fraud by material omission, a defendant must have a duty to disclose, and the information withheld must be material. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998); *Nelson v. Najm*, 127 S.W.3d 170, 174 (Tex. Ct. App. 2003) ("A failure to disclose information does not constitute fraud unless there is a duty to disclose."). The existence of a duty to disclose is a question of law, *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001), and it may arise in the following situations:

> (1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression.

*Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. Ct. App. 1997). Materiality exists if disclosure of the fact "would likely affect the conduct of a reasonable person concerning the transaction in question." *Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W.3d 325, 345 (Tex. Ct. App. 2003).

The County alleges that, as an employee of the County, Flores had a duty to disclose her involvement in the Catalina Development conspiracy. Compl. ¶ 297. The County's claim is not without support. *See Miller*, 142 S.W.3d at 345 ("The duty to disclose arises when one party knows that the other party is ignorant of the true facts and does not have an equal opportunity to discover the truth. A fact is material if it would likely affect the conduct of a reasonable person concerning the transaction in question."); *Hoggett*, 971 S.W.2d at 487; *see also Nelson v. Najm*,

12

127 S.W.3d 170, 175 (Tex. Ct. App. 2003) (citing *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)) ("Texas law has long imposed a duty to abstain from inducing another to enter into a contract through fraudulent means."). The County further alleges that, had Flores disclosed her involvement in Defendants' scheme, it is "very likely" that the Commissioners Court would have changed its conduct and voted against accepting the second settlement offer. Compl. ¶ 296. Thus, the County has stated facts that make it plausible that Flores had a duty to disclose her participation in Defendants' scheme and that her non-disclosure was material.

Allegations of fraud must be pleaded with particularity. FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). At a minimum, this requires a plaintiff to allege "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the representation and what that person obtained thereby." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994). "To plead scienter adequately, a plaintiff must set forth specific facts that support an inference of fraud." *Id.*

The County has made factual allegations sufficient to make out a claim for fraud by omission, and it has stated the time and place of the alleged fraud, the identity of Flores and the other co-conspirators, the contents of the material omissions and what Defendants gained thereby. *See Tel-Phonic Servs. Inc.*, 975 F.2d at 1139. Flores's omissions occurred in El Paso in December 2003. Compl. ¶¶ 127-131. Flores withheld information about the attempted fraud and about the fact that her favorable vote had been procured through bribes. *Id.* ¶ 161. Flores knew that the other members of the Commissioners Court did not have an equal opportunity to

13

discover the truth, and, by calling the special meeting, she intended to persuade the other Commissioners to accept the second settlement offer. *Id.* ¶¶ 127-28. As a result of Flores's omissions, the County alleges that Defendants were able to undermine a competitive bidding process for the land and secure the land at less than its true market value. *Id.* ¶ 157. Although Bowling IV argues that the County has failed to show that the other Commissioners relied on Flores's fraud by material omission, "[r]eliance is ordinarily a question of fact for the fact-finder" and is often "not a proper matter for dismissal on the pleadings." *See Celanese Corp. v. Coastal Water Auth.*, 475 F. Supp.2d 623, 637 (S.D. Tex. 2007) (citing *Jones v. Ray Ins. Agency*, 59 S.W.3d 739, 754 (Tex. Ct. App. 2001)).

Bowling IV also argues that, because the vote was four-to-one, and the County does not claim that any Commissioner other than Flores was improperly induced to vote in favor of the second settlement agreement, the County has failed to establish causation, and its state-law claim must be dismissed. Mot. to Dismiss at 2 (citing *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 555-56 (2007)). Although Flores's vote was not the deciding vote, Bowling IV overlooks the role that Flores played in the second settlement offer's acceptance. Flores, acting in her official capacity as County Commissioner, requested a special session of the Commissioners Court to consider the second settlement offer. Compl. ¶ 127. In response to her request, a special session was held on December 22, 2003. *Id.* ¶ 131. The second settlement offer was approved at that session. *Id.* Prior to the special session, the Commissioners Court had considered the second settlement offer, but it took no action on the offer. *Id.* ¶ 125. It had also received other proposals concerning the disputed property, but similarly took no action on these proposals. *Id.* ¶ 119. Thus, it is plausible that "but for" the conduct of Bowling IV and his alleged co-conspirators in

providing money and/or other benefits to Flores, the Commissioners Court would never have voted in favor of accepting the Joint Venture's second settlement offer. Because it is also foreseeable that Defendants' conduct in offering bribes to Flores could lead to acceptance of the offer, the County has established proximate cause. *See Navigant Consulting, Inc.*, 508 F.3d at 289. Thus, the County has alleged specific facts which support an inference of conspiracy to commit fraud by material omission and its claim should survive Bowling IV's motion to dismiss. *See Bradford*, 48 S.W.3d at 754-55.

### B.    Lack of subject matter jurisdiction under § 1367

In addition to his Rule 12(b)(6) challenge, Bowling IV also challenges this Court's subject matter jurisdiction over the County's state-law claim. Mot. to Dismiss 2-5. According to Bowling IV, the County's state-law claim 1) does not arise out of the same case or controversy as its federal claim; 2) presents exceptional circumstances or other compelling reasons for declining jurisdiction; and 3) raises a novel or complex issue of state law, making jurisdiction in appropriate. *Id.*; *see also* 18 U.S.C. §§ 1367(a), 1367(c)(1), 1367(c)(4).

Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In addition, federal district courts have supplemental jurisdiction over state-law claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A federal district court may decline to exercise supplemental jurisdiction over a claim if

>    (1) the claim raises a novel or complex issue of State law,
>    (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Id.* § 1367(c).

The Court indisputably has jurisdiction over the County's civil RICO claim, as Congress has specifically created a private civil remedy for persons injured by violations of the RICO Act. 18 U.S.C.A. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court."). However, Bowling IV claims that, "because the RICO claims providing the court with original jurisdiction are not so related to the claims against Bowling [IV] that they form part of the same case or controversy," there is "no basis for supplemental jurisdiction under 28 U.S.C. § 1367(a)." Mot. to Dismiss 3. The Court disagrees. Adjudication of the County's state-law conspiracy to commit fraud claim requires factual determinations similar to those underlying the County's federal claims; namely, whether the Defendants intended to defraud the County of its property rights. Further, the County's state-law claim may give rise to co-conspirator liability for predicate acts taken in furtherance of the conspiracy to commit fraud and, as such, will necessarily have to be adjudicated in order to reach the merits of the County's civil RICO claim. Even if the conspiracy to commit fraud claim does not give rise to co-conspirator liability for predicate acts, it is arguably "so related" to the County's federal claim that it "form[s] part of the same case or controversy under Article III of the United States Constitution." *See* 28 U.S.C. § 1367(a). Both claims relate to the County's sale of its land to the Joint Venture. Both claims involve a similar cast of characters and similar factual determinations. Although Bowling IV is not a party to the County's federal claim, § 1367 specifically permits supplemental jurisdiction

16

over claims "that involve the joinder or intervention of additional parties." *See* 28 U.S.C. § 1367(a).

Bowling IV further alleges that, even if the County's RICO claims "arose from the same critical facts that underlie its claims against Bowling [IV]," the fact that the County's state-law claims against Bowling IV are "inextricably intertwined with state-law claims the County has asserted against other defendants in a pending state court action," presents a "compelling reason" for the Court to decline to exercise supplemental jurisdiction as permitted by 28 U.S.C. § 1367(c)(4). *Id.* It appears that the Fifth Circuit has had only one occasion to evaluate the propriety of a district court's dismissal of a state-law claim pursuant to § 1367(c)(4). *See Hays County Guardian v. Supple*, 969 F.2d 111, 111 (5th Cir. 1992). In *Hays County Guardian*, the Fifth Circuit upheld the district court's refusal to exercise supplemental jurisdiction over plaintiffs' state-law claims for monetary relief. *Id.* at 125. Because the Eleventh Amendment barred the district court from adjudicating plaintiffs' state-law claims against defendants in their official capacity, hearing the plaintiffs' individual-capacity claims would be "a pointless waste of judicial resources." *Id.* In that case, the Fifth Circuit saw no reason to split up a claim that could be fully adjudicated in state court and would require a determination of individual liability and monetary damages unnecessary for adjudicating plaintiffs' federal claim. *Id.*

It appears that the Fifth Circuit's decision in *Hays County Guardian* is inapposite to the instant case because adjudication of the County's state-law fraud claim neither severs the County's state-law claim nor requires a determination of liability that is distinct from the County's federal question claim. Indeed, adjudication of the state-law conspiracy claim may give rise to co-conspirator liability for predicate acts underlying the County's RICO claim. *See*

*Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946); *see also Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989) (holding that acts of fraudulent concealment could be imputed to all co-conspirators); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 834 (S.D. Tex. 2009) (*citing In re Performance Nutrition, Inc.*, 239 B.R. 93, 99, 113 (Bankr. N.D. Tex. 1999)) ("Once a civil conspiracy is found, each coconspirator is responsible for any action in furtherance of the conspiracy performed by other conspirators. In other words, each action in a civil conspiracy is imputed to each coconspirator regardless of who actually performed the acts."); *First Interstate Bank of Nevada, N.A. v. Nat'l Republic Bank of Chicago*, No. 80-C-6401, 1985 WL 1118, at *8 (N.D. Ill. Mar. 10, 1985) (applying co-conspirator liability to meet predicate act requirement in civil RICO claim).

According to the Second Circuit,

> Subsection 1367(c)(4) authorizes federal courts, upon the recognition of "exceptional circumstances," to decline supplemental jurisdiction. The use of "exceptional circumstances" indicates that "Congress has sounded a note of caution that the bases for declining jurisdiction should be extended beyond the circumstances identified in subsections (c)(1)-(3) only if the circumstances are quite unusual." In other words, declining jurisdiction outside the ambit of 1367(c)(1)-(3) appears as the exception rather than the rule. Thus, federal courts "must ensure that the reasons identified as 'compelling' are not deployed in circumstances that threaten this principle."

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir. 1998) (quoting *Executive Software North Am., Inc. v. United States Dist. Court for Cent. Dist. of California*, 24 F.3d 1545, 1558 (9th Cir. 1994) (overruled on other grounds)) (internal citations omitted); *see also Women Prisoners of District of Columbia Dept. of Corrections v. District of Columbia*, 93 F.3d 910, 950, 320 (D.C. Cir. 1996) ("By using such words as 'exceptional' and 'compelling,'. . . Congress indicated that invocations of § 1367(c)(4) should be rare.").

Because the Court finds no such "exceptional circumstances" or "compelling reasons" for declining jurisdiction over the County's state-law claims, Bowling IV's motion to decline jurisdiction under § 1367(c)(4) is denied. *See* 28 U.S.C. § 1367(c)(4).

In the alternative, Bowling IV argues that the County's state-law claim raises a novel or complex issue of state law, making jurisdiction inappropriate. Mot. to Dismiss 4-5. The County "seeks to recover profits made from the land transaction in question in this federal proceeding, while simultaneously attempting to reverse the same transaction in state court." Def.'s Reply 2. Bowling IV claims that "the remedies simultaneously sought by Plaintiff in both the federal and state cases are unprecedented and to a large extent conflicting," and, as such, the Court should decline to hear the County's state-law claim. Mot. to Dismiss 5. The Court, however, finds nothing "novel" about the remedy sought by the County in the instant case. "It is well settled in Texas that when a plaintiff brings suit by reason of alleged fraudulent conduct he must elect between suing for damages or for cancellation and recision of a contract or conveyance." *Blum v. Elkins*, 369 S.W.2d 810, 812 (Tex. Civ. App. 1963). However, this does not preclude a plaintiff from seeking redress under two or more theories of recovery, provided that he or she "elect, before the judgment is rendered, under which remedy he [or she] wishes the court to enter judgment." *Star Houston, Inc. v. Shevack*, 886 S.W.2d 414, 422 (Tex. Ct. App. 1994). In the instant case, because no judgment has been rendered in the state court action, the County may seek damages for its state-law claim in federal court. *See Waite Hill Services, Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998) ("A party is generally entitled to sue and to seek damages on alternative theories."). Should the County prevail on its state-law claim in state court, Bowling IV may challenge the County's state-law claim on a theory of double recovery. *See id.* ("A party is not entitled to double recovery."); *see also Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991) (stating that plaintiffs are prevented from "obtaining more than one recovery for the same injury."). In that case, "it would be appropriate for the

19

district court, in determining damages, to adjust [the County's] remedy in this action to account for any potential for double recovery" in the state proceeding. *See Riley v. Simmons*, 45 F.3d 764, 777 (3d Cir. 1995). However, the existence of a pending state court claim which seeks an alternative remedy does not divest this Court of supplemental jurisdiction over that claim, and any concerns about double recovery at this stage are premature. *See* 28 U.S.C. § 1367.

Even assuming that Bowling IV's §§ 1367(c)(1) and 1367(c)(4) challenges to supplemental jurisdiction have merit, his claims do not divest the Court of jurisdiction over the County's state-law claims. Section 1367(c), on which Bowling IV's challenges rely, gives federal courts *discretion* to decline supplemental jurisdiction over state-law claims that raise any of the issues enumerated in that section of the statute. The statute does not *require* a federal court to decline to exercise jurisdictions over such claims. The Court finds that supplemental jurisdiction over the County's state-law claim is appropriate, and it finds no "novel or complex issue[s] of State law" or "exceptional circumstances" which warrant dismissal of the County's state-law claim under §§ 1367(c)(1) or 1367(c)(4).

## III. CONCLUSION

For the reasons set forth above, Bowling IV's Motion to Dismiss is **DENIED**.

**SO ORDERED.**

**SIGNED** on this 4th day of December, 2009.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE