**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **COUNTY OF EL PASO, TEXAS,** | §§ | |
| **Plaintiff,** | §§§ | |
| **v.** | §§ | **EP-09-CV-00119-KC** |
| | § | |
| **LUTHER JONES, DAVID ESCOBAR, MARTIE JOBE, ELIZABETH "BETTI" FLORES, ROBERT BOWLING III, ROBERT BOWLING IV, SARAH J. THOMAS, GREGORY W. COLLINS, ALAN ORTEGA, CHRIS JOHNSTONE, FRANK ARROYOS, CATALINA DEVELOPMENT, INC., TROPICANA HOMES, INC., CAREFREE HOMES INC., L.P., AMERICAS LOOP 375 L.P., TROFREE, LLC, CAREFREE HOMES I, and TROPICANA DEVELOPMENT, INC.,** | §§§§§§§§§§§§§§§§§ | _____ |
| **Defendants**. | §§ | |

**ORDER**

On this day, the Court considered "Defendant Martie Jobe's Motion to Dismiss for Failure to State a Claim and Memorandum of Points and Authorities in Support Thereof" ("Mot. to Dismiss") (Doc. No. 160). For the reasons set forth herein, the Motion is **GRANTED** in part and **DENIED** in part.

**I.      BACKGROUND**

The County of El Paso ("the County") alleges that certain Defendants were involved in a Racketeering Influenced and Corrupt Organization ("RICO"). *See generally* Pl's Second Am. Compl. ("Complaint") (Doc. No. 107). The alleged enterprise, through Martie Jobe ("Jobe"),

David Escobar ("Escobar"), and Luther Jones ("Jones"), would provide "consulting services" for clients–"individuals, businesses, or entities having or seeking to do business with [the County]." *Id.* ¶ 89. To serve the needs of its clients, the alleged enterprise would offer bribes and other benefits to County officials to secure "favorable resolutions for [its] clients." *Id.* Former El Paso County Commissioner, Elizabeth Flores ("Flores"), was one such County official. *Id.* ¶ 93. According to the County, Flores accepted money and other benefits in exchange for favorable votes in her official capacity as County Commissioner. *Id.* The County alleges that the eighteen defendants in the instant case took part in one or more of the following four racketeering episodes: Catalina Development, Fifteen-Minute lawsuit, Fair Labor Standards Act § 207(k) ("F.L.S.A. 207(k)"), and Digitization of Court Records. *See generally* Compl. For her part, Flores has pleaded guilty to her involvement in the alleged racketeering activities; however, all remaining Defendants maintain that they are innocent of the charges. *See id.* ¶¶ 24, 26-27, 85, 100-01, 106, 163, 166, 214, 238, 276.

### A. Catalina Development

On January 27, 1993, the El Paso County Commissioners Court ("Commissioners Court") passed a motion allowing for the sale of a 381.90-acre parcel of county of land by sealed bids.[1] Compl. ¶ 30. In October 1994, the Commissioners Court accepted a bid submitted by Gregory W. Collins ("Collins") and Catalina Development, Inc. ("Catalina Development"). *Id.* Shortly thereafter, two commissioners and the County Judge-elect filed suit to enjoin the sale. *Id.* On December 20, 1994, the 34th Judicial District Court issued a temporary restraining order

---

[1] The disputed land is located in Section 16, Township 3, Block 79 of the T&P Railroad Survey. Compl. ¶ 31.

enjoining the sale of the land.  *Id.* ¶ 31.  On January 30, 1995, Collins and Catalina Development

filed suit against the County for breach of contract and for specific performance ("Catalina

Development lawsuit").  *Id.*  The lawsuit was barred by sovereign immunity, and summary

judgment was granted on behalf of the County.  *Id.* ¶¶ 31-32.

Approximately nine years after the attempted sale, in fall 2003, Flores, Escobar, and four

other defendants[2] allegedly "began conspiring to defraud the County of El Paso and its citizens of

the tract of land subject to the *Catalina Development* lawsuit."  *Id.* ¶ 36.  A joint venture,

consisting of Carefree Homes and Tropicana Homes, was formed around this time period ("Joint

Venture").  *Id.* ¶ 40.  The president of Tropicana Homes, Defendant Robert Bowling, III,

("Bowling III"), negotiated the assignment of Collins's and Catalina Developments' interest in

the land to the Joint Venture.  *Id.* ¶ 39.  In September or October 2003, Bowling III entered into a

legal and consulting contract with Escobar and Jones in which Escobar and Jones were "to

acquire for the Joint Venture the tract of land from the County."  *Id.* ¶¶ 40-41.

On November 19, 2003, Escobar, acting as Trustee for the Joint Venture, submitted a

settlement offer to the County, offering $10,000 for each of approximately 304 acres, along with

reimbursement to the County of all fees and expenses paid by the County to its outside counsel.

*Id.* ¶ 42.  The County alleges that this offer was forwarded through the United States Postal

Service and/or facsimile.  *Id.* ¶ 115.  On November 20, 2003, Collins and Catalina Development

assigned their interest in the Catalina Development lawsuit to Escobar for $150,000, plus a

fifteen percent equity interest in a joint venture subsequently formed by the assignees of Collins

and Catalina Development called Americas Loops 375, LP ("Americas Loop").  *Id.* ¶ 43.  A later

---

[2]        Jobe is not alleged to be among the four other defendants.

investor in Americas Loop, Christopher Johnstone ("Johnstone"), purchased a three percent interest for $200,000 on or about May 4, 2004. *Id.* ¶ 44. Based on this contribution, the County asserts that Americas Loop valued the 304.937 acres at approximately $6,600,000. *Id.* ¶¶ 45-46.

On or about November 21, 2003, Escobar, acting as an agent for the Joint Venture, entered into a consulting contract with Joel Guaderrama ("Guaderrama") individually and in Guaderrama's role as President of CR Enterprises. *Id.* ¶ 116. Guaderrama had previously attempted to obtain the disputed land from the Commissioners Court, and his efforts continued until he entered into the consulting contract with Escobar. *Id.* ¶¶ 119-20. According to the County, the purpose of the contract was to eliminate Guaderrama's competing interest in acquiring the disputed land. *Id.* ¶ 117. Upon the Joint Venture's successful acquisition of the disputed land, Guaderrama would receive $100,000 from the Joint Venture. *Id.* ¶ 47.

On December 1, 2003, the County rejected the settlement offer submitted by Escobar. *Id.* ¶ 48. Three days later, on December 4, 2003, Escobar submitted a second settlement offer to the County. *Id.* ¶ 49. On or about December 9, 2003, the County alleges that Escobar, Jones and Flores met to discuss the second settlement offer. *Id.* ¶ 123. Around this time, Escobar and Jones "agreed to pay money and other benefits to [Flores] in exchange for her favorable vote." *Id.* ¶ 136. The County alleges that Escobar "knowingly misrepresented that the offer he submitted on behalf of the Joint Venture was [] made in good faith as he failed to disclose the conspiracy efforts of the enterprise to defraud the County of the tract of land." *Id.* ¶ 122. On December 15, 2003, the Commissioners Court considered the second settlement offer, but it took no action on the offer at that time. *Id.* ¶ 52. Between December 15, 2003 and December 20, 2003, Flores "requested a special session of the El Paso County Commissioners Court to

consider the second settlement offer." *Id.* ¶ 53. The County alleges that Flores requested this special meeting by email. *Id.* ¶ 128. A special meeting was held on December 22, 2003. *Id.* ¶ 54.

Prior to the vote of the Commissioners Court, Escobar and Jones appeared before the Commissioners Court "and made material misrepresentations to the Court in furtherance of their efforts to defraud the County. . . . [B]oth withheld from the Commissioners Court that they had offered[,] and Betti Flores agreed[,] to accept money and other consideration in exchange for her vote as an El Paso County Commissioners [sic]." *Id.* ¶ 132. Despite the El Paso County Attorney's recommendation to reject the second settlement offer, the offer was accepted by the Commissioners Court, with Flores voting in favor of accepting the offer. *Id.* ¶ 54. That same day, the County entered into an agreement with Escobar as Trustee for the Joint Venture assignees,

> whereby in consideration for the dismissal and release of all claims related to the tract of land and the promise not to seek a writ of certiorari from the United States Supreme Court, the County of El Paso agreed to sell a portion of the tract of land (approximately 304 acres) to the Joint Venture for $3,040,000.00 or the appraised value of the property, whichever is greater.

Compl. ¶ 55.

In addition, the Joint Venture agreed to reimburse the County for all attorney fees and costs incurred in the Catalina Development lawsuit. *Id.*

Prior to the December 22, 2003, special meeting, the County alleges that Escobar and Jones met with then County Commissioner Charles Scruggs to coerce him to vote in favor of the Catalina Development settlement offer. *Id.* ¶ 51. Escobar and Jones "threatened Commissioner Scruggs with adverse political consequences should he not vote in favor of the settlement." *Id.*

The County further alleges that on or about January 16, 2004, Jones sent an email to Flores containing a letter addressed to Steve Hughes ("Hughes"), then outside counsel for the County. *Id.* ¶ 138. The letter, which was drafted for Flores's signature, asked Hughes about the appraisal status of the disputed land. *Id.* The email sent by Jones instructed Flores to sign the letter in her official capacity and to forward the letter via facsimile to Hughes. *Id.*

On or about April 9, 2004, Jones, "acting as principal decision maker and coordinator of the enterprise's activities," drafted a letter to Ted Houghton ("Houghton"), an individual who is allegedly familiar with the disposition of public lands. *Id.* ¶¶ 142-44. The letter threatened litigation as a result of Houghton's previous communications with Flores concerning how to maximize the County's profit in its sale of public lands through competitive bidding. *Id.* Jones emailed the letter to Escobar and instructed Escobar to sign the letter and forward it to Houghton. *Id.* ¶ 145. Escobar forwarded the letter on April 4, 2004.[3] *Id.* ¶ 146.

On May 24, 2004, the El Paso County Judge signed a warranty deed conveying the land to Escobar as Trustee for the Joint Venture. *Id.* ¶ 149. On November 15, 2004, Escobar conveyed the land to Americas Loop. *Id.* ¶ 150. In return, Escobar received $580,000 from the Joint Venture for his role as attorney and Trustee. *Id.*

The County alleges that, on or about August 26, 2004, Bowling III and Robert Bowling, IV, ("Bowling IV") delivered campaign contributions to Flores totaling $2,500. *Id.* ¶¶ 151-53. According to the County, this money was "payment for her vote to settle the *Catalina*

---

[3]    The dates in the Complaint appear incorrect, as the Complaint states that Jones drafted the letter on April 9, 2004, five days *after* Escobar supposedly forwarded the letter to Houghton on April 4, 2004.

*Development* lawsuit" in violation of Texas Penal Code § 36.02(a)(1).[4]  *Id.* ¶ 151.  The County

alleges that "the Bowling's [sic] collectively paid [Flores] $2,500.00" in order for the Joint

Venture to acquire the disputed property.  *Id.* ¶ 154.  According to the County, these payments

were arranged jointly by Jones and Escobar.  *Id.*  The County alleges that further sums of $2,500

"disguised as campaign contributions" were each paid by Jones and Escobar to Flores on

December 16, 2004, for a total of $7,500.  *Id.* ¶¶ 155-56.

The County asserts that the amount paid by the Joint Venture to the County, $3,200,000[5]

plus attorney fees and release of all current and future claims concerning the land, was less than

the tract's true value, which the County estimates to be $6,660,000.  *Id.* ¶ 157.  The County

further alleges that the monetary injuries it sustained as a result of the land transaction were

actually and proximately caused by "the enterprise's fraudulent and racketeering activities."  *Id.* ¶

158.

According to the County, Escobar "failed to disclose the conspiracy efforts of the

enterprise to defraud the County of the tract of land."  *Id.* ¶ 122.  The County also alleges that

"Flores purposely withheld critical information that would likely have prevented a vote on the

settlement offer."  *Id.* ¶ 122.  Had the Commissioners Court known that at least one of its

---

[4]     Under the Texas Penal Code,
                [a] person commits an offense if he intentionally or knowingly offers, confers, or
                agrees to confer on another, or solicits, accepts, or agrees to accept from another:
                (1) any benefit as consideration for the recipient's decision, opinion,
                recommendation, vote, or other exercise of discretion as a public servant, party
                official, or voter.
        TEX. PENAL CODE ANN. § 36.02(a)-(a)(1) (Vernon 2003).

[5]     It is unclear from the County's Complaint how the parties agreed upon the $3,200,000 fee.  The
        agreement states that the land would be sold for the greater of $3,040,000 or the appraised value of
        the property.  *See* Compl. ¶ 55.

members had been bribed to accept the settlement offer, the County asserts that it is unlikely that the Commissioners Court would have accepted the offer.  *Id.* ¶ 130.

The County alleges financial injuries totaling $3,370,000, plus "monies and fringe benefits paid to Betti Flores."  *Id.* ¶ 162.

**B.      Fifteen-Minute lawsuit**

On or about December 13, 2002, Jobe, acting as counsel for the El Paso County Sheriff Detention Officer plaintiffs, commenced a lawsuit against the County to recover wages allegedly owed to the Officers for the fifteen-minute period at the start of each workday during which the Officers had to be present but for which they were not paid ("Fifteen-Minute lawsuit").  Compl. ¶¶ 60, 167.  The County claims that Jobe, Jones and Flores, both individually and as members of the enterprise, "conspired . . . to defraud the County into obtaining a settlement on the 15-minute lawsuit."  Compl. ¶ 164.  In early December 2004, Jobe allegedly "offered Flores monies in the form of campaign contributions in exchange for her vote" to settle the Fifteen-Minute lawsuit. *Id.* ¶ 170.  Flores agreed, and on December 6, 2004, Flores and the other members of the Commissioners Court voted to settle the lawsuit.  *Id.* ¶¶ 171-72.  In so doing, Flores allegedly made "a materially false representation to the County with the intent that the County act in reliance of [sic] the misrepresentation."  *Id.* ¶ 174.  Flores "purposely withheld critical information that would likely have prevented a vote on the settlement offer"; namely, that she had accepted bribes in exchange for her favorable vote.  *Id.* ¶ 175.

According to the County, "[i]t is unlikely that the Commissioners Court would have taken any action to accept the settlement offer submitted by Martie Jobe had the Court known of the bribing of at least one member of the Court, specifically Betti Flores."  *Id.*  "Flores' deliberate

concealment of the scheme to defraud the County was intended to have the County act in reliance of [sic] the misrepresentation and vote in favor of settlement." *Id.* ¶ 176. The County alleges that the Commissioners Court relied on Flores's material omission in voting to accept the settlement and that the vote injured the County. *Id.* ¶ 178. The County further alleges that Jobe materially misrepresented that she was "negotiating and offering settlement in good faith," she intentionally omitted that she and Jones had offered, and Flores had accepted, money and other consideration in exchange for Flores's official vote. *Id.* ¶¶ 179-80.

On or about December 1, 2004, Jobe forwarded a settlement offer to the County by mail and/or facsimile. *Id.* ¶ 182. Jobe "knowingly misrepresented that the offer included all consideration for settlement," and, once again, intentionally omitted facts relating to the bribing of Flores. *Id.* ¶ 183. On December 16, 2004, the County entered into a settlement agreement with the Officer plaintiffs in the class action lawsuit against the County. *Id.* ¶ 185. In return for their dismissal of the lawsuit, the Officers were paid $635,000. *Id.* ¶ 186. The County claims injuries of $635,000, along with "monies and fringe benefits" paid to Flores while she was engaging in activities to defraud the County of her honest services. *Id.* ¶ 195.

C.    **Fair Labor Standards Act § 207(k)**

The County alleges that the racketeering enterprise defrauded the County by "bribing at least one County Commissioner in order to obtain the County of El Paso's waiver of its right to exercise the 207(k) provision of the Fair Labor Standards Act ("F.L.S.A.")."[6] *Id.* ¶ 196.

---

[6]    Section 207(k) of the F.L.S.A. states that

[n]o public agency shall be deemed to have violated subsection (a) of this
section with respect to the employment of any employee in fire protection
activities or any employee in law enforcement activities (including security
personnel in correctional institutions) if--

F.L.S.A. 207(k) is "a federal right regarding work schedules and overtime pay for law enforcement officers." *Id.* ¶ 65. The County notified the El Paso County Sheriff's Officers Association that it intended to exercise its rights under the statute. *Id.* ¶ 67.

Following the County's assertion, on or about March 2005, Jobe threatened to sue the County for asserting its F.L.S.A. 207(k) rights. *Id.* ¶ 202. According to the County, Jobe sent written correspondence to the County, through mail and/or facsimile, "noticing the County of potential litigation regarding the County's implementation of its 207(k) rights." *Id.* Shortly thereafter, Jones and Escobar arranged for Flores to receive free or discounted legal services for an unrelated personal criminal matter in exchange for her official vote to relinquish the County's F.L.S.A. 207(k) rights. *Id.* ¶ 200. Jones instructed John Travis Ketner ("Ketner") to provide Flores with these legal services. *Id.* According to the County, Ketner has since acknowledged the existence of a conspiracy and has pleaded guilty to his involvement in the F.L.S.A. 207(k) scheme. *Id.* ¶ 201. In approximately April or May 2005, Escobar notified Flores that

---

(1) in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975; or

(2) in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his work period as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1)) bears to 28 days,

compensation at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(k).

"arrangements had been entered for a quick resolution of Flores' unrelated personal criminal matter." *Id.* ¶ 203.

Pursuant to their agreement, Flores voted in favor of relinquishing the County's F.L.S.A. 207(k) rights in approximately June 2006. *Id.* ¶ 206. According to the County, "Flores purposely withheld critical information that would likely have prevented, or at a minimum altered, a vote on whether the County would relinquish its rights under the F.L.S.A. 207(k) provision." *Id.* ¶ 208. The County alleges that it is unlikely that the Commissioners Court would have relinquished its F.L.S.A. 207(k) rights "had the Court known the threats of litigation by Martie Jobe were coupled with Jones', Escobar's, Jobe's, and Flores' agreement to conspire and defraud the County and the bribing of at least one member of the Court." *Id.*

The County alleges that it suffered damages resulting from this racketeering episode in the amount of $2,200,000, the extra pay received by Sheriff's deputies and detention officers as a result of its F.L.S.A. 207(k) waiver, plus "monies and fringe benefits paid to Betti Flores while she was engaging in activities to further the enterprise and defraud the County of El Paso of her honest services." *Id.* ¶ 213.

### D. Digitization of Court Records

On or about November 3, 2003, El Paso County District Clerk Gilbert Sanchez ("Sanchez") sought permission from the Commissioners Court to release a request for proposals ("RFP") from vendors seeking to enter into a contract with the County to digitize the County's court records. Compl. ¶ 74. On January 30, 2004, Jobe and Jones allegedly entered into a consulting services contract with Roger Miller ("Miller"), President of Altep. Compl. ¶ 75. Miller sought to obtain a contract with the County on behalf of Altep to digitize the County's

court records.  Pursuant to the contract, Jobe and Jones "were to work with staff and/or elected officials of the County of El Paso in representing Altep in matters related to obtaining a contract for services." *Id.* ¶ 76.  In exchange for their services, Jobe and Jones would receive one-third of the net profits for the two-year period following the commencement of Altep's contract with the County.  *Id.* ¶ 77.  Following the alleged agreement between Jobe, Jones and Miller, on or about June 7, 2004, a $1,000 check from Miller, dated March 5, 2004, was delivered to Flores as a campaign contribution.  *Id.* ¶ 79.  According to the County, "[s]imilar contributions were delivered to other member/s of [the] Commissioners Court."  *Id.*

On June 7, 2004, Sanchez asked the Commissioners Court to consider the proposals received by the County by the various vendors.  *Id.* ¶ 80.  Prior to the Commissioners Court's consideration of the proposals, Sanchez's staff member, Fernando Parra ("Parra"), sent the confidential list of proposals to Jobe.  *Id.* ¶ 82.  In open session of the June 7, 2004 meeting of the Commissioners Court, Sanchez admitted that Jobe had been sent the confidential proposals. *Id.*  On July 15, 2008, Parra pleaded guilty to his role in the alleged conspiracy to defraud the County.  *Id.* ¶ 84.  Parra admitted that "the defendant and others agreed to pay money, both [in] cash and in the form of political contributions, to elected members of the El Paso County Commissioner's [sic] Court . . . in exchange for their support and vote in their official capacity." *Id.* (citing *id.* at Ex. 4).  Parra further admitted to using the United States Postal Service and a commercial interstate carrier to deliver the proposals and other correspondence.  *Id.*  The County seeks damages in the form of salary and fringe benefits paid to Flores during the time she deprived the County of her honest services.  *Id.* ¶ 234.

In the instant suit, the County seeks to avail itself of civil remedies created for violations of the RICO Act. Jobe filed a Motion to Dismiss the County's Complaint against her on October 8, 2009. *See generally* Mot. to Dismiss. On October 26, 2009, the County filed "Plaintiff's Response to Defendant Martie Jobe's Motion to Dismiss for Failure to State a Claim and Memorandum of Points and Authorities in Support Thereof" ("Pl.'s Resp.") (Doc. No. 163). On November 4, 2009, Jobe filed "Defendant Martie Jobe's Reply to Plaintiff's Response to Martie Jobe's Motion to Dismiss for Failure to State a Claim and Memorandum of Points and Authorities in Support Thereof" ("Def.'s Reply") (Doc. No. 166).

## II. DISCUSSION

Jobe seeks dismissal of the instant suit against her in light of the Settlement Agreement and Mutual Release ("Settlement Agreement" and "Release," respectively) signed by the County, releasing Jobe from liability arising from the filing and prosecution of the Fifteen-Minute lawsuit. *See* Mot. to Dismiss Ex. 1 at Ex. C. In addition, Jobe seeks dismissal of the County's claim for failure to state a claim for which relief may be granted under Rule 12(b)(6). *See generally id.* The Court will address each argument in turn.

### A. Standard

A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, the Court must accept well-pleaded facts as true and view them in a light most favorable to the plaintiff. *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002)*; Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Still, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and

a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted); *see also Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (stating that a court need not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions.").

Though a complaint need not contain "detailed" factual allegations, the "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555 (internal citation omitted). Thus, to survive a motion to dismiss, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Id.* at 570. Nevertheless, "a well-pleaded complaint may proceed even if its strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

When a plaintiff alleges fraud or fraudulent concealment, however, a plaintiff's complaint must meet a heightened pleading standard under Rule 9(b). *See* FED. R. CIV. P. 9(b). At a minimum, Rule 9(b) requires a plaintiff to state particulars of "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he [or she] obtained thereby." *Tel-Phonic Servs. Inc. v. TBS Intern., Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992). The Rule 9(b) particularity requirement applies when fraud is alleged as a predicate act in a civil RICO claim. *Id.* at 1138.

## B. The Release between Jobe and the County does not bar the County from basing its RICO claim on facts arising from the Fifteen-Minute lawsuit

As an initial matter, Jobe claims that the County released her from "any and all liability

arising out of the filing and prosecution of said suit."  Mot. to Dismiss 5 (quoting Mot. to

Dismiss Ex. 1 at Ex. C).  The Release further states that all parties "assume the risk that the facts

or laws may be otherwise than they believe."  *Id.*  According to Jobe, the Release, signed by

Assistant County Attorneys Ralph Girvin ("Girvin") and Daniel Ordonez ("Ordonez"), is

dispositive and bars the County's claim against her.[7]

Jobe asks the Court to consider evidence outside of the County's Complaint in ruling

upon her Motion to Dismiss.  Mot. to Dismiss 12.  In determining whether to grant a motion to

dismiss, a district court "must not go outside the pleadings."  *Scanlan v. Texas A&M Univ.*, 343

F.3d 533, 536 (5th Cir. 2003).  However, there is a "limited exception" for "documents that are

referred to in the plaintiff's complaint and are central to plaintiff's claim."  *Id.*; *In re Katrina

Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).  Because the Settlement Agreement is

both referred to in, and is central to, the County's claim of damages with respect to the Fifteen-

Minute lawsuit, Compl. ¶¶ 184-187, 195, the Court will consider both the Settlement Agreement

and the Release contained therein when ruling upon Jobe's Motion to Dismiss.

Though the Court can find no relevant case law in the Fifth Circuit, according to the

Third Circuit, parties to a contract can release one another from liability arising from potential

civil RICO claims.  *Williams v. Stone*, 109 F.3d 890, 895 (3d Cir. 1997).  The language of the

Release in this case, however, states that the County released Jobe from liability arising out of the

"filing and prosecution" of the Fifteen-Minute lawsuit.  Mot. to Dismiss Ex 1 at Ex. C.  The

County's claim in the instant suit does not arise from either the filing or the prosecution of the

---

[7]    Jobe has attached a copy of the Settlement Agreement and Release to her Motion to Dismiss.  Mot.
       to Dismiss Ex. 1 at Ex. C.

Fifteen-Minute lawsuit.  Rather, the basis for the County's Complaint in the Fifteen-Minute lawsuit episode is the alleged bribing of Flores in exchange for her vote to *settle* the lawsuit. Compl. ¶¶ 170-72.  Thus, it is unclear that the Release functions to shield Jobe from liability under civil RICO with respect to the Fifteen-Minute lawsuit episode.

Furthermore, while parties may release one another from liability arising from potential claims, the Release is plausibly void under the doctrine of fraud and/or for reasons of public policy.  *See Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 571 (5th Cir. 2003) (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997); *Dallas Farm Mach. Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233 (1957)).  Although the release states that it is "fully binding" and "a complete settlement," Mot. to Dismiss Ex. 1 at Ex. C, "Texas courts hold that . . . the parol evidence rule does not bar proof of [] fraud."  *Id.*; *see also Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1315 (5th Cir. 1983) (indicating that a release from liability is invalid if it constitutes "part and parcel" of a conspiracy); *TANO Automation, Inc. v. United States*, 939 F. Supp. 483, 488 (E.D. La. 1996) (citing *Ingram Corp.*, 698 F.2d at 1315) ("Fraudulent inducement can vitiate a release.").  Though the law regards written instruments as embracing the entire contract, this rule

> is only predicated of [sic] contracts legal in their character, and the rule cannot be invoked to cover, protect, enforce or give effect by judicial sanction to such contracts as may be shown by extrinsic evidence to have been entered into contrary to public policy, to public morals, or other cause which, if expressed upon their face, would stamp them with illegality.

*Donley v. Tindall*, 32 Tex. 43, 1869 WL 4756, at *7 (Tex. 1869).

Texas state law protects the freedom of parties to contract as they see fit.  *See* TEX. CONST. ANN. ART. 1 § 16 (Vernon 2003); *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653,

664 (Tex. 2008) ("[W]e have long recognized a strong public policy in favor of preserving the freedom of contract."). However, this freedom to contract exists only absent "fraud, duress, accident, mistake, [] failure or inadequacy of consideration" or reasons of public policy which caution against allowing the language of a contract to control. *Fairfield Ins. Co.*, 246 S.W.3d at 664. Because the Settlement Agreement itself was allegedly procured through bribery and fraud, the clause releasing Jobe from liability may be void, and the County's claim survives Jobe's Motion to Dismiss.

### C. Civil RICO

In her Motion to Dismiss, Jobe argues that the County has failed to make factual allegations sufficient to meet both the non-statutory and statutory standing requirements to state a claim for civil RICO. *See generally* Mot. to Dismiss. However, even if the County does have standing to bring its claim, Jobe claims that the County has made material factual omissions that critically undermine its claim against her. Mot. to Dismiss 1-12.

### 1. Non-statutory standing requirements

Jobe claims that the County lacks standing to bring its civil RICO claim because the County has failed to sufficiently allege 1) that it suffered injury; and 2) that Jobe's conduct was the proximate cause of any injuries that it may have sustained. *See* Mot. to Dismiss 16-30; *see also* 18 U.S.C. § 1962(c). In order to have standing to bring a claim, a civil RICO plaintiff must show 1) an injury to business or property, and 2) causation. *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998). These standing requirements

> must be satisfied in addition to the statutory standing requirements. Therefore, in determining whether a plaintiff has standing to assert RICO claims, the district court first must determine whether any non-RICO standing requirements apply

17

and have been satisfied. Then the court must determine whether the plaintiff has demonstrated that he has suffered an injury "by reason of" predicate acts which constitute a violation of RICO section 1962.

*Carter*, 954 F.2d at 1091.

To survive a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (quoting *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994)). However, if it is clear from the face of the complaint that the injury is purely speculative, a plaintiff will not be able to proceed with his or her claim. *See In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 522-23 (5th Cir. 1995).

A plaintiff must allege facts which, if proved, would show factual and proximate causation. *Whalen v. Carter*, 954 F.2d 1087, 1091 (5th Cir. 1992); *Sharma v. Skaarup Ship Mgmt.*, 916 F.2d 820, 828 (2d Cir. 1990); *see also Twombly*, 550 U.S. at 570 (A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."). The Fifth Circuit has noted that:

> Section 1964(c) embodies the only standing requirement which the civil RICO statute itself imposes. Only persons who have been injured "by reason of" the commission of predicate acts have standing to bring suit under section 1964(c) . . . . Thus, a person will be considered injured "by reason of" a RICO violation if the predicate acts constitute (1) factual (but for) causation and (2) legal (proximate) causation of the alleged injury.

*Ocean Energy II v. Alexander & Alexander, Inc.*, 868 F.2d 740, 744 (5th Cir. 1989).

A plaintiff must allege facts which show that, "but for" defendant's conduct, the plaintiff would not have suffered the injuries claimed. *Id.* A plaintiff must also allege facts which show that its injuries were a foreseeable consequence of the defendant's conduct. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 289 (5th Cir. 2007).

The County need not allege injury and causation for each alleged episode engaged in by the enterprise, however. *See Deppe v. Tripp*, 863 F.2d 1356, 1366-1377 (7th Cir. 1988).

> [N]o requirement exists that the plaintiff must suffer an injury from two or more predicate acts, or from all of the predicate acts. Thus, a RICO verdict can be sustained when a pattern of racketeering acts existed, but when only one act caused injury. Stated differently, merely because one of the racketeering acts was not successful does not mean that it is unavailable to establish a pattern.

*Id.*; *see also United States v. Baxter Intern., Inc.*, 345 F.3d 866, 883 -884 (11th Cir. 2003) ("a complaint governed by the ordinary standard of Rule 8 . . . need not allege the particulars of each instance of injury in order to survive a motion to dismiss."); *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001) ("Even if the precise amount of [plaintiff's] injury is not susceptible of ready proof, it is clear that a reasonable finder of fact could infer that some injury has occurred.").

Provided that the County can demonstrate that it suffered some injury that was proximately caused by the Defendants' conduct, it has standing to bring its civil RICO claim.

### a.    Catalina Development

The County alleges that it suffered financial losses from the sale of its land in the Catalina Development conspiracy. Compl. ¶ 314. It claims damages of at least $3,370,000 plus "monies and fringe benefits" paid to Flores while she was engaging in "activities to further the enterprise and defraud the County of El Paso and its citizens of her honest services." *Id.* ¶ 162. Jobe argues that the County should not be able to recover wages or benefits paid to Flores because the County has a duty to pay its public servants irrespective of Defendants' conduct. Mot. to Dismiss 21. Even assuming that Jobe's assertion is accurate, the wages and benefits paid to Flores are not the only injuries claimed by the County. At this early stage in the proceedings, the County need not prove the exact amount of damages incurred; it need only "raise[] a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555. The County's Complaint is sufficient so long as it states a plausible injury. *See id.* Because the County has alleged plausible injuries

notwithstanding its request for wages and benefits paid to Flores; namely, the difference between the disputed land's alleged true value and the price it was paid by Defendants, the County has met its burden in this regard.

Jobe also states that the County has failed to show that her alleged conduct was the proximate cause of the County's injuries. Mot. to Dismiss 22-30. In the Catalina Development conspiracy, the Commissioners Court voted four-to-one to accept Defendants' second settlement offer. Mot. to Dismiss 24. According to Jobe, "Flores' vote was only one of the four votes that passed the item. Take her vote away through her absence or negative vote, and the action would still have passed and the transaction would have proceeded." *Id.* Although Flores's vote was not the deciding vote, Jobe overlooks the role that Flores played in the second settlement offer's acceptance. Flores, acting in her official capacity as County Commissioner, requested a special session of the Commissioners Court to consider the second settlement offer. Compl. ¶ 127. In response to her request, a special session was held on December 22, 2003. *Id.* ¶ 131. The second settlement offer was approved at that session. *Id.* Prior to the special session, the Commissioners Court had considered the second settlement offer, but it took no action on the offer. *Id.* ¶ 125. It had also received other proposals concerning the disputed property, but similarly took no action on these proposals. *Id.* ¶ 119. Thus, it is plausible that "but for" the conduct of Jobe's co-defendants, Escobar and Jones, in providing money and/or other benefits to Flores, the Commissioners Court would never have voted in favor of accepting the Joint Venture's second settlement offer. Because it is also foreseeable that Defendants' conduct in offering bribes to Flores would lead to acceptance of the offer, the County has established proximate cause. *See Navigant Consulting, Inc.*, 508 F.3d at 289.

In response to Jobe's argument that she "is in no way alleged to have been involved in any predicate act in connection with the Catalina Development Settlement matter," Mot. to Dismiss 12, the Court notes that, "[u]nder RICO, a defendant need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the fraudulent scheme." *See Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112, 115 (5th Cir. 1987). Although Jobe is not alleged to have participated in the Catalina Development episode, she allegedly participated in the scheme to defraud the County by contracting with "individuals, businesses or entities having or seeking to do business" with the County. Compl. ¶ 89. In addition, Jobe allegedly took at least one overt step in furtherance of the scheme by offering Flores bribes in exchange for her official vote as County Commissioner. *Id.* ¶ 165. Jobe's alleged involvement in the Fifteen-Minute lawsuit, the F.L.S.A. 207(k) and the Digitization of Court Records episodes is "sufficient to connect [her] to the fraudulent scheme" for purposes of stating a claim. *See Casperone*, 819 F.2d at 115.

In addition, where an act can be attributed to the conspiracy itself, it can be imputed to each co-conspirator. *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946); *see also United States v. Hurley*, 63 F.3d 1, 22 (1st Cir. 1995) (applying *Pinkerton* liability to co-conspirators in determining criminal penalties for RICO violations); *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989) (holding that acts of fraudulent concealment could be imputed to all co-conspirators); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 834 (S.D. Tex. 2009) (*citing In re Performance Nutrition, Inc.*, 239 B.R. 93, 99, 113 (Bankr. N.D. Tex. 1999)) ("Once a civil conspiracy is found, each coconspirator is responsible for any action in furtherance of the conspiracy performed by other conspirators. In other words, each

action in a civil conspiracy is imputed to each coconspirator regardless of who actually performed the acts."); *Brunswick Corp., Mercury Marine Div. v. E.A. Doyle Mfg. Co.*, 770 F. Supp. 1351, 1371-72 (E.D. Wis. 1991) (stating that a RICO defendant is "responsible for offenses committed by his fellow conspirators"); *First Interstate Bank of Nevada, N.A. v. Nat'l Republic Bank of Chicago*, No. 80-C-6401, 1985 WL 1118, at *8 (N.D. Ill. Mar. 10, 1985) (applying co-conspirator liability to meet predicate act requirement in civil RICO claim). Thus, because Jobe is also alleged to have engaged in a conspiracy to commit fraud against the County, the actions that Jobe's co-conspirators took in furtherance of the alleged conspiracy may be imputed to Jobe.

### b. Fifteen-Minute lawsuit

In the Fifteen-Minute lawsuit, the County alleges that it suffered damages in the amount of $635,000, the amount the Officers were paid in return for the dismissal of their lawsuit against the County, "plus monies and fringe benefits" paid to Flores while she was engaging in activities to defraud the County and its citizens of her honest services. Compl. ¶¶ 186, 195. The County alleges that the Settlement Agreement with the Officers was procured by fraud, and that Defendants' bribing of Flores to secure her vote in favor of the Settlement Agreement proximately caused its injury. *Id.* ¶ 195.

Although Jobe argues that "payment or acceptance of funds in lieu of the right to pursue litigation of unknown value does not amount to a concrete financial loss which a party may sue to recover under RICO," Mot. to Dismiss 17 (citing *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 492 n.16 (5th Cir. 2003); *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995)), the County is not alleging that its damages flow from its loss of the right to pursue litigation.

The County does not claim that its losses are its inability "to pursue litigation of unknown value" or "mere expectancy interests" associated with that right. *See* Mot. to Dismiss 17. Rather, the County alleges that it suffered concrete losses resulting from Defendants' fraudulent procurement of a settlement agreement. Absent Defendants' fraudulent interference with the Fifteen-Minute lawsuit, the County claims that it would not have paid $635,000 to settle the lawsuit. Because the County alleges that Defendants' bribing of Flores was both the factual and proximate cause of the Commissioners Court's vote in favor of accepting the Settlement Agreement, and this result is a foreseeable consequence of Defendants' conduct, the County has also met the non-statutory standing requirements with respect to the Fifteen Minute lawsuit episode.

### c.    F.L.S.A. 207(k)

With regard to the F.L.S.A. 207(k) conspiracy, the County alleges that it suffered financial injuries as a result of its waiver of its right to exercise the 207(k) provision of the F.L.S.A.[8] *Id.* ¶ 213. The County alleges that its losses total a minimum of $2,200,000 "plus monies and fringe benefits" paid to Flores. *Id.* The County further alleges that its injury was

---

[8]      The F.L.S.A. requires employers to pay overtime compensation to employees who work in excess of forty hours per week. 29 U.S.C. § 207(a)(1). However, the statute partially exempts public agencies engaged in fire protection or law enforcement activities. 29 U.S.C. § 207(k). Under section 207(k), the County could adopt a work period of between seven and twenty-eight days to avoid the strict over forty-hour workweek overtime compensation requirement.

> If the municipality adopts a 7-day work period, it need not pay overtime compensation to its [exempted employees] until they have worked over 53 hours in a single week. If the municipality adopts a 14-day work period, it need not pay overtime compensation to its [exempted employees] until they have worked over 106 hours in the two-week period. If the municipality adopts a 28-day work period, it need not pay overtime compensation to its [exempted employees] until they have worked over 212 hours in that four-week period. Thus, by adopting a § 207(k) work period, a municipality can limit the number of hours for which it must pay "time-and-a-half" to its [employees].

*Singer v. City of Waco, Texas*, 324 F.3d 813, 818 (5th Cir. 2003) (internal citations omitted) (calculating overtime compensation as it relates to fire protection personnel).

proximately caused by Defendants' act of bribing Flores to vote in favor of waiving the County's rights. *Id.* ¶ 200.

Jobe claims that "[p]ayment of compensation to Sheriff's Officers . . . is not injury to Plaintiff in its business or property within the meaning of RICO." Mot. to Dismiss 21. In addition, she claims that the County has failed to establish that its financial injuries in the alleged F.L.S.A. 207(k) conspiracy were proximately caused by Defendants' conduct because "the vote not to implement a 207(k) exemption did not require the County to *cause* Sheriff's Officers to work overtime hours." Mot. to Dismiss 28 (emphasis added).

First, even assuming that the County cannot recover all of the wages it paid to the Sheriff's Officers, it can plausibly claim injuries consisting of the excess overtime wages it paid using the more costly forty-hour workweek method of calculating overtime wages. Second, the County does not claim that Defendants *caused* it to make its employees work overtime hours. Rather, the injury suffered by the County is the difference between what it would have paid to its employees had it exercised its F.L.S.A. 207(k) rights and what it paid as a result of Defendants' interference.[9] According to its Complaint, the County intended to exercise its F.L.S.A. 207(k) rights prior to Defendants' interference with the vote of the Commissioners Court. Compl. ¶ 67. The County alleges that "but for" Defendants' conduct in bribing and threatening County officials, it is unlikely that the County would have waived its F.L.S.A. rights. *Id.* ¶¶ 196-213.

---

[9] It is unclear whether the amount claimed, $2,200,000 in "extra pay," represents the full amount of overtime wages paid to the Sheriffs' deputies and detention officers or whether it represents the difference between what the County paid and what it would have paid had the County exercised its rights under F.L.S.A. 207(k). *See* Compl. ¶ 213. However, the Court need only determine whether the County has stated a cognizable injury; it need not assess whether the County is entitled to the total amount claimed. Because the County alleges that it was financially injured by Defendants' interference with its exercise of its F.L.S.A. 207(k) rights, the Court finds that it has sufficiently pleaded injury with regard to the alleged conspiracy.

Because it is also foreseeable that Defendants' conduct would lead to the County's waiver of its F.L.S.A. 207(k) rights and that waiving these rights would cost the County more in overtime compensation, the County has sufficiently pleaded proximate cause.

### 2. Factual omissions

Despite the County's claim that it has standing to bring its civil RICO suit, Jobe alleges that material factual omissions by the County undermine its claim. Mot. to Dismiss 2-12.

### a. The vote by the Commissioners Court violated the Collective Bargaining Agreement that the County had with the County's Detention Officers

First, Jobe argues that the County could not exercise its F.L.S.A. 207(k) rights because doing so would have violated the Collective Bargaining Agreement ("C.B.A.") that the County had entered into with the County's Detention Officers. Mot. to Dismiss 6. Rather than deciding whether the County should invoke its F.L.S.A. 207(k) rights, the dispute, according to Jobe, concerned whether such an invocation would violate the C.B.A. *Id.* Presumably, this omission makes the County's claim that Flores's omissions proximately caused the County injury more attenuated and similarly weakens the County's claim of damages.

In construing a written contract, the primary concern is to ascertain and to give effect to the parties' intentions as expressed in the document. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005). The Court considers the entire writing and attempts to harmonize and to give effect to all of the contract's provisions. *Id.* at 312. Contracts are construed "'from a utilitarian standpoint bearing in mind the particular business activity sought to be served'" and "'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Id.* (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530

(Tex. 1987)). "The language in a contract is to be given its plain grammatical meaning unless doing so would defeat the parties' intent." *Amtech Elevator Servs. Co. v. CSFB 1998-P1 Buffalo Speedway Office Ltd. P'ship*, 248 S.W.3d 373, 379 (Tex. Ct. App. 2007).

If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous, and the Court may construe it as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312. However, if after such rules are applied, the meaning of the contract remains uncertain or is susceptible to more than one reasonable interpretation, it is ambiguous. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *Coker v. Coker*, 650 S.W.2d 391, 393-94 (Tex. 1983). If a contract is ambiguous, the contract's interpretation becomes a fact issue to be resolved by deciding the parties' true intent, for which the fact finder may consider extraneous evidence of intent. *See Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520; *Coker*, 650 S.W.2d at 394-95.

The language of the C.B.A. is ambiguous. *See* Compl. Ex. 3 at 9. Article Eight, section 2 of the C.B.A. reads as follows: "[o]vertime shall be paid for all hours worked in excess of forty (40) hours during any scheduled seven day work period." Compl. Ex. 3 at 9. However, Article Eight section 1 appears to preserve the County's F.L.S.A. 207(k) rights by stating that "[t]he parties intend to take full advantage of the exemption set out in Section 207(k) of the Fair Labor Standards Act. Therefore, Detention Officers will be on a 28-day work schedule." *Id.* These two provisions appear to conflict with one another.

Because the C.B.A. is ambiguous, the Court must consider extraneous evidence of intent in order to construe meaning of the provision. *See Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520; *Coker*, 650 S.W.2d at 394-95. Such extraneous evidence is outside of the pleadings, however,

and therefore cannot be considered for purposes of a motion to dismiss. *See Scanlan*, 343 F.3d at 536. Because the C.B.A. is ambiguous as to the County's waiver of its F.L.S.A. 207(k) rights, Jobe's assertion that the Commissioners Court's vote violated the C.B.A. is questionable, and it is plausible that, but for the bribing of Flores, the County would have invoked its F.L.S.A. 207(k) rights.

> **b.** **The County wrongfully implied that the Officers had a right to sue and that Jobe represented the officers in their grievances against the County**

Jobe notes that "the grievances filed by the sheriff officers . . . were contractual disputes alleging that the County had violated the CBA with its January 10, 2005 vote, and that said grievances were required to be arbitrated individually according to the CBA." Mot. to Dismiss 6 (citing Compl. Ex. 3 at 18-20). Jobe further argues that the County falsely stated that Jobe represented the Officers in their grievances against the County. *Id.* at 7. According to Jobe, this omission is critical because it demonstrates that "none of the attorneys named as defendants in this case had anything to gain from the settlement of the grievances or the vote of commissioner's [sic] court on the issue." *Id.*

Whether the Officers had a right to sue the County for recovery of their overtime wages is irrelevant for purposes of stating a civil RICO claim. The County claims that Jobe and others "conspired to defraud the County into relinquishing its rights to exercise the 207(k) provision of the F.L.S.A." Compl. ¶ 197. The wrongdoing alleged by the County is bribery and mail and/or wire fraud in furtherance of the alleged conspiracy. *Id.* ¶¶ 199-203. Furthermore, at this early stage in the proceedings, the Court finds it inappropriate to delve into the issues surrounding the possible impact that the arbitration clause may have had on causation and injury.

Jobe also challenges the County's claim on the basis that the County failed to attach to its Complaint any correspondence indicating that she had threatened suit on the Officers' behalf. *Id.* The County, for its part, is not required to provide the Court with evidence supporting the factual allegations embodied in its Complaint at this stage in the proceedings. *See* FED R. CIV. P. 8(a). All that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.*

<blockquote>

c.   **The County failed to mention that it took five different meetings over the course of five months to reverse the F.L.S.A. 207(k) exemption vote, and that the County Attorney's office was directly in charge of those negotiations**

</blockquote>

On June 26, 2006, the Commissioners Court "authorized the County Attorney's Office to organize a negotiating team" to resolve the Officers' grievances. Mot. to Dismiss Ex. 5 at 3. According to Jobe, "[t]he fact that the extensive and repetitive 207(k) reversal deliberations and votes were directly connected to the commissioner's court [sic] consideration of the officer grievances which claimed contractual violations, makes the allegation of damages in the complaint impossible and intentionally misleading to the court." *Id.* at 9. The County, however, alleges that Jones and Escobar bribed Flores to vote in favor of waiving the County's F.L.S.A. 207(k) rights in April or May of 2005, over one year before the Commissioners Court's authorization in June 2006. Compl. ¶ 203. Thus, it is plausible that the bribes were the proximate cause of the Commissioners Court's subsequent authorization of a negotiating team and that the extensive deliberations resulted from the conduct of the alleged enterprise. It is similarly plausible that "but for" Defendants' improper inducements, the Commissioners Court would not have voted in favor of relinquishing the County's rights under the F.L.S.A. Although the "extensive and repetitive 207(k) reversal deliberations and votes" alleged by Jobe may indeed

undermine the County's civil RICO claim, for the purposes of its Complaint, the County's

allegations of causation and damages are sufficient to withstand Jobe's Motion to Dismiss. *See*

FED. R. CIV. P. 8.

> **d.** **The County settled Officer grievances in November 2007, after a neutral federal arbitrator rendered a decision that the County violated the C.B.A.**

Jobe further argues that, because the Settlement Agreement was the result of an

arbitration hearing that was mandated by the C.B.A., the County's claim for damages must fail.

Mot. to Dismiss 9-10. The arbitrator's decision, Mot. to Dismiss Ex. 7, is neither referred to in

the County's Complaint nor is it a matter of public record. Thus, the Court cannot consider the

arbitration hearing at this stage of the litigation. *Cf. Scanlan*, 343 F.3d at 536 (allowing courts to

consider "documents that are referred to in the plaintiff's complaint and are central to the

plaintiff's claim" for purposes of a motion to dismiss). As such, the Court declines to consider

the arbitration hearing in considering Jobe's Motion to Dismiss.

> **e.** **Ketner's legal services were in exchange for Flores's vote to settle the Fifteen-Minute lawsuit, and not in exchange for Flores's vote to waive the County's rights under F.L.S.A. 207(k)**

Jobe further alleges that the "free or discounted legal services" that Defendants allegedly

offered to Flores in exchange for her vote to waive the County's F.L.S.A. 207(k) rights were,

according to the exhibits supporting the County's Complaint, in exchange for her vote in favor of

the Fifteen-Minute lawsuit Settlement Agreement and not, as the County contends, in exchange

for the County's waiver of its rights under the F.L.S.A. Mot. to Dismiss 11. As such, "[the

County's] factual allegation is not entitled to the presumption of truth for the purposes of Rule 12

challenges." *Id.* Count 3 of the Ketner Information, to which he pleaded guilty, states that his

legal services were offered "[i]n order to secure the vote of Jane CC-2 in favor of the approximately $700,000 settlement," Compl. Ex. 2 at 12; however, this does not, as Jobe claims, "directly controvert[]" the County's factual allegations. *See* Compl. ¶ 201. It is possible that Ketner's services were offered in exchange for Flores's vote in favor of *both* the Fifteen-Minute lawsuit settlement and the waiver of the County's 207(k) rights. As the County's exhibits do not serve to controvert its allegations in this respect, the factual allegations in its Complaint are entitled to a presumption of truth. *See Twombly*, 550 U.S. at 555 (A court ruling on a motion to dismiss must assume that "all the allegations in the complaint are true (even if doubtful in fact).")

Furthermore, even if the factual omissions alleged by Jobe undermine the County's claims of damages and proximate cause with respect to the F.L.S.A. 207(k) and Fifteen-Minute lawsuit episodes, the County's civil RICO claim survives. As discussed above, it is not necessary for the County to allege that each episode caused it damages. *See Deppe*, 863 F.2d at 1366-67. The episodes alleged form the "pattern" in the County's RICO claim. *See* 18 U.S.C. § 1962(c). For this reason, the County has sufficiently alleged that it suffered injury "by reason of" Defendants' conduct, and it has standing to bring its claim.

### 3. Civil RICO requirements

Jobe also asserts that, in addition to the County's alleged factual omissions, the County has also failed to state a claim for civil RICO. Mot. to Dismiss 15.

### a. Elements of civil RICO

Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "Racketeering activity" includes "any act or threat involving . . . bribery." *Id.* § 1961(a). In addition to the standing requirements discussed above, a civil RICO plaintiff must allege the existence of: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007) (quoting *In re Burzynski*, 989 F.2d 733, 741-42 (5th Cir. 1993)). Each element is itself "a term of art which carries its own inherent requirements of particularity." *Elliot v. Foufas,* 867 F.2d 877, 880 (5th Cir. 1989).

### (1)     Person

First, Jobe claims that she is not a "person" subject to RICO liability. Mot. to Dismiss 49-50. She claims that a RICO person is one who "poses or has posed a continuous threat of engaging in acts of racketeering." *Id.* at 49 (quoting *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988)). Although "a threat of[] continuing racketeering activity" is a requirement for liability under the civil RICO statute, it is more aptly categorized as a component of RICO's "pattern" requirement. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240 (1989). The RICO Act broadly defines a "person" as including "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Because Jobe is indisputably an "individual . . . capable of holding a legal or beneficial interest in property," she qualifies as a "person" under the RICO statute.

### (2)     Pattern of racketeering activity

Second, Jobe claims that the County has failed to establish that she engaged in a "related and continuing pattern of racketeering activity." Mot. to Dismiss 45-47. To establish a pattern

of racketeering activity, a plaintiff must allege facts which show that the defendant engaged in "two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity." *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009); *see also* 18 U.S.C. § 1961(5) ("'[P]attern of racketeering activity' requires at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."). The predicate criminal acts can be either federal or state crimes. *St. Germain*, 556 F.3d at 263.

The Supreme Court has stated that:

> Congress defined Title X's pattern requirement solely in terms of the relationship of the defendant's criminal acts one to another: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." § 3575(e). We have no reason to suppose that Congress had in mind for RICO's pattern of racketeering component any more constrained a notion of the relationships between predicates that would suffice.

*H.J. Inc.*, 492 U.S. at 240.

To show continuing racketeering activity, a plaintiff may allege facts which indicate that the predicate acts are "part of an ongoing entity's regular way of doing business." *Id.* at 242.

According to Jobe, the County has failed to adequately plead that she was involved in any racketeering activity. Mot. to Dismiss 45. The Court disagrees. The County has specifically cited the state and federal laws on which it relies as predicate acts: the federal wire fraud statute, the federal mail fraud statute, and the Texas state-law bribery statute; and it has made factual allegations which "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555. The County alleges that Jobe personally engaged in bribery and mail and/or wire fraud in

connection with the Fifteen-Minute lawsuit and the Digitization of Court Records episodes. Compl. ¶¶ 171, 182.

Jobe points out that individual predicate acts alone do not satisfy the pattern requirement of civil RICO claims. Mot. to Dismiss 45-47. Rather, she argues, a pattern "requires a relationship between the predicates and a threat of continuing activity." *Id.* at 46. According to the Supreme Court, however, "[i]t is reasonable to infer . . . that Congress intended to take a flexible approach [to the pattern requirement of civil RICO claims], and envisaged that a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set." *H.J. Inc.*, 492 U.S. at 238. The County's claims of bribery, mail fraud and/or wire fraud plausibly show a pattern of racketeering activity because the acts were allegedly in furtherance of Defendants' attempts to secure favorable results for their clients by manipulating corrupt officials.

Further, given the non-Commissioner Defendants' ongoing relationship with County officials and their alleged ability to use these officials' positions to benefit the enterprise, Defendants' acts give rise to a threat of continued criminal activity. In reversing the dismissal of petitioners' complaint in *H.J. Inc.*, the Supreme Court held:

> The acts of bribery alleged are said to be related by a common purpose, to influence commissioners in carrying out their duties in order to win approval of unfairly and unreasonably high rates for [Defendant]. Furthermore, petitioners claim that the racketeering predicates occurred with some frequency over at least a 6-year period, which may be sufficient to satisfy the continuity requirement. Alternatively, a threat of continuity of racketeering activity might be established at trial by showing that the alleged bribes were a regular way of conducting [Defendant's] ongoing business, or a regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise.

*Id.* at 250.

Though Flores is no longer serving as a County Commissioner, Defendants' alleged "consulting services" enterprise and their access to County officials plausibly presents a threat of continued criminal activity. *See id.* It would be an absurd result if, as Jobe suggests, Flores's indictment and subsequent loss of her position as County Commissioner immunizes Flores and her co-defendants from civil liability under RICO because her loss of power eliminated any plausible "threat of continuity." *See id.* at 242-43 ("[T]he threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes."). The ongoing threat exists, not because of Flores's position as County Commissioner, but because of Defendants' method of doing business, which allegedly involves eliminating competition, threatening litigation, and offering improper inducements to County officials through bribery, wire fraud and/or mail fraud. Flores was simply a vehicle through which the enterprise, Flores included, allegedly carried out its schemes. Compl. ¶ 87. In executing their scheme, Defendants allegedly attempted to "coerce" at least one other County Commissioner into voting in their favor. Compl. ¶ 125. Although Defendants were unable to secure Commissioner Scruggs's favorable vote, their attempt evinces their willingness to recruit additional officials to assist in carrying out their activities. In addition, the racketeering predicates in the instant case occurred "with some frequency" over a period of at least several years. Compl. ¶ 7. The County has plausibly established a threat of continuity by alleging that the bribing of County officials, in the form of free or discounted legal services, campaign

contributions, or otherwise, was a regular way that Jobe, Escobar and Jones conducted their business.

Jobe also argues that there is no "nexus between the alleged pattern of racketeering activity and conduct or participation in the affairs of the alleged enterprise 'through' such activity." Mot. to Dismiss 48. According to Jobe, to establish a nexus, the County must show that "1) the defendant committed acts of racketeering; 2) the defendant's position in the enterprise facilitated the acts of racketeering; and 3) the predicate acts had some effect on the enterprise." *Id.* (citing *United States v. Erwin*, 793 F.2d 656, 671 (5th Cir. 1986); *United States v. Cauble*, 706 F.2d 1322, 1332-33 (5th Cir. 1983); *Overnight Transp. Co. v. Truck Drivers Union Local No. 705*, 904 F.2d 391, 393 (7th Cir. 1990)). Jobe alleges that the County has failed to establish that her position in the enterprise facilitated the acts of racketeering and that her acts had some effect on the enterprise. *Id.*

The County, for its part, has alleged that Jobe played a significant role in the Fifteen-Minute lawsuit episode, engaging in bribery, wire fraud and/or mail fraud in furtherance of the enterprise's objective of obtaining a favorable settlement for its clients. Compl. ¶¶ 168, 179, 182. Jobe's participation in bribing Flores and her submission of the settlement offer by wire or through the mails furthered the goals of the alleged "consulting services" enterprise and helped to secure the County's acceptance of the Settlement Agreement. Jobe is also alleged to have offered Flores bribes in exchange for her vote in awarding the court records digitization contract to the enterprise's client, Altep, in the Digitization of Court Records episode, *id.* ¶ 221, and Jobe obtained confidential bid proposals in violation of the federal wire fraud statute. *Id.* ¶¶ 226-27. Although Jobe's alleged role in the F.L.S.A. 207(k) conspiracy is less prominent, she allegedly

participated in planning the scheme to defraud the County and assisted in the scheme by threatening the County with litigation. *Id.* ¶¶ 197, 202. Thus, the Court finds that the County has made factual allegations sufficient to show that Jobe's position facilitated the acts of racketeering and that her acts had some effect on the enterprise.

Further, the alleged acts of bribery and mail and/or wire fraud have "the same or similar purposes, results, participants, victims [and] methods of commission" required to constitute a "pattern." *See H.J. Inc.*, 492 U.S. at 240. The method of commission is the same, as are the purposes and results; namely, securing profits by ensuring favorable votes from the Commissioners Court. *See generally* Compl. In both instances, the victim is the County, and the participants include Jobe, Jones, Escobar and Flores. *Id.*

Finally, Jobe argues that the County has failed to demonstrate that she "conducted" or "participated in the conduct" of the affairs of the enterprise. Mot. to Dismiss 47. Jobe claims that only those individuals who participate in the operation or management of the enterprise can be held civilly liable under RICO. *Id.* The Supreme Court has held that, "[i]n order to participate, directly or indirectly, in the conduct of such enterprise's affairs, one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (internal quotation marks omitted). However, "liability under § 1962(c) is not limited to upper management." *Id.* at 184. Even "outsiders" may be liable if they "are 'associated with' an enterprise and participate in the conduct of *its* affairs." *Id.* at 185 (emphasis in original). The Fifth Circuit has similarly held that § 1962(c) *"*only requires that a defendant 'take part in' the operation of the enterprise, not that he direct its affairs." *United States v. Posada-Rios*, 158 F.3d 832, 856 (5th Cir. 1998) (citing *Reves*, 507 U.S. at 179).

It is evident from the County's Complaint, as discussed above, that Jobe is no "outsider" in the operations of the alleged enterprise. Therefore, the Court finds that the County has sufficiently alleged that Jobe "participated in the conduct" of the affairs of the enterprise.

### (3) Enterprise

Third, Jobe claims that the County has failed to establish the existence of an enterprise. Mot. to Dismiss 30-32. To establish the third element of a RICO claim, a plaintiff must allege the existence of an enterprise with "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 129 S.Ct. 2237, 2244 (2009); *see also* 18 U.S.C. § 1961(4) (defining "enterprise" broadly to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity"). Jobe maintains that, because the enterprise has no alleged existence apart from the claimed pattern of activity, has no common interest, and is not alleged to be an ongoing organization, the County's claim must fail. Mot. to Dismiss 30-35.

Jobe cites the Supreme Court's opinion in *Boyle* for the proposition that an enterprise "must have an existence separate and apart from [the alleged racketeering] activity." *Id.* at 30-31 (citing *Boyle*, 129 S.Ct. at 2244). However, the Supreme Court in *Boyle* also stated that the requirement of an enterprise's separate existence may, at times, be inferred from "the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity." *Boyle*, 129 S.Ct. at 2245 ("[T]he evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce.") (internal quotation marks omitted).

[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods-by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.* at 2245-46.

The County alleges that Defendants functioned as an association-in-fact. *See* Compl. ¶ 89. They provided consulting services to the public. *Id.* In exchange for their fees, they exploited insider connections with County officials, including Flores, to eliminate competition and to secure County contracts or agreements on behalf of their clients, using unlawful means. *Id.* For example, Defendants allegedly purchased Guaderrama's competing interest in acquiring the County's property and attempted to obtain privileged information regarding the property's value in order to secure the property for their client. *Id.* ¶¶ 105-62. The association-in-fact's main objective, securing County contracts or agreements for its clients, evinces an existence "separate and apart" from the alleged racketeering activities. *See id.* ¶ 89. Although Defendants' "consulting services" organization allegedly engaged in predicate acts in furtherance of its objectives, the County has alleged that the enterprise existed for purposes other than to commit the predicate acts. *See* Mot. to Dismiss 33 (citing *Clark v. Douglas*, No. 06-40364, 2008 WL 58774 (5th Cir. Jan. 4, 2008)). However, even if the County failed to allege an existence separate and apart from Defendants' alleged racketeering activities, it is not clear that this would

prove fatal to its claim. Because Defendants' "consulting services" organization functioned

through its commission of the predicate racketeering acts, the evidence establishing the

association-in-fact and the pattern of racketeering activity in the instant case may "coalesce." *See*

*Boyle*, 129 S.Ct. at 2245.

The County has also sufficiently alleged a "common interest." The common interest

shared by Defendants was making a profit by securing County contracts or agreements on behalf

of their clients. Compl. ¶ 89; *see also Cunningham v. Offshore Specialty Fabrications, Inc.*, 543

F. Supp. 2d 614, 634 (E.D. Tex. 2008) (citing *United States v. Elliott*, 571 F.2d 880, 898 (5th

Cir. 1978)) ("The 'desire to make money' is a common purpose recognized by multiple courts.").

Although Jobe claims that the four alleged conspiracies are "independent and unrelated" matters

"involving completely different issues, different times, and different parties," Mot. to Dismiss 35,

the conspiracies all involve the use of Defendants' consulting services and insider connections to

profit at the County's expense. Jobe need not be implicated in all four racketeering episodes. It

is sufficient for the purpose of the County's civil RICO claim that she is implicated in at least

two predicate acts. *See Casperone*, 819 F.2d at 115. The County has met its burden in this

regard.

The County has also stated factual allegations that make it plausible that Defendants

functioned as a "continuing unit." Compl. ¶ 89. As noted above, the County claimed that the

Defendants engaged in a consulting services enterprise that secured contracts with the County by

bribing and threatening county officials. *Id.* The County further alleges that Defendants'

"consulting services" organization has been operating for at least several years. *See generally id.*

Jobe relies on the Fifth Circuit's opinion in *Calcasieu-Marine National Bank v. Grant*, 943 F.2d

1453, 1462 (5th Cir. 1991), for the proposition that no ongoing activity existed; however, *Calcasieu* was an appeal from a jury verdict, not a dismissal based on the sufficiency of the plaintiff's pleadings. *See Calcasieu-Marine Nat'l Bank*, 943 F.2d at 1462. To withstand a motion to dismiss, the County need not prove each element of its civil RICO claim. It need only state "enough facts to state a claim to relief that is plausible on its face." *See Twombly*, 550 U.S. at 570. Jobe's contention that, because Flores "has been out of public office since December 31, 2006," there can exist no "continuing unit" is inapposite. *See* Mot. to Dismiss 34. As stated above, the Court does not share Jobe's belief that the criminal indictment of one participant based on RICO violations shields Defendants from civil liability.

### (4) Predicate acts

Jobe further alleges that the County has failed to state a claim for the predicate acts of state-law bribery, mail fraud and wire fraud. Mot. to Dismiss 38-45. As stated above, a civil RICO plaintiff must make factual allegations that the defendant or his or her co-conspirators participated in two or more predicate acts. *See* 18 U.S.C. § 1961(5); *see also Casperone*, 819 F.2d at 115. Under the Texas Penal Code, a person commits bribery if he or she "intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another: (1) any benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter." TEX. PENAL CODE ANN. §§ 36.02(a)-(a)(1) (Vernon 2003). This section is qualified by Texas Penal Code § 36.02(d), which states, "[i]t is an exception to the application of Subdivisions (1), (2), and (3) of Subsection (a) that the benefit is a political contribution as defined by Title 15,

Election Code, or an expenditure made and reported in accordance with Chapter 305, Government Code."  TEX. PENAL CODE ANN. § 36.02(d).[10]

Jobe claims that the County has failed to state a claim for bribery in each of the four alleged episodes.  Mot. to Dismiss 40-42.  More specifically, Jobe states that the County has failed to claim that Jobe acted intentionally or knowingly when bribing Flores.  *Id.* at 13.  Even under the heightened pleading requirements of Rule 9(b), which do not apply to bribery claims, "knowledge" may be alleged generally.  *See* FED. R. CIV. P. 9(b).  Although a complaint which alleges conclusory statements that "amount to nothing more than a 'formulaic recitation of the elements'" cannot survive a motion to dismiss, *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1951 (2009) (citing *Twombly*, 550 U.S. at 555), a complaint that plausibly suggests unlawful conduct, and "does more than contain bare allegations of an impermissible" course of conduct may survive such a motion.  *al-Kidd v. Ashcroft*, 580 F.3d 949, 975 (9th Cir. 2009).

The County generally avers that Jobe "knowingly engaged in racketeering activities" in violation of the RICO Act.  Compl. ¶ 88.  However, the County also makes factual allegations to support its claim.  For example, the County claims that on December 16, 2004, Jobe paid Flores $1,000 in exchange for her vote to settle the Fifteen-Minute lawsuit.  *Id.* ¶ 188.  With respect to the Digitization of Court Records episode, the County alleges that Jobe violated the Texas state bribery statute by offering Flores monies, in the form of campaign contributions, in exchange for

---

[10]    "Political contribution" is defined as a campaign contribution or an officeholder contribution. TEX. ELEC. CODE § 251.001(5).  "Campaign contribution" is defined as "a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure." *Id.* § 251.001(3).  Similarly, "officeholder contribution" is defined as "a contribution to an officeholder or political committee that is offered or given with the intent that it be used to defray expenses that:  (A) are incurred by the officeholder in performing a duty or engaging in an activity in connection with the office; and (B) are not reimbursable with public money." *Id.* § 251.001(4).

Flores's official vote in awarding the digitization contract to Altep. Compl. ¶ 221. Thus, the County has sufficiently alleged that Jobe knowingly engaged in at least two predicate acts of bribery.

Jobe argues that the County erroneously cites § 36.02(a)(1) of the Texas Penal Code when the relevant statute is § 36.02(a)(4). Mot. to Dismiss 41; *see also* TEX. PENAL CODE ANN. §§ 36.02(a)(1), 36.02(a)(4). Section 36.02(a)(4) states that

> [A]ny benefit that is a political contribution as defined by Title 15, Election Code, or that is an expenditure made and reported in accordance with Chapter 305, Government Code, if the benefit was offered, conferred, solicited, accepted, or agreed to pursuant to an express agreement to take or withhold a specific exercise of official discretion if such exercise of official discretion would not have been taken or withheld but for the benefit; notwithstanding any rule of evidence or jury instruction allowing factual inferences in the absence of certain evidence, direct evidence of the express agreement shall be required in any prosecution under this subdivision.

TEX. PENAL CODE ANN. § 36.02(a)(4).

According to Jobe, the County has "failed to allege any reason that this exception does not apply to the political contribution made by Jobe." Mot. to Dismiss 41. Because the benefits Flores received took the form of campaign contributions, Jobe claims that the County's bribery claim cannot survive. *Id.* The County, however, is neither required to state the various elements of its alleged causes of action, nor is it required to reference specific statutes in its Complaint. *See* FED. R. CIV. P. 8(a). It must simply present "a short and plain statement of the claim" showing that it is entitled to relief. *Id.* The County has met its burden in this regard.[11]

---

[11] The County alleges that the monies paid were "disguised as campaign contributions." Compl. ¶ 155. This implies that the funds were not given "with the intent that [they] be used in connection with a campaign for elective office or on a measure." *See id.*; *see also* TEX. ELEC. CODE 251.001(3). As such, they would not be included in the Texas Election Code's definition of "campaign contribution." *See* TEX. ELEC. CODE 251.001(3) (defining "campaign contribution" as a contribution that "is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure.").

Jobe also asserts that the County has failed to state a claim of mail or wire fraud in any of the four alleged episodes. Mot. to Dismiss 43-45. Title 18 of the United States Code § 1341 makes it unlawful to

> devise[] or intend[] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing.

18 U.S.C. § 1341.

Similarly, Title 18 of the United States Code § 1343 makes it unlawful to

> devise[] or intend[] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

18 U.S.C. § 1343.

To state a claim for mail or wire fraud, a plaintiff must establish the following:

> (1) a scheme or artifice to defraud or to obtain money or property by means of false pretenses, representations, or promises; (2) a use of the interstate mails or wires for the purpose of executing the scheme; and (3) a specific intent to defraud either by revising, participating in, or abetting the scheme.

*See Hewlett-Packard Co. v. Byd:Sign, Inc.*, No. 6:05-cv-456, 2007 WL 275476, at *3 (E.D. Tex. Jan. 25, 2007) (citing *United States v. Davis*, 752 F.2d 963, 970 (5th Cir. 1985) (setting out elements of mail fraud); *Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988) (setting out elements of wire fraud)).

For the purposes of the federal mail and/or wire fraud statute, it is not necessary that the mailing itself be fraudulent. *See Parr v. United States*, 363 U.S. 370, 391 (1960). The correspondence need only further defendants' fraudulent scheme. *Id.*

Jobe accurately notes that fraud is subject to the heightened pleading requirements of Rule 9(b). Mot. to Dismiss 41; FED. R. CIV. P. 9(b); *Tel-Phonic Servs. Inc.*, 975 F.2d at 1139 (stating that the "particularity requirement applies to the pleading of fraud as a predicate act in a RICO claim"). At a minimum, the County must state particulars of "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *See Tel-Phonic Servs. Inc.*, 975 F.2d at 1139.

The County alleges that in June 2004, Jobe obtained confidential bid proposals through the United States mails, and that she did so for the benefit of the enterprise's client, Altep. Compl. ¶¶ 226-27. According to its Complaint, Jobe was "seeking an unfair advantage in bidding by circumventing the fair bidding procedures" as required by the Texas Local Government Code. *Id.* ¶ 230. In addition, the County states that on or about March 2005, Jobe sent a letter or facsimile to the County "noticing the County of potential litigation regarding the County's implementation of its 207(k) rights." *Id.* ¶ 202. Further, the County has alleged that on or about December 1, 2004, Jobe forwarded a settlement offer to the County via facsimile and/or the United States Postal Service in violation of 18 U.S.C. §§ 1343 and/or 1341. *Id.* ¶ 182. The County further alleges that the offer was sent in furtherance of the enterprise's activities and scheme to defraud the County. *Id.* Thus, the County has sufficiently pleaded mail fraud in violation of 18 U.S.C. § 1341.

Although Jobe claims that the County has not alleged that she participated directly in any predicate acts with respect to the Catalina Development episode, Mot. to Dismiss 43, the County has alleged that Jobe participated directly in at least four predicate acts, and she may also be responsible for predicate acts taken by her co-defendants in furtherance of their unlawful scheme. *See Casperone*, 819 F.2d at 115.  Specifically, "[a] defendant need not personally handle the mail; there need only be sufficient evidence to connect him to the fraudulent scheme involving the use of the mails."  *United States v. Finney*, 714 F.2d 420, 423 (5th Cir. 1983).  The County has made sufficient factual allegations to connect Jobe to the alleged fraudulent scheme.  Thus, any mail and/or wire fraud committed by her co-defendants in furtherance of the alleged racketeering episode may be imputed to Jobe.

Jobe may also be held liable for predicate acts taken in any of the alleged episodes, even if she did not commit the acts herself, if she aided and abetted in their commission.  *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258, 270 (3d Cir. 1995); *see also Conkling v. Turner*, 18 F.3d 1285, 1293 (5th Cir. 1994) (citing *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992) (stating that the "bare minimum of a RICO charge is that a defendant personally committed or aided and abetted the commission of two predicate acts.")).  To find a defendant liable for aiding and abetting a predicate act, a plaintiff must show "(1) that the substantive act has been committed, and (2) that the defendant alleged to have aided and abetted the act knew of the commission of the act and acted with intent to facilitate it."  *Jaguar Cars, Inc.*, 46 F.3d at 270.  Jobe's co-defendant, Jones, is alleged to have "offered to arrange to have free or discounted legal representation on a criminal matter provided to Betti Flores in exchange for her official vote."  *See* Compl. ¶ 198.  Jobe was allegedly aware of the bribe and "sent written

correspondence to the County, via facsimile and/or U.S. Postal Service, noticing the County of potential litigation regarding the County's implementation of its rights." *Id.* ¶ 202. Thus, it is plausible that Jobe "aided and abetted" in the violation, and that the actions of Jones may be imputed to her for purposes of pleading bribery in violation of Texas law as a RICO predicate act.

The Complaint alleges that Jobe participated directly in the bribing of Flores during the commission of the Fifteen-Minute lawsuit episode, *id.* ¶ 221, and that she engaged in wire and/or mail fraud when forwarding the settlement offer to the County, *id.* ¶ 182. Thus, the County has alleged that Jobe personally committed at least two predicate acts in the Fifteen-Minute lawsuit episode alone. In addition, the County has adequately alleged that Jobe aided and abetted the commission of at least one additional predicate act; namely, the bribing of Flores in connection with the F.L.S.A. 207(k) conspiracy. *See Conkling*, 18 F.3d at 1293 (citing *McLaughlin*, 962 F.2d at 192). Thus, the County has sufficiently alleged Jobe's participation in at least two of the episodes underpinning its civil RICO claim.

### b.      Four-year statute of limitations

Irrespective of the contents of the County's pleadings, Jobe argues that the County's claim, filed on April 1, 2009, is barred by the four-year statute of limitations for civil RICO violations with respect to the Catalina Development and Fifteen-Minute lawsuit episodes. Mot. to Dismiss 43 (citing *Rotella v. Wood*, 528 U.S. 549, 553 (2000)). A statute of limitations defense may be asserted by a defendant in a 12(b)(6) motion. *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003). Such a defense may support dismissal of the complaint "where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis

46

for tolling or the like." *Id.* A party who raises a statute of limitations defense shoulders the burden of proof on this issue. *In re Hinsley*, 201 F.3d 638, 644-45 (5th Cir. 2000).

RICO civil enforcement actions are subject to a four-year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 107 (1987). The Fifth Circuit has adopted the "injury discovery rule" for civil RICO claims. *Rotella v. Wood*, 147 F.3d 438, 440 (5th Cir. 1998), *aff'd*, 528 U.S. 549 (2000). Under the "injury discovery rule," a plaintiff must file a claim within four years of the date that his or her alleged injury was discovered or should have been discovered in the exercise of reasonable diligence. *See Rotella*, 528 U.S. at 553.

Because the County's injuries occurred at the time that it entered into the settlement agreements for the Catalina Development and Fifteen-Minute lawsuits in December 2003 and May 2004, respectively, Jobe asserts that the County's claim is time-barred. Compl. ¶ 53-55. The County defends that it had no reason to know about its injury or the alleged fraud until Flores's guilty plea in June 2007. Pl.'s Resp. ¶ 76. Jobe counters that the County's claim that it was unable to discover its harm is conclusory, and that the County should have discovered its injury at the time of the respective settlement agreements. Def.'s Reply 29-30.

In the Catalina Development episode, the injury alleged by the County is purportedly the difference between the true value of the disputed land and the monies it received from Defendants as a result of the second settlement agreement.[12] Compl. ¶¶ 105-62. A competitive

---

[12] Jobe argues that the County's claim fails to establish the "concrete financial loss" required of RICO complaints. Mot. to Dismiss 17 (citing *Patterson v. Mobil Co.*, 335 F.3d 476, 492 n.16 (5th Cir. 2003)). Although Jobe challenges the County's assertion that the value of the land was $6,660,000 at the time of its sale, *id.* at 19, the Court "must accept as true the well-pleaded factual allegations in the complaint during the pleadings stage." *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009). The County alleges concrete financial losses of over three million dollars in the sale of its property based on the value of the Joint Venture around the time of the sale, and its claim survives Jobe's Motion to Dismiss.

bidding process allegedly would have allowed the County to obtain the highest price for the disputed land. *Id.* ¶ 143. By bribing members of the Commissioners Court, purchasing competing interests in the land, and threatening individuals capable of advising the Commissioners Court against the sale, Defendants allegedly undermined the ability of the County to secure a favorable price for the property. *See id.* ¶¶ 116-19, 135, 143-47. Flores, the only Commissioner who both knew of Defendants' scheme and voted in favor of the settlement offer, did not disclose her involvement in the scheme or Defendants' tactics to secure the land. *See id.* ¶ 130. Thus, it is plausible that the County neither knew nor had reason to know that Defendants had actively interfered with its sale of the land until Flores's guilty plea in June 2007. *See* Pl.'s Resp. ¶¶ 76-77.

Similarly, with respect to the Fifteen-Minute lawsuit, the County had no reason to suspect the motives of the County Commissioners when the Commissioners Court entered into the Settlement Agreement with the Officers. *Id.* It was not until the County learned of the criminal indictments brought against Flores that it had reason to suspect that the Commissioners Court might not have been acting in the best interests of the County. For these reasons, the County's claim is timely.

### 4. Civil RICO conspiracy claim

The County also alleges that Jobe, Jones, Escobar and Flores engaged in a conspiracy to commit a RICO Act offense in violation of 18 U.S.C. § 1962(d). Compl. ¶ 197. Jobe moves to dismiss the claim on the basis that the County has failed to allege "an agreement by Defendant Jobe to participate in the predicate acts of the enterprise or racketeering activity" with respect to the four episodes. Mot. to Dismiss 51. The elements of a conspiracy to violate RICO are: "(1)

knowledge by the defendant of the essential nature of the conspiracy; (2) the defendant's

objective manifestations of an agreement to participate in the conduct of the affairs of an

enterprise; and (3) an overt act, which need not be a crime, in furtherance of the conspiracy."

*Bonton v. Archer Chrysler Plymouth, Inc.*, 889 F. Supp. 995, 1005 (S.D. Tex. 1995) (citing

*United States v. Sutherland*, 656 F.2d 1181, 1187 n.4 (5th Cir.1981)).  A plaintiff must allege

that the defendants entered into an agreement to commit two or more predicate acts in

furtherance of the RICO conspiracy.  *Tel-Phonic Servs., Inc.*, 975 F.2d at 1140 (citing *Hecht v.*

*Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990)) ("[B]ecause the core of a RICO

civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at

the very least, must allege specifically such an agreement.").  In addition, a plaintiff must show

that defendants knew that the acts agreed upon were part of a pattern of racketeering activity.  *Id.*

at 1140-41 (citing *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 47 (1st Cir. 1991)).

> The County states that Flores
>
> pled guilty to a six-count Federal Information . . . charging that she "conspired
> and agreed together with others . . . to knowingly devise a scheme and artifice to
> defraud the County of El Paso and its citizens of the right to [her] honest services
> in the affairs of the County of El Paso and to obtain money and property by means
> of material false and fraudulent pretenses, representations and promises, and in
> furtherance of the scheme to deprive . . .  others known and unknown offered to
> pay and paid the defendant money and other benefits in exchange for her vote in
> her official capacity as an El Paso County Commissioner.["]

Compl. ¶ 24 (omissions in original).

The County further alleges that "the enterprise and its members knowingly engaged in

racketeering activities in violation of 18 U.S.C. § 1962(c) and (d)."  *Id.* ¶ 88.  However, nowhere

in its Complaint does the County allege that Jobe entered into an agreement to commit two or

more predicate acts which she knew to be part of a pattern of racketeering activity.  *See*

49

*Tel-Phonic Servs., Inc.*, 975 F.2d at 1141 (affirming dismissal of RICO conspiracy claim where plaintiff "fail[ed] to plead specifically any agreement to commit predicate acts of racketeering," and finding the conclusory allegation that defendants "conspired" insufficient). The County has failed to meet the minimal pleading requirements for a RICO conspiracy claim, and its claim is dismissed.

## III.    CONCLUSION

For the reasons set forth above, Jobe's Motion to Dismiss (Doc. No. 160) is **GRANTED** in part and **DENIED** in part. The County's civil RICO conspiracy claim against Jobe is dismissed. All other claims survive.

**SO ORDERED.**

**SIGNED** on this 4th day of December, 2009.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE