**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **COUNTY OF EL PASO, TEXAS,** | _§ | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-09-CV-00119-KC** |
| | § | |
| **LUTHER JONES, DAVID ESCOBAR,** | § | |
| **MARTIE JOBE, ELIZABETH** | § | |
| **"BETTI" FLORES, ROBERT** | § | |
| **BOWLING III, ROBERT BOWLING** | § | |
| **IV, SARAH J. THOMAS, GREGORY** | § | |
| **W. COLLINS, ALAN ORTEGA,** | § | |
| **CHRIS JOHNSTONE, FRANK** | § | |
| **ARROYOS, CATALINA** | § | |
| **DEVELOPMENT, INC., TROPICANA** | § | |
| **HOMES, INC., CAREFREE HOMES** | § | |
| **INC., L.P., AMERICAS LOOP 375** | § | |
| **L.P., TROFREE, LLC, CAREFREE** | § | |
| **HOMES I, and TROPICANA** | § | |
| **DEVELOPMENT, INC.,** | § | |
| | § | |
| **Defendants**. | § | |

## ORDER

On this day, the Court considered Defendant David Escobar's "Motion to Dismiss Plaintiff's Second Amended Complaint for Failure to State a Claim and Motion to Decline to Exercise Supplemental Jurisdiction Over State-Law Claim" ("Mot. to Dismiss") (Doc. No. 135). For the reasons set forth herein, the Motion is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

The County of El Paso ("the County") alleges that certain Defendants were involved in a Racketeering Influenced and Corrupt Organization ("RICO"). *See generally* Pl's Second Am.

Compl. ("Complaint") (Doc. No. 107). The alleged enterprise, through David Escobar

("Escobar"), Martie Jobe ("Jobe"), and Luther Jones ("Jones"), would provide "consulting

services" for clients–"individuals, businesses, or entities having or seeking to do business with El

Paso County." *Id.* ¶ 89. To serve the needs of its clients, the alleged enterprise would offer

bribes and other benefits to County officials to secure "favorable resolutions for clients doing, or

seeking to do, business with the County." *Id.* Former El Paso County Commissioner, Elizabeth

Flores ("Flores"), was one such County official. *Id.* ¶ 93. According to the County, Flores

accepted money and other benefits in exchange for favorable votes in her official capacity as

County Commissioner. *Id.* The County alleges that the eighteen defendants in the instant case

took part in one or more of the following four racketeering episodes: Catalina Development,

Fifteen-Minute lawsuit, Fair Labor Standards Act 207(k) ("F.L.S.A. 207(k)"), and Digitization of

Court Records. *See generally* Compl. For her part, Flores has pleaded guilty to her involvement

in the alleged racketeering activities; however, all remaining Defendants maintain that they are

innocent of the charges. *See id.* ¶¶ 24, 26-27, 85, 100-01, 106, 163, 166, 214, 238, 276.

In the instant suit, the County seeks to avail itself of the civil remedies created for

violations of the RICO Act and the supplemental state-law claim of conspiracy to commit fraud.

The County alleges that Escobar was involved in the Catalina Development episode, both

individually and as Trustee for a joint venture ("Joint Venture") consisting of Carefree Homes

Inc., L.P. ("Carefree Homes") and Tropicana Homes, Inc. ("Tropicana Homes"). *Id.* ¶ 6. The

County further alleges that Escobar was involved in the F.L.S.A. 207(k) episode, both

individually and as a member of the alleged enterprise. *Id.* ¶ 197. Although the County has not

made factual allegations connecting Escobar with the Fifteen-Minute lawsuit or the Digitization

of Court Records episodes, the County alleges that the enterprise is responsible for all four episodes. If the County makes factual allegations which sufficiently tie each Defendant to the fraudulent scheme, the Defendants may be held liable for predicate acts committed by their co-defendants. For this reason, the Court will recite the facts alleged for each of the four episodes. *See Casperone v. Landmark Oil & Gas Corp.*, 819 F.2d 112, 115 (5th Cir. 1987).

### A.    Catalina Development

On January 27, 1993, the El Paso County Commissioners Court ("Commissioners Court") passed a motion allowing for the sale of a 381.90-acre parcel of county of land by sealed bids.[1]  *Id.* ¶ 30.  In October 1994, the Commissioners Court accepted a bid submitted by Gregory W. Collins ("Collins") and Catalina Development, Inc. ("Catalina Development").  *Id.*  Shortly thereafter, two commissioners and the County Judge-elect filed suit to enjoin the sale.  *Id.*  On December 20, 1994, the 34th Judicial District Court issued a temporary restraining order enjoining the sale of the land.  *Id.* ¶ 31.  On January 30, 1995, Collins and Catalina Development filed suit against the County for breach of contract and for specific performance ("Catalina Development lawsuit").  *Id.*  The lawsuit was barred by sovereign immunity, and summary judgment was granted on behalf of the County.  *Id.* ¶¶ 31-32.

Approximately nine years after the attempted sale, in fall 2003, Flores, Escobar, and four other defendants allegedly "began conspiring to defraud the County of El Paso and its citizens of the tract of land subject to the *Catalina Development* lawsuit."  *Id.* ¶ 36.  A joint venture, consisting of Carefree Homes and Tropicana Homes, was formed around this time period ("Joint

---

[1]     The disputed land is located in Section 16, Township 3, Block 79 of the T&P Railroad Survey. Compl. ¶ 31.

Venture"). *Id.* ¶ 40. The president of Tropicana Homes, Defendant Robert Bowling, III, ("Bowling III"), negotiated the assignment of Collins's and Catalina Developments' interest in the land to the Joint Venture. *Id.* ¶ 39. In September or October 2003, Bowling III entered into a legal and consulting contract with Escobar and Jones in which Escobar and Jones were "to acquire for the Joint Venture the tract of land from the County." *Id.* ¶¶ 40-41.

On November 19, 2003, Escobar, acting as Trustee for the Joint Venture, submitted a settlement offer to the County, offering $10,000 for each of approximately 304 acres, along with reimbursement to the County of all fees and expenses paid by the County to its outside counsel. *Id.* ¶ 42. The County alleges that this offer was forwarded through the United States Postal Service and/or facsimile. *Id.* ¶ 115. On November 20, 2003, Collins and Catalina Development assigned their interest in the Catalina Development lawsuit to Escobar for $150,000, plus a fifteen percent equity interest in a joint venture subsequently formed by the assignees of Collins and Catalina Development called Americas Loops 375, LP ("Americas Loop"). *Id.* ¶ 43. A later investor in Americas Loop, Christopher Johnstone ("Johnstone"), purchased a three percent interest in the joint venture for $200,000 on or about May 4, 2004. *Id.* ¶ 44. Based on this contribution, the County asserts that Americas Loop valued the 304.937 acres at approximately $6,600,000. *Id.* ¶¶ 45-46.

On or about November 21, 2003, Escobar, acting as an agent for the Joint Venture, entered into a consulting contract with Joel Guaderrama ("Guaderrama") individually and in Guaderrama's role as President of CR Enterprises. *Id.* ¶ 116. Guaderrama had previously attempted to obtain the disputed land from the Commissioners Court, and his efforts continued until he entered into the consulting contract with Escobar. *Id.* ¶¶ 119-20. Upon its successful

acquisition of the disputed land, Guaderrama would receive $100,000 from the Joint Venture. *Id.* ¶ 47. According to the County, the purpose of the contract was to eliminate Guaderrama's competing interest in acquiring the disputed land. *Id.* ¶ 117.

On December 1, 2003, the County rejected the settlement offer submitted by Escobar. *Id.* ¶ 48. Three days later, on December 4, 2003, Escobar submitted a second settlement offer to the County. *Id.* ¶ 49. On or about December 9, 2003, the County alleges that Escobar, Jones and Flores met to discuss the second settlement offer. *Id.* ¶ 123. Around this time, Escobar and Jones "agreed to pay money and other benefits to [Flores] in exchange for her favorable vote." *Id.* ¶ 136. The County alleges that Escobar "knowingly misrepresented that the offer he submitted on behalf of the Joint Venture was [] made in good faith as he failed to disclose the conspiracy efforts of the enterprise to defraud the County of the tract of land." *Id.* ¶ 122. On December 15, 2003, the Commissioners Court considered the second settlement offer, but it took no action on the offer at that time. *Id.* ¶ 52. Between December 15, 2003 and December 20, 2003, Flores "requested a special session of the El Paso County Commissioners Court to consider the second settlement offer." *Id.* ¶ 53. The County alleges that Flores requested this special meeting by email. *Id.* ¶ 128. A special meeting was held on December 22, 2003. *Id.* ¶ 54.

Prior to the vote of the Commissioners Court, Escobar and Jones appeared before the Commissioners Court "and made material misrepresentations to the Court in furtherance of their efforts to defraud the County. . . . [B]oth withheld from the Commissioners Court that they had offered[,] and Betti Flores agreed[,] to accept money and other consideration in exchange for her vote as an El Paso County Commissioners [sic]." *Id.* ¶ 132. Despite the El Paso County

Attorney's recommendation to reject the second settlement offer, the offer was accepted by the Commissioners Court, with Flores voting in favor of accepting the offer. *Id.* ¶ 54. Escobar notes that four Commissioners voted to accept the second settlement offer, while only one Commissioner opposed the transaction. Mot. to Dismiss 27, Ex. A. That same day, the County entered into an agreement with Escobar as Trustee for the Joint Venture assignees,

> whereby in consideration for the dismissal and release of all claims related to the tract of land and the promise not to seek a writ of certiorari from the United States Supreme Court, the County of El Paso agreed to sell a portion of the tract of land (approximately 304 acres) to the Joint Venture for $3,040,000.00 or the appraised value of the property, whichever is greater.

Compl. ¶ 55.

In addition, the Joint Venture agreed to reimburse the County for all attorney fees and costs incurred in the Catalina Development lawsuit. *Id.*

Prior to the December 22, 2003, special meeting, the County alleges that Escobar and Jones met with then County Commissioner Charles Scruggs to coerce him to vote in favor of the Catalina Development settlement offer. *Id.* ¶ 51. Escobar and Jones "threatened Commissioner Scruggs with adverse political consequences should he not vote in favor of the settlement." *Id.*

The County further alleges that on or about January 16, 2004, Jones sent an email to Flores containing a letter addressed to Steve Hughes ("Hughes"), then outside counsel for the County. *Id.* ¶ 138. The letter, which was drafted for Flores's signature, asked Hughes about the appraisal status of the disputed land. *Id.* The email sent by Jones instructed Flores to sign the letter in her official capacity and to forward the letter via facsimile to Hughes. *Id.*

On or about April 9, 2004, Jones, "acting as principal decision maker and coordinator of the enterprise's activities," drafted a letter to Ted Houghton ("Houghton"), an individual who is

allegedly familiar with the disposition of public lands. *Id.* ¶¶ 142-44. The letter threatened litigation as a result of Houghton's previous communications with Flores concerning how to maximize the County's profit in its sale of public lands through competitive bidding. *Id.* Jones emailed the letter to Escobar and instructed Escobar to sign the letter and forward it to Houghton. *Id.* ¶ 145. Escobar forwarded the letter on April 4, 2004.[2] *Id.* ¶ 146.

On May 24, 2004, the El Paso County Judge signed a warranty deed conveying the land to Escobar as Trustee for the Joint Venture. *Id.* ¶ 149. On November 15, 2004, Escobar conveyed the land to Americas Loop. *Id.* ¶ 150. In return, Escobar received $580,000 from the Joint Venture for his role as attorney and Trustee. *Id.*

The County alleges that on or about August 26, 2004, Bowling III and Robert Bowling, IV, ("Bowling IV") delivered campaign contributions to Flores totaling $2,500. *Id.* ¶¶ 151-53. According to the County, this money was "payment for her vote to settle the *Catalina Development* lawsuit" in violation of Texas Penal Code § 36.02(a)(1).[3] *Id.* ¶ 151. The County alleges that "the Bowling's [sic] collectively paid [Flores] $2,500.00" in order for the Joint Venture to acquire the disputed property. *Id.* ¶ 154. According to the County, these payments were arranged jointly by Jones and Escobar. *Id.* The County alleges that further sums of $2,500

---

[2] The dates in the Complaint appear incorrect, as the Complaint states that Jones drafted the letter on April 9, 2004, five days *after* Escobar supposedly forwarded the letter to Houghton on April 4, 2004.

[3] Under the Texas Penal Code,

> [a] person commits an offense if he intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another: (1) any benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter.

TEX. PENAL CODE ANN. § 36.02(a)-(a)(1) (Vernon 2003).

"disguised as campaign contributions" were each paid by Jones and Escobar to Flores on December 16, 2004, for a total of $7,500. *Id.* ¶¶ 155-56.

The County asserts that the amount paid by the Joint Venture to the County, $3,200,000[4] plus attorney fees and release of all current and future claims concerning the land, was less than the tract's true value, which the County estimates to be $6,660,000. *Id.* ¶ 157. The County further alleges that the monetary injuries it sustained as a result of the land transaction were actually and proximately caused by "the enterprise's fraudulent and racketeering activities." *Id.* ¶ 158.

According to the County, Escobar "failed to disclose the conspiracy efforts of the enterprise to defraud the County of the tract of land." *Id.* ¶ 122. The County also alleges that "Flores purposely withheld critical information that would likely have prevented a vote on the settlement offer." *Id.* ¶ 122. Had the Commissioners Court known that at least one of its members had been bribed to accept the settlement offer, the County asserts that it is unlikely that the Commissioners Court would have accepted the offer. *Id.* ¶ 130.

The County alleges financial injuries totaling $3,370,000, plus "monies and fringe benefits paid to Betti Flores." *Id.* ¶ 162.

### B. Fifteen-Minute lawsuit

On or about December 13, 2002, Jobe, counsel for the El Paso County Sheriff Detention Officer plaintiffs, commenced a lawsuit against the County to recover wages allegedly owed to the Officers for the fifteen-minute period at the start of each workday during which the Officers

---

[4] It is unclear from the County's Complaint how the parties agreed upon the $3,200,000 fee. The agreement states that the land would be sold for the greater of $3,040,000 or the appraised value of the property. *See* Compl. ¶ 55.

had to be present but for which they were not paid ("Fifteen-Minute lawsuit"). Compl. ¶¶ 60, 167. The County claims that Jobe, Jones and Flores, both individually and as members of the enterprise, "conspired . . . to defraud the County into obtaining a settlement on the 15-minute lawsuit." *Id.* ¶ 164. In early December 2004, Jobe allegedly "offered Flores monies in the form of campaign contributions in exchange for her vote" to settle the fifteen-minute lawsuit. *Id.* ¶ 170. Flores agreed, and on December 6, 2004, Flores and the other members of the Commissioners Court voted to settle the lawsuit. *Id.* ¶¶ 171-72. In so doing, Flores allegedly made "a materially false representation to the County with the intent that the County act in reliance of [sic] the misrepresentation." *Id.* ¶ 174. Flores "purposely withheld critical information that would likely have prevented a vote on the settlement offer." *Id.* ¶ 175. According to the County, "[i]t is unlikely that the Commissioners Court would have taken any action to accept the settlement offer submitted by Martie Jobe had the Court known of the bribing of at least one member of the Court, specifically Betti Flores." *Id.* "Flores' deliberate concealment of the scheme to defraud the County was intended to have the County act in reliance of [sic] the misrepresentation and vote in favor of settlement." *Id.* ¶ 176. The County alleges that the Commissioners Court relied on Flores's material omission in voting to accept the settlement and that the vote injured the County. *Id.* ¶ 178. The County also alleges that Jobe made a material misrepresentation to the County that she was "negotiating and offering settlement in good faith" and that she and Jones had offered, and Flores had accepted, money and other consideration in exchange for her vote. *Id.* ¶¶ 179-80. On or about December 1, 2004, Jobe forwarded a settlement offer to the County by mail and/or facsimile. *Id.* ¶ 182. Jobe "knowingly misrepresented that the offer included all consideration for settlement," and she

intentionally omitted facts relating to the bribing of Flores. *Id.* ¶ 183. On December 16, 2004, the County entered into a settlement agreement with the Officer plaintiffs in the class action lawsuit against the County. *Id.* ¶ 185. In return for their dismissal of the lawsuit, the Officers were paid $635,000. *Id.* ¶ 186. The County claims injuries of $635,000, along with "monies and fringe benefits" paid to Flores while she was engaging in activities to defraud the County of her honest services. *Id.* ¶ 195.

C.       **Fair Labor Standards Act § 207(k)**[5]

The County's Complaint also alleges that the racketeering enterprise defrauded the County by "bribing at least one County Commissioner in order to obtain the County of El Paso's waiver of its right to exercise the 207(k) provision of the Fair Labor Standards Act ("F.L.S.A.")." *Id.* ¶ 196. F.L.S.A. 207(k) is "a federal right regarding work schedules and overtime pay for law

---

[5]       Section 207(k) of the F.L.S.A. states that

> [n]o public agency shall be deemed to have violated subsection (a) of this section with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities (including security personnel in correctional institutions) if--
>
> (1) in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975; or
>
> (2) in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his work period as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1)) bears to 28 days,
>
> compensation at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(k).

enforcement officers." *Id.* ¶ 65. The County notified the El Paso County Sheriff's Officers Association that it intended to exercise its rights under the statute. *Id.* ¶ 67.

Following the County's assertion, Jobe threatened to sue the County for asserting its F.L.S.A. 207(k) rights. *Id.* ¶ 69. Shortly thereafter, Jones and Escobar arranged for Flores to receive free or discounted legal services for an unrelated personal criminal matter in exchange for her official vote to relinquish the County's F.L.S.A. 207(k) rights. *Id.* ¶ 200. Jones instructed John Travis Ketner ("Ketner") to provide Flores with these legal services. *Id.* According to the County, Ketner has since acknowledged the existence of a conspiracy and has pleaded guilty to his involvement in the F.L.S.A. 207(k) scheme. *Id.* ¶ 201. In approximately April or May 2005, Escobar notified Flores that "arrangements had been entered for a quick resolution of Flores' unrelated personal criminal matter." *Id.* ¶ 203.

Pursuant to their agreement, Flores voted in favor of relinquishing the County's F.L.S.A. 207(k) rights in approximately June 2006. *Id.* ¶ 206. According to the County, "Flores purposely withheld critical information that would likely have prevented, or at a minimum altered, a vote on whether the County would relinquish its rights under the F.L.S.A. 207(k) provision." *Id.* ¶ 208. The County alleges that it is unlikely that the Commissioners Court would have relinquished its F.L.S.A. 207(k) rights "had the Court known the threats of litigation by Martie Jobe were coupled with Jones', Escobar's, Jobe's, and Flores' agreement to conspire and defraud the County and the bribing of at least one member of the Court." *Id.*

The County alleges that it suffered damages resulting from this racketeering episode in the amount of $2,200,000, the extra pay received by Sheriff's deputies and detention officers as a result of the 207(k) waiver, plus "monies and fringe benefits paid to Betti Flores while she was

engaging in activities to further the enterprise and defraud the County of El Paso of her honest services." *Id.* ¶ 213.

### D. Digitization of Court Records

On or about November 3, 2003, El Paso County District Clerk Gilbert Sanchez ("Sanchez") sought permission from the Commissioners Court to release a request for proposals ("RFP") from vendors who sought to contract with the County to digitize the County's court records. Compl. ¶ 74. On January 30, 2004, Jobe and Jones allegedly entered into a consulting services contract with Roger Miller ("Miller"), President of Altep. Compl. ¶ 75. Jobe and Jones "were to work with staff and/or elected officials of the County of El Paso in representing Altep in matters related to obtaining a contract for services." *Id.* ¶ 76. In exchange for their services, Jobe and Jones would receive one-third of the net profits for the two-year period following the commencement of Altep's contract with the County. *Id.* ¶ 77. Following the agreement between Jones, Jobe and Miller, on or about June 7, 2004, a $1,000 check from Miller dated Mach 5, 2004, was delivered to Flores as a campaign contribution. *Id.* ¶ 79. According to the County, "[s]imilar contributions were delivered to other member/s of [the] Commissioners Court." *Id.* On June 7, 2004, Sanchez asked the Commissioners Court to consider the proposals received by the County. *Id.* ¶ 80. Prior to the Commissioners Court's consideration of the proposals, Sanchez's staff member, Fernando Parra ("Parra"), sent the confidential list of proposals to Jobe. *Id.* ¶ 82. In open session of the June 7, 2004 meeting of the Commissioners Court, Sanchez admitted that Jobe had been sent the confidential proposals. *Id.* On July 15, 2008, Parra pleaded guilty to his role in the alleged conspiracy to defraud the County. *Id.* ¶ 84. Parra admitted that "the defendant and others agreed to pay money, both [in] cash and in the form of political

contributions, to elected members of the El Paso County Commissioner's [sic] Court . . . in exchange for their support and vote in their official capacity." *Id.* (citing Compl. Ex. 4). Parra further admitted to using the United States Postal Service and a commercial interstate carrier to deliver the proposals and other correspondence. *Id.* The County seeks damages in the form of salary and fringe benefits paid to Flores during the time she deprived the County of her honest services. *Id.* ¶ 234.

The County alleges that Escobar committed a civil Racketeer Influenced and Corrupt Organizations Act ("civil RICO Act") violation and engaged in a conspiracy to commit the same. *See generally id.*; *see also* 18 U.S.C. §§ 1962(c)-(d). The predicate acts claimed by the County are mail and/or wire fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 and bribery in violation of Texas Penal Code § 36.02(a)(1). In addition, the County alleges that Escobar engaged in a conspiracy to defraud the County in violation of Texas state law. Compl. ¶ 238.

Escobar filed a Motion to Dismiss the County's Complaint against him on July 24, 2009. *See generally* Mot. to Dismiss. On August 4, 2009, the County filed "Plaintiff's Response to Defendant David Escobar's Motion to Dismiss Plaintiff's Second Amended Complaint for Failure to State a Claim and Motion to Decline to Exercise Supplemental Jurisdiction Over State-law Claim" ("Pl.'s Response") (Doc. No. 136). On August 7, 2009, Escobar filed "Defendant David Escobar's Reply to Plaintiff's Response to Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint for Failure to State a Claim and Motion to Decline to Exercise Supplemental Jurisdiction Over State-law Claim" ("Def's Reply") (Doc. No. 143).

II.     DISCUSSION

Escobar seeks dismissal of the instant suit against him for failure to state a claim for which relief may be granted under Rule 12(b)(6) and/or for lack of subject matter jurisdiction under 28 U.S.C. § 1367. The Court addresses these requests in turn.

### A.    Motion to Dismiss

#### 1.    Standard

A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, the court must accept well-pleaded facts as true and view them in a light most favorable to the plaintiff. *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002)*; Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Still, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted); *see also Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (stating that a court need not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions.").

Though a complaint need not contain "detailed" factual allegations, the "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555 (internal citation omitted). Thus, to survive a motion to dismiss, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Id.* at 570. Nevertheless, "a well-pleaded complaint may proceed even if its strikes a savvy judge that actual proof of those facts is

improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

When a plaintiff alleges fraud or fraudulent concealment, however, a plaintiff's complaint must meet a heightened pleading standard under Rule 9(b). *See* Fed. R. Civ. P. 9(b). At a minimum, Rule 9(b) requires a plaintiff to state particulars of "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he [or she] obtained thereby." *Tel-Phonic Servs. Inc. v. TBS Intern., Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992). The Rule 9(b) particularity requirement applies when fraud is alleged as a predicate act in a civil RICO claim. *Id.* at 1138.

### 2. The civil RICO, civil RICO conspiracy and state-law claim

In his Motion to Dismiss, Escobar urges the Court to dismiss the County's civil RICO and civil RICO conspiracy claims, along with its state-law claim for conspiracy to commit fraud, because the County has failed to plead factual allegations which would entitle it to relief for each claim alleged. *See generally* Mot. to Dismiss. In reviewing these documents, the Court bears in mind the Supreme Court's reminder that RICO claims should be "liberally construed to effectuate [their] remedial purposes," *United States v. Turkette*, 452 U.S. 576, 587 (1981), and that "[t]he statute's 'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498 (1985).

### a. Civil RICO

Escobar challenges the County's standing to bring its civil RICO claim, and he claims that the County has failed to adequately allege each element of its civil RICO claim, including

the existence of a person, a pattern of racketeering, and the existence of an enterprise.  *See generally* Mot. to Dismiss.  Escobar further alleges that the County has failed to state a claim for the predicate acts supporting its civil RICO claim.  *Id.*

### (1) Standing

As an initial matter, Escobar claims that the County lacks standing to bring its civil RICO claim because the County has failed to sufficiently allege 1) that it suffered injury; and 2) that Escobar's conduct was the proximate cause of any injuries it may have sustained.  *See* Mot. to Dismiss 26-39; *see also* 18 U.S.C. § 1962(c).  In order to have standing to bring a claim, a civil RICO plaintiff must show 1) an injury to business or property, and 2) causation.  *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 606 (5th Cir. 1998).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."  *Id.* (quoting *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994)).  However, if it is clear from the face of the complaint that the injury is purely speculative, a plaintiff will not be able to proceed with his or her claim.  *See In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d 518, 522-23 (5th Cir. 1995).

The County alleges that it suffered financial losses from the sale of its land in the Catalina Development conspiracy.  Compl. ¶ 314.  It claims damages of at least $3,370,000 "plus monies and fringe benefits" paid to Flores while she was engaging in "activities to further the enterprise and defraud the County of El Paso and its citizens of her honest services."  *Id.* ¶ 162.  With regard to the F.L.S.A. 207(k) conspiracy, the County alleges that it suffered financial injuries as a

result of its waiver of its right to exercise the 207(k) provision of the F.L.S.A.[6] *Id.* ¶ 213. The County alleges that its losses total a minimum of $2,200,000 "plus monies and fringe benefits" paid to Flores. *Id.*

Escobar argues that the County should not be able to recover wages or benefits paid to Flores because the County has a duty to pay its public servants irrespective of Defendants' conduct. Mot. to Dismiss 40. Even assuming that Escobar's assertion is accurate, the wages and benefits paid to Flores are not the only injuries claimed by the County. At this stage in the proceedings, the County need not prove the exact amount of damages incurred; it need only "raise[] a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555 (A court ruling on a motion to dismiss must assume that "all the allegations in the complaint are true (even if doubtful in fact)."). The County's Complaint is sufficient so long as it states a plausible injury. *See id.* Because the County has alleged plausible injuries, consisting of the excess overtime wages it paid using the more costly forty-hour workweek method of calculating overtime wages, notwithstanding its request for wages and benefits paid to Flores, the County has met its burden in this regard.

---

[6]     The F.L.S.A. requires employers to pay overtime compensation to employees who work in excess of forty hours per week. 29 U.S.C. § 207(a)(1). However, the statute partially exempts public agencies engaged in fire protection or law enforcement activities. 29 U.S.C. § 207(k). Under section 207(k), the County could adopt a work period of between seven and twenty-eight days to avoid the strict over forty-hour workweek overtime compensation requirement.

> If the municipality adopts a 7-day work period, it need not pay overtime compensation to its [exempted employees] until they have worked over 53 hours in a single week. If the municipality adopts a 14-day work period, it need not pay overtime compensation to its [exempted employees] until they have worked over 106 hours in the two-week period. If the municipality adopts a 28-day work period, it need not pay overtime compensation to its [exempted employees] until they have worked over 212 hours in that four-week period. Thus, by adopting a § 207(k) work period, a municipality can limit the number of hours for which it must pay "time-and-a-half" to its [employees].

*Singer v. City of Waco, Texas*, 324 F.3d 813, 818 (5th Cir. 2003) (internal citations omitted) (calculating overtime compensation as it relates to fire protection personnel).

Escobar also states that the County has failed to show that his alleged conduct was the proximate cause of the County's injuries. To survive a motion to dismiss, a plaintiff need only allege facts which, if proved, would show factual and proximate causation. *Whalen v. Carter*, 954 F.2d 1087, 1091 (5th Cir. 1992); *Sharma v. Skaarup Ship Mgmt.*, 916 F.2d 820, 828 (2d Cir. 1990); *see also Twombly*, 550 U.S. at 570 (A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."). The Fifth Circuit has noted that:

> Section 1964(c) embodies the only standing requirement which the civil RICO statute itself imposes. Only persons who have been injured "by reason of" the commission of predicate acts have standing to bring suit under section 1964(c) . . . . Thus, a person will be considered injured "by reason of" a RICO violation if the predicate acts constitute (1) factual (but for) causation and (2) legal (proximate) causation of the alleged injury.

*Ocean Energy II v. Alexander & Alexander, Inc.*, 868 F.2d 740, 744 (5th Cir. 1989).

A plaintiff must allege facts which show that, "but for" defendant's conduct, the plaintiff would not have suffered the injuries claimed. *Id.* A plaintiff must also allege facts which show that its alleged injuries were a foreseeable consequence of the defendant's conduct. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 289 (5th Cir. 2007).

> Even though these other standing requirements may have no relation to RICO or its regulatory scheme, they must be satisfied in addition to the statutory standing requirements. Therefore, in determining whether a plaintiff has standing to assert RICO claims, the district court first must determine whether any non-RICO standing requirements apply and have been satisfied. Then the court must determine whether the plaintiff has demonstrated that he has suffered an injury "by reason of" predicate acts which constitute a violation of RICO section 1962.

*Carter*, 954 F.2d at 1091.

### (a)    Catalina Development

In the Catalina Development conspiracy, the Commissioners Court voted four-to-one to accept Defendants' second settlement offer. Mot. to Dismiss Ex. A. According to Escobar,

"[b]ecause Flores was only one Commissioner, whose votes were not necessary to [the] *Catalina Development* settlement, any alleged violation in connection with this vote did not proximately cause any damage to Plaintiff." Mot. to Dismiss 27. Although Flores's vote was not the deciding vote, Escobar overlooks the role that Flores played in the second settlement offer's acceptance. Flores, acting in her official capacity as County Commissioner, requested a special session of the Commissioners Court to consider the second settlement offer. Compl. ¶ 127. In response to her request, a special session was held on December 22, 2003. *Id.* ¶ 131. The second settlement offer was approved at that session. *Id.* Prior to the special session, the Commissioners Court had considered the second settlement offer, but it took no action on the offer. *Id.* ¶ 125. It had also received other proposals concerning the disputed property, but similarly took no action on these proposals. *Id.* ¶ 119. Thus, it is plausible that "but for" the conduct of Escobar and Jones in providing money and/or other benefits to Flores, the Commissioners Court would never have voted in favor of accepting the Joint Venture's second settlement offer. Because it is also foreseeable that Defendants' conduct in offering bribes to Flores would lead to acceptance of the offer, the County has established proximate cause. *See Navigant Consulting, Inc.*, 508 F.3d at 289.

### (b) F.L.S.A. 207(k)

Escobar also claims that the County has failed to establish that its financial injuries in the alleged F.L.S.A. 207(k) conspiracy were proximately caused by his conduct because "the vote not to implement a 207(k) exemption did not require the County to *cause* employees to work overtime hours." Mot. to Dismiss 29 (emphasis added). In addition, Escobar claims that his involvement in the alleged conspiracy is "far too remote and attenuated to meet the standard of

proximate causation." *Id.* at 30. Because the County's only factual allegation related to his involvement with the F.L.S.A. 207(k) conspiracy is that he "advised Betti Flores that arrangements had been entered for a quick resolution of Flores' unrelated personal criminal matter," *id.* at 9, Escobar argues that the County's Complaint "fail[s] to state a plausible claim that [Escobar] committed the predicate act of bribery under section 36.02(a)(1) in connection with the F.L.S.A. section 207(k) episode." *Id.* at 15.

First, the County does not claim that Escobar *caused* the County to make its employees work overtime hours. Rather, the injury suffered by the County is the difference between what it would have paid to its employees had it exercised its F.L.S.A. 207(k) rights and what it paid as a result of Defendants' interference.[7] According to its Complaint, the County intended to exercise its F.L.S.A. 207(k) rights prior to Defendants' interference with the vote of the Commissioners Court. Compl. ¶ 67. The County alleges that "but for" Defendants' conduct in bribing and threatening County officials, it is unlikely that the County would have waived its F.L.S.A. rights. *Id.* ¶¶ 196-213. Because it is also foreseeable that Defendants' conduct would lead to the County's waiver of its F.L.S.A. 207(k) rights and that waiving these rights would cost the County more in overtime compensation, the County has sufficiently pleaded proximate cause.

In response to Escobar's claim that his involvement in the F.L.S.A. 207(k) episode was too attenuated for him to be held civilly liable, the Court notes that "[u]nder RICO, a defendant

---

[7] It is unclear whether the amount claimed, $2,200,000 in "extra pay," represents the full amount of overtime wages paid to the Sheriffs' deputies and detention officers or whether it represents the difference between what the County paid and what it would have paid had the County exercised its rights under F.L.S.A. 207(k). *See* Compl. ¶ 213. However, the Court need only determine whether the County has stated a cognizable injury; it need not assess whether the County is entitled to the total amount claimed. Because the County alleges that it was financially injured by Defendants' interference with its exercise of its F.L.S.A. 207(k) rights, the Court finds that it has sufficiently pleaded injury with regard to the alleged conspiracy.

need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the fraudulent scheme." *Casperone*, 819 F.2d at 115. Although Escobar did not personally offer Flores discounted or free legal services in exchange for her favorable vote in the F.L.S.A. 207(k) episode, he allegedly participated in planning the scheme to defraud the County of its F.L.S.A. 207(k) rights, and he allegedly took at least one overt step in furtherance of the conspiracy by advising Flores that the enterprise had arranged "for a quick resolution" of her unrelated personal criminal matter. Compl. ¶ 197, 203. Escobar's involvement in the F.L.S.A. 207(k) episode, combined with the role he played in the Catalina Development conspiracy are "sufficient to connect him to the fraudulent scheme" for purposes of stating a claim. *See Casperone*, 819 F.2d at 115.

In addition, where an act can be attributed to the conspiracy itself, it can be imputed to each co-conspirator. *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946); *see also United States v. Hurley*, 63 F.3d 1, 22 (1st Cir. 1995) (applying *Pinkerton* liability to co-conspirators in determining criminal penalties for RICO violations); *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989) (holding that acts of fraudulent concealment could be imputed to all co-conspirators); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 834 (S.D. Tex. 2009) (*citing In re Performance Nutrition, Inc.*, 239 B.R. 93, 99, 113 (Bankr. N.D. Tex. 1999)) ("Once a civil conspiracy is found, each coconspirator is responsible for any action in furtherance of the conspiracy performed by other conspirators. In other words, each action in a civil conspiracy is imputed to each coconspirator regardless of who actually performed the acts."); *Brunswick Corp., Mercury Marine Div. v. E.A. Doyle Mfg. Co.*, 770 F. Supp. 1351, 1371-72 (E.D. Wis. 1991) (stating that a RICO defendant is "responsible for

offenses committed by his fellow conspirators"); *First Interstate Bank of Nevada, N.A. v. Nat'l Republic Bank of Chicago*, No. 80-C-6401, 1985 WL 1118, at *8 (N.D. Ill. Mar. 10, 1985) (applying co-conspirator liability to meet predicate act requirement in civil RICO claim). Thus, the actions that Escobar's co-conspirators took in furtherance of the alleged conspiracy may be imputed to Escobar.

Alternatively, Escobar may be held liable for predicate acts, even if he did not commit the acts himself, if he aided and abetted in the commission of at least two predicate acts. *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258, 270 (3d Cir. 1995); *see also Conkling v. Turner*, 18 F.3d 1285, 1293 (5th Cir. 1994) (citing *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992) (stating that the "bare minimum of a RICO charge is that a defendant personally committed or aided and abetted the commission of two predicate acts.")). To find a defendant liable for aiding and abetting a predicate act, a plaintiff must show "(1) that the substantive act has been committed, and (2) that the defendant alleged to have aided and abetted the act knew of the commission of the act and acted with intent to facilitate it." *Jaguar Cars, Inc.*, 46 F.3d at 270. Escobar's co-defendant, Jones, is alleged to have "offered to arrange to have free or discounted legal representation on a criminal matter provided to Betti Flores in exchange for her official vote." *See* Compl. ¶ 198. Escobar was allegedly aware of the bribe and advised Flores that "arrangements had been entered for a quick resolution" of her legal issue. *Id.* ¶ 203. Thus, as Escobar "aided and abetted" in the violation, the actions of Jones may be imputed to Escobar for the purposes of pleading bribery in violation of Texas law as a RICO predicate act.

Because the Complaint alleges that Escobar participated directly in the bribing of Flores during the commission of the Catalina Development conspiracy, *id.* ¶¶ 154, 156, and that he engaged in wire and/or mail fraud when forwarding the second settlement offer on behalf of the Joint Venture, *id.* ¶ 122, the County contends that Escobar personally committed at least two predicate acts in the Catalina Development episode. In addition, the County has adequately alleged that Escobar aided and abetted the commission of at least one additional predicate act; namely, the bribing of Flores in connection with the F.L.S.A. 207(k) conspiracy. *See Conkling*, 18 F.3d at 1293 (citing *McLaughlin*, 962 F.2d at 192). Thus, the County has sufficiently alleged Escobar's participation in two of the episodes underpinning its civil RICO claim, along with its standing to bring its claim.

### (2) Elements of civil RICO

Next, Escobar challenges the sufficiency of the County's Complaint by stating that it fails to adequately allege each element of the civil RICO violation. *See generally* Mot. to Dismiss. Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "Racketeering activity" includes "any act or threat involving . . . bribery." *Id.* § 1961(a). In addition to the standing requirements discussed above, a civil RICO plaintiff must allege the existence of: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007) (quoting *In re Burzynski*, 989 F.2d 733, 741-42 (5th Cir. 1993)). Each element is

itself "a term of art which carries its own inherent requirements of particularity." *Elliot v. Foufas,* 867 F.2d 877, 880 (5th Cir. 1989).

### (a)    Person

First, Escobar claims that he is not a "person" subject to RICO liability. Mot to Dismiss 25. He claims that a RICO person is one who "poses or has posed a continuous threat of engaging in acts of racketeering." *Id.* (quoting *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988)). Although "a threat of[] continuing racketeering activity" is a requirement for liability under the civil RICO statute, it is more aptly categorized as a component of RICO's "pattern" requirement. *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240 (1989). The RICO Act broadly defines a "person" as including "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Because Escobar is indisputably an "individual . . . capable of holding a legal or beneficial interest in property," Escobar qualifies as a "person" under the RICO statute.

### (b)    Pattern of racketeering activity

Second, Escobar also claims that the County has failed to establish a "pattern of racketeering activity." Mot. to Dismiss 12-22. To establish a pattern of racketeering activity, a plaintiff must allege facts which show that the defendant engaged in "two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity." *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009); *see also* 18 U.S.C. § 1961(5) ("'[P]attern of racketeering activity' requires at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering

activity."). The predicate criminal acts can be either federal or state crimes. *St. Germain*, 556

F.3d at 263.

> The Supreme Court has stated that:
>
> Congress defined Title X's pattern requirement solely in terms of the relationship of the defendant's criminal acts one to another: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." § 3575(e). We have no reason to suppose that Congress had in mind for RICO's pattern of racketeering component any more constrained a notion of the relationships between predicates that would suffice.

*H.J. Inc.*, 492 U.S. at 240.

To show continuing racketeering activity, a plaintiff may allege facts which indicate that the

predicate acts are "part of an ongoing entity's regular way of doing business." *Id.* at 242.

According to Escobar, in order to meet the "pattern" requirement of civil RICO claims,

the County must "identify the statute which it alleges prohibits the activity it relies upon to

establish predicate acts of racketeering." Mot. to Dismiss 12. We find little support for this

assertion in the law. Escobar cites no Fifth Circuit precedent, and the cases he cites do not

appear to support this claim. Escobar cites the unpublished case of *Dalton v. City of Las Vegas*,

282 F. App'x. 652, 655 (10th Cir. 2008), which states that a plaintiff must identify which

offenses are predicate acts for its civil RICO claim, along with the time frame in which those acts

occurred. Mot. to Dismiss 12 (citing *Dalton*, 282 F. App'x. at 655). The County has identified

the predicate acts upon which its claim is based; namely, mail fraud, wire fraud and bribery,

along with the relevant time periods in which the alleged acts occurred. *See generally* Compl. In

another case cited by Escobar, *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350,

1375 (M.D. Fla. 2005), the plaintiff alleged that defendants offered a co-conspirator employment

in exchange for confidential information. *See Lockheed Martin Corp*., 357 F. Supp. 2d at 1375. Although "[a]n allegation of bribery as a RICO predicate act need not incorporate the common law definition of bribery nor must it be based on a statute specifically denominated as a bribery statute," and a prior Eleventh Circuit case had "read RICO broadly" to allow the state Unauthorized Compensation Statute to serve as a RICO predicate act, if a plaintiff is departing from a state or common law bribery claim, it must, at a minimum "put Defendants on notice as to what laws they are alleged to have violated." *See id.* (internal quotation marks omitted).  The district court in that case was concerned that the plaintiff's complaint "provide[d] neither the Court nor Defendants any clue as to what elements [plaintiff] must ultimately prove to establish a violation." *Id.*  That is not a concern in the instant case.

The County has specifically cited the state and federal laws on which it relies as predicate acts:  the federal wire fraud statute, the federal mail fraud statute, and the Texas state-law bribery statute. *See generally* Compl.  Although Escobar claims that the County erroneously invoked the wrong subsection of the Texas bribery statute, Mot. to Dismiss 14, the County clearly relies on bribery as a predicate act for its claim and makes factual allegations which "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555.  Lastly, *Raney v. Allstate Insurance Co.*, 370 F.3d 1086, 1087 (11th Cir. 2004), does not, as Escobar alleges, require a plaintiff to identify the particular statutes which serve as the predicate acts for its claim. *See* Mot. to Dismiss 13 (citing *Raney*, 370 F.3d at 1087).  The *Raney* court simply asserted that the filing of a lawsuit alone "cannot form a predicate act under RICO." *Raney*, 370 F.3d at 1087.  Instead, a plaintiff must allege facts that support the elements of the violations claimed. *Id.*

Escobar points out that individual predicate acts alone do not satisfy the pattern requirement of civil RICO claims. Mot. to Dismiss 21. Rather, he argues, the alleged acts must be related to a larger scheme and evince a threat of continued criminal activity. Def.'s Reply 11. According to the Supreme Court, however, "[i]t is reasonable to infer . . . that Congress intended to take a flexible approach [to the pattern requirement of civil RICO claims], and envisaged that a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates, within the expansive bounds set." *H.J. Inc.*, 492 U.S. at 238. The County's claims of bribery, mail fraud and wire fraud plausibly show a pattern of racketeering activity because the acts were allegedly in furtherance of Defendants' attempts to secure favorable results for their clients by manipulating corrupt officials.

Further, given Defendants' ongoing relationship with County officials and Defendants' alleged ability to use their network of corrupt officials to benefit their clients, Defendants' acts give rise to a threat of continued criminal activity. In reversing the dismissal of petitioners' complaint in *H.J. Inc.*, the Supreme Court held:

> The acts of bribery alleged are said to be related by a common purpose, to influence commissioners in carrying out their duties in order to win approval of unfairly and unreasonably high rates for [Defendant]. Furthermore, petitioners claim that the racketeering predicates occurred with some frequency over at least a 6-year period, which may be sufficient to satisfy the continuity requirement. Alternatively, a threat of continuity of racketeering activity might be established at trial by showing that the alleged bribes were a regular way of conducting [Defendant's] ongoing business, or a regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise.

*Id.* at 250.

Though Flores is no longer serving as a County Commissioner, Defendants' alleged "consulting services" enterprise and their access to County officials plausibly presents a threat of continued criminal activity. *See id.* It would be an absurd result if, as Escobar suggests, Flores's

indictment and subsequent loss of her position as County Commissioner immunizes her and her co-defendants from civil liability under RICO because her loss of power eliminated any plausible "threat of continuity." *See id.* at 242-43 ("[T]he threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes."). The ongoing threat exists, not because of Flores's position as County Commissioner, but because of Defendants' method of doing business, which allegedly involves eliminating competition, threatening litigation, and offering improper inducements to County officials through bribery, mail, and/or wire fraud. Flores was simply a vehicle through which the enterprise, Flores included, allegedly carried out its schemes. Defendants allegedly attempted to "coerce" at least one other County Commissioner into voting in favor of the second settlement offer in the Catalina Development episode. Compl. ¶ 125. Although Defendants were unable to secure Commissioner Scruggs's favorable vote, Mot. to Dismiss Ex. A, their attempt evinces their willingness to recruit additional officials to assist in carrying out their activities. In addition, the racketeering predicates in the instant case occurred "with some frequency" over a period of at least several years. Compl. ¶ 7. The County has plausibly established a threat of continuity by alleging that the bribing of County officials, in the form of free or discounted legal services, campaign contributions, or otherwise, was a regular way that Escobar and other non-commissioner Defendants conducted their business.

Escobar also argues that there is "[n]o nexus between [the] alleged pattern of racketeering activity and conduct or participation in the affairs of the alleged enterprise 'through' such

activity." Mot. to Dismiss 24. According to Escobar, to establish a nexus, the County must

show that "1) the defendant committed acts of racketeering; 2) the defendant's position in the

enterprise facilitated the acts of racketeering; and 3) the predicate acts had some effect on the

enterprise." *Id.* (citing *United States v. Erwin*, 793 F.2d 656, 671 (5th Cir. 1986); *United States

v. Cauble*, 706 F.2d 1322, 1332-33 (5th Cir. 1983); *Overnight Transp. Co. v. Truck Drivers

Union Local No. 705*, 904 F.2d 391, 393 (7th Cir. 1990)). Escobar alleges that the County has

failed to establish that his position in the enterprise facilitated the acts of racketeering and that his

acts had some effect on the enterprise. *Id.*

The County, for its part, has alleged that Escobar played a significant role in the Catalina

Development conspiracy, serving as Trustee for the Joint Venture and engaging in wire fraud

and/or mail fraud in furtherance of the enterprise's objective of securing the County's land on

behalf of the Joint Venture. Compl. ¶ 113. Escobar is also alleged to have participated in

bribing Flores. *Id.* ¶¶ 156, 243. Escobar's participation in bribing Flores and his submission of

the second settlement offer by wire or through the mails furthered the goals of the alleged

"consulting services" enterprise and helped to secure the County's acceptance of the second

settlement offer. Although Esobar's alleged role in the F.L.S.A. 207(k) conspiracy is less

prominent, he allegedly participated in planning the scheme to defraud the County and assisted in

the bribing of Flores. *Id.* ¶¶ 197, 203. Thus, the Court finds that the County has alleged that

Escobar's position facilitated the acts of racketeering and that his acts had some effect on the

enterprise.

Next, Escobar argues that the County must allege that he, and not the enterprise, engaged

in a pattern of racketeering activity. Mot. to Dismiss 21 (citing 18 U.S.C. § 1961(c); *United*

*States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987); *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk*, 793 F. Supp. 1114, 1128 (E.D.N.Y. 1992)).  According to Escobar, "[i]f either of the two events in which Plaintiff claims this Defendant was involved does not sufficiently [indicate] racketeering activity, then by definition, there was no pattern of racketeering activity."  *Id.*

The RICO statute states that it is "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  Escobar's assertion that the pattern requirement must be met by each individual defendant is not without question.  *See United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992) ("Proof of a RICO violation pursuant to § 1962(c) requires a showing that an "enterprise" engaged in a "pattern" of racketeering activity.").  However, even assuming that Escobar's assertion is accurate, the County has alleged that Escobar directly or indirectly participated in two or more predicate acts which plausibly constitute a "pattern" of racketeering activity.  *See H.J. Inc.*, 492 U.S. at 240.  Escobar is alleged to have directly or indirectly participated in the bribing of Flores in both the Catalina Development and the F.L.S.A. 207(k) conspiracies.  Compl. ¶¶ 135, 203.  These alleged acts of bribery have "the same or similar purposes, results, participants, victims [and] methods of commission" required to constitute a "pattern."  *See H.J. Inc.*, 492 U.S. at 240.  The method of commission is the same, as are the purposes and results; namely, securing profits by ensuring favorable votes from the Commissioners Court.  *See generally* Compl.  In both instances, the victim is the County, and the participants include Jones, Escobar and Flores.  *Id.*

Finally, Escobar argues that the County has failed to demonstrate that he "conducted" or "participated in the conduct" of the affairs of the enterprise. Mot. to Dismiss 23. Escobar claims that only those individuals who participate in the operation or management of the enterprise can be held civilly liable under RICO. *Id.* The Supreme Court has held that, "[i]n order to participate, directly or indirectly, in the conduct of such enterprise's affairs, one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (internal quotation marks omitted). However, "liability under § 1962(c) is not limited to upper management." *Id.* at 184. Even "outsiders" may be liable if they "are 'associated with' an enterprise and participate in the conduct of *its* affairs." *Id.* at 185 (emphasis in original). The Fifth Circuit has similarly held that § 1962(c) "only requires that a defendant 'take part in' the operation of the enterprise, not that he direct its affairs." *United States v. Posada-Rios*, 158 F.3d 832, 856 (5th Cir. 1998) (citing *Reves*, 507 U.S. at 179).

It is evident from the County's Complaint that Escobar is no "outsider" in the operations of the alleged enterprise. *See generally* Compl. Escobar allegedly served as Trustee for the Joint Venture and submitted several offers on its behalf. *Id.* ¶¶ 42-43. Escobar entered into a contract with Guaderrama to allegedly eliminate Guaderrama's competing interest in acquiring the County's land, *id.* ¶ 47, and he threatened Commissioner Scruggs with adverse political consequences should he fail to vote in favor of the second settlement offer. *Id.* ¶ 51. For these reasons, the Court finds that the County has demonstrated that Escobar "participated in the conduct" of the affairs of the enterprise.

### (c)     Enterprise

Third, Escobar claims that the County has failed to establish the existence of an enterprise. Mot. to Dismiss 6-11. To establish the third element of a RICO claim, a plaintiff must allege the existence of an enterprise with "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009); *see also* 18 U.S.C. § 1961(4) (defining "enterprise" broadly to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity"). Escobar maintains that, because the enterprise has no alleged existence apart from the claimed pattern of activity, has no common interest, and is not alleged to be an ongoing organization, the County's claim must fail. Mot. to Dismiss 6-11.

Escobar cites the Supreme Court's opinion in *Boyle* for the proposition that an enterprise "must have an existence separate and apart from [the alleged racketeering] activity." *Id.* at 8 (citing *Boyle*, 129 S. Ct. at 2244). However, the Supreme Court in *Boyle* also stated that the requirement of an enterprise's separate existence may, at times, be inferred from "the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity." *Boyle*, 129 S. Ct. at 2245 ("[T]he evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce.") (internal quotation marks omitted).

> [A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods-by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing

> unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.* at 2245-46.

The County alleges that Defendants functioned as an association-in-fact. *See* Compl. ¶ 89. They provided consulting services to the public. *Id.* In exchange for their fees, they exploited insider connections with County officials, including Flores, to eliminate competition and to secure County contracts and agreements on behalf of their clients. *Id.* For example, Defendants allegedly purchased Guaderrama's competing interest in acquiring the County's property and attempted to obtain privileged information regarding the property's value in order to secure the property for their client. *Id.* ¶¶ 105-62. The association-in-fact's main objective, securing County contracts and agreements for its clients, evinces an existence "separate and apart" from the alleged racketeering activities. *See id.* ¶ 89. Although Defendants' "consulting services" organization allegedly engaged in predicate acts in furtherance of its objectives, the County has alleged that it "exists for purposes other than merely to commit the predicate acts." *See* Mot. to Dismiss 8 (citing *Clark v. Douglas*, No. 06-40364, 2008 WL 58774, *4 (5th Cir. Jan. 4, 2008)). However, even if the County failed to allege an existence separate and apart from Defendants' alleged racketeering activities, it is not clear that this would prove fatal to its claim. Because Defendants' "consulting services" organization functioned through its commission of the predicate racketeering acts, the evidence establishing the association-in-fact and the pattern of racketeering activity in the instant case may "coalesce." *See Boyle*, 129 S. Ct. at 2245.

The County has also sufficiently alleged a "common interest."  The common interest shared by Defendants was making a profit by securing County contracts and agreements on behalf of their clients.  Compl. ¶ 89; *see also Cunningham v. Offshore Specialty Fabrications, Inc.*, 543 F. Supp. 2d 614, 634 (E.D. Tex. 2008) (citing *United States v. Elliott*, 571 F.2d 880, 898 (5th Cir. 1978)) ("The 'desire to make money' is a common purpose recognized by multiple courts.").  Although Escobar claims that the four alleged conspiracies are "independent matters involving separate issues arising at different times," the conspiracies all involve the use of Defendants' consulting services and insider connections to profit at the County's expense.  Escobar need not be implicated in all four racketeering episodes.  It is sufficient for the purpose of the County's civil RICO claim that he is implicated in at least two predicate acts.  *See Casperone*, 819 F.2d at 115.  The County has met its burden in this regard.

The County has also stated factual allegations that make it plausible that Defendants functioned as a "continuing unit."  Compl. ¶ 89.  As noted above, the County claimed that the Defendants engaged in a consulting services enterprise that secured contracts and agreements with the County by bribing and threatening county officials.  *Id.*  The County further alleges that Defendants' consulting services organization has been operating for at least several years.  *See generally id.*  Escobar relies on the Fifth Circuit's opinion in *Calcasieu-Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1462 (5th Cir. 1991), for the proposition that no ongoing activity existed; however, *Calcasieu* was an appeal from a jury verdict, not a dismissal based on the sufficiency of the plaintiff's pleadings.  *Calcasieu-Marine Nat'l Bank*, 943 F.2d at 1462.  To withstand a motion to dismiss, the County need not prove each element of its civil RICO claim.  It need only state "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at

570.  Escobar's contention that, because "Flores no longer serves as County Commissioner," there can exist no "continuing unit" is inapposite.  As stated above, the Court does not share Escobar's belief that the criminal indictment of one participant based on RICO violations shields Defendants from civil liability.

### (d) Predicate acts

Escobar further alleges that the County has failed to state a claim for the predicate acts of state-law bribery, mail fraud and wire fraud.  Mot. to Dismiss 13-20.  As stated above, a civil RICO plaintiff must make factual allegations that the defendant or his co-conspirators participated in two or more predicate acts.  *See* 18 U.S.C. § 1961(5).  Under the Texas Penal Code, a person commits bribery if he or she "intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another:  (1) any benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter."  TEX. PENAL CODE ANN. §§ 36.02(a)-(a)(1) (Vernon 2003).  This section is qualified by Texas Penal Code § 36.02(d), which states, "[i]t is an exception to the application of Subdivisions (1), (2), and (3) of Subsection (a) that the benefit is a political contribution as defined by Title 15, Election Code, or an expenditure made and reported in accordance with Chapter 305, Government Code."  TEX. PENAL CODE ANN. § 36.02(d).[8]

---

[8]  "Political contribution" is defined as a campaign contribution or an officeholder contribution.  TEX. ELEC. CODE § 251.001(5).  "Campaign contribution" is defined as "a contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure."  *Id.* § 251.001(3).  Similarly, "officeholder contribution" is defined as "a contribution to an officeholder or political committee that is offered or given with the intent that it be used to defray expenses that:  (A) are incurred by the officeholder in performing a duty or engaging in an activity in connection with the office; and (B) are not reimbursable with public money."  *Id.* § 251.001(4).

The County alleges that Escobar and others agreed to pay money and other benefits to Flores in exchange for her favorable vote. Compl. ¶ 135. Escobar claims that the County fails to state a claim for bribery in both the Catalina Development and the F.L.S.A. 207(k) racketeering episodes. Mot. to Dismiss 13-16. More specifically, Escobar states that the County has failed to claim that Escobar acted intentionally or knowingly when bribing Flores. *Id.* at 13. Even under the heightened pleading requirements of Rule 9(b), which do not apply to bribery claims, "knowledge" may be alleged generally. *See* FED. R. CIV. P. 9(b). Although a Complaint which alleges conclusory statements that "amount to nothing more than a 'formulaic recitation of the elements'" cannot survive a motion to dismiss, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009) (citing *Twombly*, 550 U.S. at 555), a complaint that plausibly suggests unlawful conduct, and "does more than contain bare allegations of an impermissible" course of conduct may survive such a motion. *al-Kidd v. Ashcroft*, 580 F.3d 949, 975 (9th Cir. 2009).

The County generally avers that Escobar "knowingly engaged in racketeering activities" in violation of the RICO Act. Compl. ¶ 88. However, the County also makes factual allegations to support its claim. For example, the County claims that Escobar met with and delivered bribes to Flores, that he threatened Commissioner Scruggs with adverse political consequences, and that he received $580,000 in compensation for his efforts in acquiring the County's property on behalf of the Joint Venture. *Id.* ¶¶ 125, 150, 156. Because bribery is alleged to be one such racketeering activity in which Escobar is alleged to have knowingly engaged, and the County has made factual allegations sufficient to withstand Escobar's Motion to Dismiss.

Escobar further notes that the County erroneously cites § 36.02(a)(1) of the Texas Penal Code when the relevant statute is § 36.02(a)(4). Def.'s Reply 8; *see also* Tex. Penal Code Ann. §§ 36.02(a)(1), 36.02(a)(4). Section 36.02(a)(4) states that

> [A]ny benefit that is a political contribution as defined by Title 15, Election Code, or that is an expenditure made and reported in accordance with Chapter 305, Government Code, if the benefit was offered, conferred, solicited, accepted, or agreed to pursuant to an express agreement to take or withhold a specific exercise of official discretion if such exercise of official discretion would not have been taken or withheld but for the benefit; notwithstanding any rule of evidence or jury instruction allowing factual inferences in the absence of certain evidence, direct evidence of the express agreement shall be required in any prosecution under this subdivision.

Tex. Penal Code Ann. § 36.02(a)(4).

According to Escobar, the statute "imposes an additional element not claimed by Plaintiff." Def.'s Reply 8 n.1. Because the benefits Flores received took the form of campaign contributions, Escobar claims that the County's claim cannot survive. The County, however, is neither required to state the various elements of the alleged causes of action, nor is it required to reference specific statutes in its Complaint. *See* Fed. R. Civ. P. 8(a). It must simply present "a short and plain statement of the claim" showing that it is entitled to relief. *Id.* The County has met its burden in this regard.[9]

With respect to the F.L.S.A. 207(k) episode, the County alleges that Jones violated the Texas state bribery statute by "offer[ing] to have free or discounted legal representation . . . provided to Betti Flores in exchange for her official vote as an El Paso County Commissioner."

---

[9] The County alleges that the monies paid were "disguised as campaign contributions." Compl. ¶ 155. This implies that the funds were not given "with the intent that [they] be used in connection with a campaign for elective office or on a measure." *See id.*; *see also* Tex. Elec. Code 251.001(3). As such, they would not be included in the Texas Election Code's definition of "campaign contribution." *See* Tex. Elec. Code 251.001(3) (defining "campaign contribution" as a contribution that "is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure.").

Compl. ¶ 198.  As noted herein, a defendant may be liable for predicate acts committed by co-defendants if he or she aided and abetted in the commission of those acts or was sufficiently connected to the fraudulent scheme.  *See Conkling*, 18 F.3d at 1293; *Casperone*, 819 F.2d at 115.  The County has pleaded facts indicating that Escobar aided and abetted in Jones's bribing of Flores.  Compl. ¶ 203.  In the alternative, the County has alleged that Escobar participated in the bribing of Flores and was sufficiently connected to Defendants' fraudulent scheme to be held liable for predicate acts taken in furtherance of the F.L.S.A. 207(k) scheme.  *See* Compl. ¶ 203.  Thus, the County has stated a claim against Escobar for the predicate act of bribery in the F.L.S.A. 207(k) episode.

Escobar also asserts that the County has failed to state a claim of mail or wire fraud in either the Catalina Development or the F.L.S.A. 207(k) conspiracy.  Mot. to Dismiss 16-20.

Title 18 of the United States Code § 1341 makes it unlawful to

> devise[] or intend[] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing.

18 U.S.C. § 1341.

Similarly, Title 18 of the United States Code § 1343 makes it unlawful to

> devise[] or intend[] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or

> promises, transmits or causes to be transmitted by means of wire . . .
> communication in interstate or foreign commerce, any writings, signs, signals,
> pictures, or sounds for the purpose of executing such scheme or artifice.

18 U.S.C. § 1343.

> To state a claim for mail or wire fraud, a plaintiff must establish the following:
>
> (1) a scheme or artifice to defraud or to obtain money or property by means of
> false pretenses, representations, or promises; (2) a use of the interstate mails or
> wires for the purpose of executing the scheme; and (3) a specific intent to defraud
> either by revising, participating in, or abetting the scheme.

*See Hewlett-Packard Co. v. Byd:Sign, Inc.*, No. 6:05-cv-456, 2007 WL 275476, at *3 (E.D. Tex.
Jan. 25, 2007) (citing *United States v. Davis*, 752 F.2d 963, 970 (5th Cir. 1985) (setting out
elements of mail fraud); *Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988) (setting out
elements of wire fraud)).

Escobar accurately notes that fraud is subject to the heightened pleading requirements of Rule

9(b).  Mot to Dismiss 16; FED. R. CIV. P. 9(b); *Tel-Phonic Servs. Inc.*, 975 F.2d at 1139 (stating

that the "particularity requirement applies to the pleading of fraud as a predicate act in a RICO

claim").  At a minimum, the County must state particulars of "time, place, and contents of the

false representations, as well as the identity of the person making the misrepresentation and what

he obtained thereby."  *See Tel-Phonic Servs. Inc.*, 975 F.2d at 1139.

Escobar claims that the only specific allegations made by the County regarding mail

and/or wire fraud in connection with the Catalina Development conspiracy is that Escobar

forwarded two separate settlement offers to Steve Hughes, an attorney for the County, and that he

forwarded a letter to Ted Houghton "fraudulently threatening litigation."  Mot to Dismiss 17-18

(citing Compl. ¶¶ 114-15, 120-22, 131, 142-46).  Escobar argues that the County has failed to

allege that any of the correspondence was fraudulent.  *Id.* at 18.  However, it is not a requirement

that the correspondence itself be fraudulent; it need only be forwarded in furtherance of a

fraudulent scheme.  *See* 18 U.S.C. §§ 1341, 1343; *United States v. Tencer*, 107 F.3d 1120, 1125

(5th Cir. 1997) ("Even a routine or innocent mailing may supply the mailing element as long as it contributes to the execution of the scheme."). The County's Complaint states that Escobar engaged in a scheme to defraud the County of its property by means of false representations, that on December 4, 2003, Escobar submitted the Joint Venture's second settlement offer by mail or by wire, that the second settlement offer was subsequently accepted by the County, and that Escobar specifically intended to defraud the County of its land. Compl. ¶¶ 108-24; *see also Tel-Phonic Servs. Inc.*, 975 F.2d at 1139; *Hewlett-Packard Co.*, 2007 WL 275476, at *3. Thus, the County has sufficiently made out a claim for mail and/or wire fraud.

In addition, the County has also made out a second claim for wire fraud with respect to the threatening correspondence that Escobar allegedly forwarded to Houghton. The County claims that Escobar forwarded a letter to Houghton via facsimile on April 4, 2004. Compl. ¶ 146. The letter was allegedly sent in furtherance of Defendants' scheme to defraud the County of its land, and it was sent with this specific intent in mind. *Id.* ¶ 147. The County's Complaint states the time, the contents of the false representations, the identity of the person making the misrepresentations, as well as what Defendants obtained through their fraudulent misrepresentations; namely, "successful completion of the enterprise's scheme to defraud the County and obtain conveyance of the tract of land." *Id.*; *see also Tel-Phonic Servs., Inc.*, 975 F.2d at 1138.

As noted above, Escobar "need not personally commit the predicate acts provided that the evidence is sufficient to connect him to the fraudulent scheme." *See Casperone*, 819 F.2d at 115. Specifically, "[a] defendant need not personally handle the mail; there need only be sufficient evidence to connect him to the fraudulent scheme involving the use of the mails." *United States*

*v. Finney*, 714 F.2d 420, 423 (5th Cir. 1983). The County has made sufficient factual allegations to connect Escobar to the alleged fraudulent scheme. Thus, any mail and/or wire fraud committed by his co-defendants in furtherance of the alleged racketeering episode may be imputed to Escobar. For example, the County states that, between December 15 and December 20, 2003, Flores requested a special meeting of the Commissioners Court via email. Compl. ¶ 128. The County's allegation meets the minimal requirements of Rule 9(b) and states the "time, place, contents of the false representations, . . . the identity of the person making the misrepresentation and what [s]he obtained thereby." *See Tel-Phonic Servs. Inc.*, 975 F.2d at 1139. According to the County, Flores's email was a direct result of the bribes that she received from the non-commissioner Defendants. Compl. ¶ 128. The email was allegedly sent in furtherance of the scheme to undermine a competitive bidding process for the County's land and to secure the land on behalf of the Joint Venture. *Id.* Because the County has pleaded factual allegations which are sufficient to connect Escobar to the fraudulent scheme, Escobar may be held liable for predicate acts committed by other Defendants, including emails sent by Flores in furtherance of the scheme. *See Casperone*, 819 F.2d at 115.

The County has also made factual allegations that Defendants unlawfully attempted to obtain privileged information concerning the appraisal status of the County's land from Steve Hughes, then outside counsel for the County. Compl. ¶¶ 138, 270. The County specifically alleges that Jones "intended to obtain privileged attorney client information from the County under false pretenses and in furtherance of the conspiracy to defraud the County and ensure favorable resolution for the Joint Venture." *Id.* ¶ 271. The County alleges that Defendants in the Catalina Development conspiracy colluded to eliminate competing interests in the disputed

property.  *Id.* ¶ 277.  By so doing, Defendants "deliberate[ly] circumvent[ed] . . . a legitimate competitive bidding process open to the public" which "resulted in the land selling for less than it [sic] true market value."  *Id.*  Presumably, attempting to obtain confidential information regarding the disputed property's appraised value was "in furtherance" of Defendants' alleged conspiracy to defraud the County.  *See United States v. Byrd*, 954 F.2d 586, 589 (9th Cir. 1992) (finding the defendant's threatening phone call to be in furtherance of a conspiracy to interfere with federally protected activities).  Because these communications occurred through the internet and facsimile, the fraud by wire statute is implicated.  *See* Compl. ¶¶ 138-39.  Further, because the County has made factual allegations sufficiently connecting Escobar to the unlawful scheme, Jones's alleged act of wire fraud may be imputed to Escobar.  *Id.*

Escobar claims that the County has failed to make factual allegations sufficient to sustain a claim for mail and/or wire fraud in connection with the F.L.S.A. 207(k) conspiracy; however, in its Complaint, the County states that Escobar's co-defendant, Jobe, sent a letter or facsimile to the County "noticing the County of potential litigation regarding the County's implementation of its 207(k) rights."  Compl. ¶ 202.  Again, because the County has pleaded factual allegations which plausibly link Escobar to the fraudulent scheme, Escobar may be held liable for predicate acts committed by Jobe.  *See Casperone*, 819 F.2d at 115.

### (3)    Four-year statute of limitations

Irrespective of the contents of the County's pleadings, Escobar argues that the County's civil RICO claim for the Catalina Development conspiracy, filed on April 1, 2009, is barred by the four-year statute of limitations for civil RICO violations.  Mot. to Dismiss 43 (citing *Rotella v. Wood*, 528 U.S. 549, 553 (2000)).  A statute of limitations defense may be asserted by a

defendant in a 12(b)(6) motion.  *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003).  Such a defense may support dismissal of the complaint "where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like."  *Id.*  A party who raises a statute of limitations defense shoulders the burden of proof on this issue.  *In re Hinsley*, 201 F.3d 638, 644-45 (5th Cir. 2000).  Once a party meets this burden, a plaintiff who asserts a claim outside of the statutory period bears the burden of showing the propriety of equitable tolling.  *See Bradley v. Phillips Petroleum Co.*, 527 F. Supp. 2d 625, 639 (S.D. Tex. 2007) ("The plaintiff, as the party seeking to benefit from the discovery rule, has the burden to plead and prove facts in order to avoid a limitations bar.").

 RICO civil enforcement actions are subject to a four-year statute of limitations.  *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 107 (1987).  The Fifth Circuit has adopted the "injury discovery rule" for civil RICO claims.  *Rotella v. Wood*, 147 F.3d 438, 440 (5th Cir. 1998), *aff'd*, 528 U.S. 549 (2000).  Under the "injury discovery rule," a plaintiff must file a claim within four years of the date that his or her alleged injury was discovered or should have been discovered in the exercise of reasonable diligence.  *See Rotella*, 528 U.S. at 553.

Because the County's injury occurred at the time that it entered into the land sale agreement with Defendants, in December 2003, Escobar asserts that the County's claim is time-barred.  The County defends that it had no reason to know about the injury or the alleged fraud until Flores's guilty plea in June 2007.  Pl.'s Resp. ¶ 74.  Escobar counters that the County's allegation is "inconsistent with the facts admitted by its complaint" and "provides no factual basis for allowing it to avoid limitations."  Def.'s Reply 20.

The injury alleged by the County is the difference between the true value of the disputed land and the monies it received from Defendants as a result of the second settlement agreement.[10] Compl. ¶¶ 105-62. A competitive bidding process allegedly would have allowed the County to obtain the highest price for the disputed land. *Id.* ¶ 143. By bribing members of the Commissioners Court, purchasing competing interests in the land and threatening individuals capable of advising the Commissioners Court against the sale, Defendants allegedly undermined the ability of the County to secure a favorable price for the property. *See id.* ¶¶ 116-19, 135, 143-47. Flores, the only Commissioner who both knew of Defendants' scheme and voted in favor of the settlement offer, did not disclose her involvement in the scheme or Defendants' tactics to secure the land. *See Id.* ¶ 130. Thus, it is plausible that the County neither knew nor had reason to know that Defendants had actively interfered with its sale of the land until Flores's guilty plea in June 2007, and the County's civil RICO claim is timely. *See* Pl.'s Resp. ¶¶ 16-17.

### b. Conspiracy to commit RICO Act violation

The County also alleges that Escobar and others engaged in a conspiracy to commit a RICO Act offense in violation of 18 U.S.C. § 1962(d). Compl. ¶ 197. Escobar moves to dismiss the claim on the basis that the County has failed to allege an "objective manifestation of an intent to participate in the affairs of the enterprise" with respect to the alleged F.L.S.A. 207(k) conspiracy. Mot. to Dismiss 41. The elements of a conspiracy to violate RICO are: "(1) knowledge by the defendant of the essential nature of the conspiracy; (2) the defendant's

---

[10] Escobar argues that the County's claim fails to establish the "concrete financial loss" required of RICO complaints. Mot. to Dismiss 35 (citing *Patterson v. Mobil Co.*, 335 F.3d 476, 492 n.16 (5th Cir. 2003)). Although Escobar challenges the County's "highly suspect assertion" that the value of the land was $6,660,000 at the time of its sale, *id.* at 36, the Court "must accept as true the well-pleaded factual allegations in the complaint during the pleadings stage." *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009). The County alleges concrete financial losses of over three million dollars in the sale of its property based on the value of the Joint Venture around the time of the sale, and its claim survives Escobar's Motion to Dismiss.

objective manifestations of an agreement to participate in the conduct of the affairs of an enterprise; and (3) an overt act, which need not be a crime, in furtherance of the conspiracy." *Bonton v. Archer Chrysler Plymouth, Inc.*, 889 F. Supp. 995, 1005 (S.D. Tex. 1995) (citing *United States v. Sutherland*, 656 F.2d 1181, 1187 n.4 (5th Cir.1981)). A plaintiff must allege that defendants entered into an agreement to commit two or more predicate acts in furtherance of the RICO conspiracy. *Tel-Phonic Servs., Inc.*, 975 F.2d at 1140 (citing *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990)) ("[B]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement."). In addition, a plaintiff must show that defendants knew that the acts agreed upon were part of a pattern of racketeering activity. *Id.* at 1140-41 (citing *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 47 (1st Cir. 1991)).

> The County states that Flores

> pled guilty to a six-count Federal Information . . . charging that she "conspired and agreed together with others . . . to knowingly devise a scheme and artifice to defraud the County of El Paso and its citizens of the right to [her] honest services in the affairs of the County of El Paso and to obtain money and property by means of material false and fraudulent pretenses, representations and promises, and in furtherance of the scheme to deprive . . . others known and unknown offered to pay and paid the defendant money and other benefits in exchange for her vote in her official capacity as an El Paso County Commissioner.["]

Compl. ¶ 24 (omissions in original).

The County further alleges that "the enterprise and its members knowingly engaged in racketeering activities in violation of 18 U.S.C. § 1962(c) and (d)." *Id.* ¶ 88. However, nowhere in its Complaint does the County allege that Escobar entered into an agreement to commit two or more predicate acts which he knew were part of a pattern of racketeering activity. *See Tel-Phonic Servs., Inc.*, 975 F.2d at 1141 (affirming dismissal of RICO conspiracy claim where

45

plaintiff "fail[ed] to plead specifically any agreement to commit predicate acts of racketeering," and finding the conclusory allegation that defendants "conspired" insufficient). The County has failed to meet the minimal pleading requirements for a RICO conspiracy claim, and its claim is dismissed.

### c. Conspiracy to commit fraud

Escobar also alleges that the County has failed to plead its conspiracy to commit fraud claim with the specificity required by Rule 9(b). Mot. to Dismiss 46-52. To state a claim for civil conspiracy in violation of Texas state law, a plaintiff must allege "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *See Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005); *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1990); *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). Once a plaintiff has established the existence of a conspiracy, each co-conspirator "is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination." *State v. Standard Oil Co.*, 107 S.W.2d 550, 559 (Tex. 1937); *see also Bentley v. Bunton*, 94 S.W.3d 561, 619 (Tex. 2002); *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963) ("The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators.").

The County has sufficiently alleged that Escobar and others agreed to commit fraud against the County, and that they took overt steps which resulted in damages to the County. *See Tri*, 162 S.W.3d at 556. According to the County, in the early fall of 2003, Jones, Escobar and

Flores began conspiring with others to defraud the County of its land, Compl. ¶ 108, and Escobar

and his co-defendants took overt steps, including bribery, toward accomplishing their fraud.  *See*

*generally* Compl.; *see, e.g., Tri*, 162 S.W.3d at 556.  The County further alleges that it suffered

damages as a result of Defendants' acts.  Compl. ¶¶ 157.  Thus, the County has sufficiently

alleged the elements of conspiracy.[11]

Allegations of conspiracy alone, however, are insufficient to sustain the County's claims

of conspiracy to commit fraud.  The County must also state a claim for the underlying fraud

offense.  *See Avery Pharm., Inc. v. Haynes and Boone, LLP*, No. 2-07-317-CV,  2009 WL

279334, at *11 (Tex. Ct. App. Feb. 5, 2009) (citing *Tilton v. Marshall,* 925 S.W.2d 672, 681

(Tex. 1996)) ("[A] defendant's liability for conspiracy depends on participation in some

underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.").

The County alleges that Flores committed fraud by material omission.  Compl. ¶¶ 161,

211; *see Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos., Inc.*, 217 S.W.3d 653, 670 (Tex.

Ct. App. 2006) ("Fraud by omission is a subcategory of fraud because the omission or

non-disclosure may be as misleading as a positive misrepresentation of fact where a party has a

duty to disclose.").  The elements of fraud by material omission are: (1) a party conceals or fails

to disclose a material fact within his or her knowledge; (2) the party knows that the other party is

---

[11]     A significant difference between a civil RICO conspiracy claim and a Texas state-law civil
conspiracy claim is the degree of specificity required when alleging the existence of an agreement.
*Compare Tel-Phonic Servs., Inc.*, 975 F.2d at 1140 (outlining requirements for civil RICO
conspiracy claim), *with Tri*, 162 S.W.3d at 556 (outlining requirements for a state-law civil
conspiracy claim).  A civil RICO conspiracy claim requires factual allegations that
defendants *knowingly* entered into an agreement to commit two or more predicate acts in
furtherance of the RICO conspiracy.  *Tel-Phonic Servs., Inc.*, 975 F.2d at 1140.  For a state-law
civil conspiracy claim, all that is required is an object to be accomplished and a "meeting of the
minds."  *Tri*, 162 S.W.3d at 556.  The County has failed to state a claim for a civil RICO
conspiracy because its Complaint fails to allege the existence of an agreement to knowingly
commit two or more predicate acts.  However, the County's allegations are sufficient to support its
state-law claim for conspiracy to commit fraud.

ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the party intends to induce the other party to take some action by concealing or failing to disclose the fact; and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact. *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001).

To be liable for fraud by material omission, a defendant must have a duty to disclose, and the information withheld must be material. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998); *Nelson v. Najm*, 127 S.W.3d 170, 174 (Tex. Ct. App. 2003) ("A failure to disclose information does not constitute fraud unless there is a duty to disclose."). The existence of a duty to disclose is a question of law, *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001), and it may arise in the following situations:

(1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a
partial disclosure and conveys a false impression.
*Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. Ct. App. 1997).

Materiality exists if disclosure of the fact "would likely affect the conduct of a reasonable person concerning the transaction in question." *Miller v. Kennedy & Minshew, Prof'l Corp.*, 142 S.W.3d 325, 345 (Tex. Ct. App. 2003).

The County alleges that, as an employee of the County, Flores had a duty to disclose her involvement in the Catalina Development conspiracy. Compl. ¶ 297. The County's claim is not without support. *See Hoggett*, 971 S.W.2d at 487; *see also Nelson*, 127 S.W.3d at 175 (citing *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)) ("Texas law has long imposed a duty to abstain from inducing another to enter into a contract through fraudulent means."). Although Escobar claims that the County suffered no damages as a result of the alleged Catalina

Development scheme because the County received fair compensation for its land, Flores's omissions deprived the Commissioners Court of the knowledge that the County could have secured a higher price for its property. Compl. ¶ 157. The County further alleges that, had Flores disclosed her involvement in Defendants' scheme, it is "very likely" that the Commissioners Court would have changed its business conduct and voted against accepting the second settlement offer. Compl. ¶ 296. Thus, the County has stated facts that make it plausible that Flores had a duty to disclose her participation in Defendants' scheme and that her non-disclosure was material.

Allegations of fraud must be pleaded with particularity.[12] FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). At a minimum, this requires a plaintiff to allege "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the representation and what that person obtained thereby." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994). "To plead scienter adequately, a plaintiff must set forth specific facts that support an inference of fraud." *Id.* The County has made factual allegations sufficient to make out a claim for fraud by omission, and it has stated the time and place of the alleged

---

[12]     The County cites the Supreme Court's opinion in *Rotella* as support for its assertion that the Rule 9(b) pleading requirement should be relaxed where a RICO plaintiff lacks access to all the facts necessary to support its claim. Pl.'s Resp ¶ 92 (citing *Rotella*, 528 U.S. at 560). However, the Supreme Court in *Rotella* appears to reject this argument, stating that it was aware of "no case in which Rule 9(b) has effectively barred a claim" similar to plaintiff's civil RICO claim, and that Rule 11(b)(3), which states that a complaint may contain factual assertions which "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery," allows plaintiffs to plead facts that are not known with certainty at the time of pleading so that they may meet the heightened pleading requirements of Rule 9(b). *Rotella*, 528 U.S. at 560; FED. R. CIV. P. 11(b)(3).

fraud, the identity of Flores and the other co-conspirators, the contents of the material omissions and what Defendants gained thereby. *See Tel-Phonic Servs. Inc.*, 975 F.2d at 1139. Flores's omissions occurred in El Paso in December 2003. Compl. ¶¶ 127-131. Flores's withheld information about the attempted fraud and about the fact that her favorable vote had been procured through bribes. *Id.* ¶ 161. Flores knew that the other members of the Commissioners Court did not have an equal opportunity to discover the truth, and, by calling the special meeting, she intended to persuade the other Commissioners to accept the second settlement offer. As a result of Flores's omissions, the County alleges that Defendants were able to undermine a competitive bidding process for the land and secure the land at less than its true market value. *Id.* ¶ 157. Although Escobar claims that the County cannot show that the other Commissioners relied on Flores's fraud by material omission, "[r]eliance is ordinarily a question of fact for the fact-finder" and is often "not a proper matter for dismissal on the pleadings." *See Celanese Corp. v. Coastal Water Auth.*, 475 F. Supp. 2d 623, 637 (S.D. Tex. 2007) (citing *Jones v. Ray Ins. Agency*, 59 S.W.3d 739, 754 (Tex. Ct. App. 2001)). Thus, the County has alleged specific facts which support an inference of conspiracy to commit fraud by material omission. *See Bradford*, 48 S.W.3d at 754-55.

Escobar argues that, even if the County's conspiracy to commit fraud claim survives, its claim is barred by limitations. Mot. to Dismiss 52. In Texas, fraud claims are subject to a four-year statute of limitations period. *See Williams v. Khalaf*, 802 S.W.2d 651, 657-58 (Tex. 1990). However, similar to the "injury discovery" rule in civil RICO claims, the "discovery rule" provides an equitable basis for tolling the limitations period for fraud. *See Childs v. Haussecker*, 974 S.W.2d 31, 36-37 (Tex. 1998). The discovery rule defers the accrual of certain causes of

action, including fraud, "until the plaintiff knew, or exercising reasonable diligence, should have known of the wrongful act causing injury." *Salinas v. Gary Pools, Inc.*, 31 S.W.3d 333, 336 (Tex. Ct. App. 2000). The defendant bears the burden of negating the discovery rule once it has been invoked by the plaintiff. *Doe v. Linam*, 225 F. Supp. 2d 731, 735 (S.D. Tex. 2002) (citing *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 n. 2 (Tex. 1988)).

In response to Escobar's limitations defense, the County asserts that it neither knew nor had reason to know of Defendants' fraudulent scheme or of its injury until Flores's guilty plea in June 2007. Pl.'s Resp. ¶ 74. Escobar counters that the County "clearly knew of its 'loss'" when the deed was conveyed in May 2004. Def.'s Reply 25. The County, however, maintains that its injury was not apparent from its settlement agreement with Defendants. Pl.'s Resp. ¶ 74. The Court agrees. The County had no reason to mistrust the motives of its Commissioners in approving the sale, and it had no reason to mistrust Flores's actions in arranging the special meeting. Furthermore, the County had no reason to know that Defendants had allegedly undermined a competitive bidding process by threatening those capable of advising the Commissioners Court against the sale and by purchasing the interests of potential competitors. *See* Compl. ¶¶ 116-19, 142-47. It was not until the United States began investigating Flores's activities that the County discovered the basis for its claim. For this reason, the Court finds it appropriate to apply the discovery rule to equitably toll the limitations period for the County's state-law claim of conspiracy to commit fraud.

**B.      Motion to Decline to Exercise Supplemental Jurisdiction Over State-Law Claim**

Should the Court decline to dismiss the County's state-law claim under Rule 12(b)(6), Escobar urges the Court to decline to exercise supplemental jurisdiction over the state-

law conspiracy to commit fraud claim that the County has alleged against him.  Mot. to Dismiss 44.  Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  In addition, federal district courts have supplemental jurisdiction over state-law claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  A federal district court may decline to exercise supplemental jurisdiction over a claim if

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Id.* § 1367(c).

Escobar urges the Court to decline to exercise supplemental jurisdiction over the County's state-law claim under § 1367(c)(3) and § 1367(c)(4).  Mot. to Dismiss 45.  The Court indisputably has jurisdiction over the County's civil RICO claim, as Congress has specifically created a private civil remedy for individuals injured by violations of the RICO Act.  18 U.S.C.A. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court.").  Because the Court declines to dismiss the County's civil RICO claim against Escobar, dismissal under § 1367(c)(3) is inappropriate.

Escobar alleges that, even if the County's civil RICO claims survive his Motion to Dismiss, the instant case "presents exceptional circumstances providing compelling reasons for declining jurisdiction under section 1367(c)(4)."  Mot. to Dismiss 45.  Escobar notes that similar

state-law claims have been filed in state court and have been referred to arbitration, *id.* at 46, and

he argues that "[a]djudicating state-law claims in federal court while identical claims are pending

in state court would be a pointless waste of judicial resources." *Id.* (citing *Hays County*

*Guardian v. Supple*, 969 F.2d 111, 125 (5th Cir. 1992)).

It appears that the Fifth Circuit has had only one occasion to evaluate the propriety of a

district court's dismissal of a state-law claim pursuant to § 1367(c)(4). *See Hays County*

*Guardian*, 969 F.2d at 111. In *Hays County Guardian*, the Fifth Circuit upheld the district

court's refusal to exercise supplemental jurisdiction over plaintiffs' state-law claims for

monetary relief. *Id.* at 125. Because the Eleventh Amendment barred the district court from

adjudicating plaintiffs' state-law claims against defendants in their official capacity, hearing the

plaintiffs' individual-capacity claims would be "a pointless waste of judicial resources." *Id.* at

125. In that case, the Fifth Circuit saw no reason to divide a claim that could be fully adjudicated

in state court and would require a determination of individual liability and monetary damages

unnecessary for adjudicating plaintiffs' federal claim. *Id.*

The Fifth Circuit's decision in *Hays County Guardian* is inapposite to the instant case

because adjudication of the County's state-law fraud claim neither severs the County's state-law

claims nor requires a determination of liability that is distinct from the County's federal question

claim. Adjudication of the County's state-law conspiracy to commit fraud claim requires factual

determinations similar to those underlying the County's federal claims; namely, whether

Defendants intended to defraud the County of its property. Further, the County's state-law claim

may give rise to co-conspirator liability for predicate acts taken in furtherance of the conspiracy

to commit fraud and, as such, will necessarily have to be adjudicated in order to reach the merits

of the County's civil RICO claim. Even if the conspiracy to commit fraud claim does not give

rise to co-conspirator liability for predicate acts, it is arguably "so related" to the County's federal

claims that it "form[s] part of the same case or controversy under Article III of the United States

Constitution." *See* 28 U.S.C. § 1367(a).

   According to the Second Circuit,

> Subsection 1367(c)(4) authorizes federal courts, upon the recognition of
> "exceptional circumstances," to decline supplemental jurisdiction. The use of
> "exceptional circumstances" indicates that "Congress has sounded a note of
> caution that the bases for declining jurisdiction should be extended beyond the
> circumstances identified in subsections (c)(1)-(3) only if the circumstances are
> quite unusual." In other words, declining jurisdiction outside the ambit of
> 1367(c)(1)-(3) appears as the exception rather than the rule. Thus, federal courts
> "must ensure that the reasons identified as 'compelling' are not deployed in
> circumstances that threaten this principle."

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir. 1998)
(quoting *Executive Software North Am., Inc. v. United States Dist. Court for Cent. Dist. of
California*, 24 F.3d 1545, 1558 (9th Cir. 1994) (overruled on other grounds)) (internal citations
omitted); *see also Women Prisoners of District of Columbia Dept. of Corrections v. District of
Columbia*, 93 F.3d 910, 950, 320 (D.C. Cir. 1996) ("By using such words as 'exceptional' and
'compelling,'. . . Congress indicated that invocations of § 1367(c)(4) should be rare.").

Because the Court finds no such "exceptional circumstances" or "compelling reasons" for

declining jurisdiction over the County's state-law claim, Escobar's Motion to Decline to Exercise

Supplemental Jurisdiction Over State-Law Claim is **DENIED**. *See* 28 U.S.C. § 1367(c)(4).

## III.   CONCLUSION

For the reasons set forth above, Escobar's Motion to Dismiss is **GRANTED** in part and

**DENIED** in part. The County's civil RICO conspiracy claim against Escobar is dismissed. All

other claims survive.

   **IT IS FURTHER ORDERED** that Escobar's Motion to Decline to Exercise

Supplemental Jurisdiction Over State-Law Claim is **DENIED**.

**SO ORDERED.**

**SIGNED** on this 4th  day of December, 2009.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE