**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **COUNTY OF EL PASO, TEXAS,** | §§ | |
| **Plaintiff,** | §§§ | |
| **v.** | §§ | **EP-09-CV-00119-KC** |
| **LUTHER JONES, DAVID ESCOBAR, MARTIE JOBE, ELIZABETH "BETTI" FLORES, ROBERT BOWLING III, ROBERT BOWLING IV, SARAH J. THOMAS, GREGORY W. COLLINS, ALAN ORTEGA, CHRIS JOHNSTONE, FRANK ARROYOS, CATALINA DEVELOPMENT, INC., TROPICANA HOMES, INC., CAREFREE HOMES INC., L.P., AMERICAS LOOP 375 L.P., TROFREE, LLC, CAREFREE HOMES I, and TROPICANA DEVELOPMENT, INC.,** | §§§§§§§§§§§§§§§§§§ | |
| **Defendants.** | §§ | |

## ORDER

On this day, the Court considered Defendants Catalina Development, Inc. ("Catalina

Development") and Gregory W. Collins's ("Collins") "Motion to Dismiss in Response to

Plaintiff's Second Amended Complaint" ("Catalina Motion to Dismiss") (Doc. No. 109),

Defendant Frank Arroyos's ("Arroyos") "Second Amended Motion to Dismiss for Failure to

State a Claim in Response to Plaintiff's Second Amended Complaint" ("Arroyos Motion to

Dismiss") (Doc. No. 114), Defendant Carefree Homes Inc., L.P.'s ("Carefree Homes") "Motion

to Dismiss Plaintiff's Second Amended Complaint of Defendant Carefree Homes Inc., L.P."

("Carefree Homes Motion to Dismiss") (Doc. No. 117), Defendant Chris Johnstone's

("Johnstone") "Motion to Dismiss Plaintiff's Second Amended Complaint of Defendant Chris

Johnstone" ("Johnstone Motion to Dismiss") (Doc. No. 118), Defendant Alan Ortega's

("Ortega") "Motion to Dismiss Plaintiff's Second Amended Complaint of Defendant Alan

Ortega" ("Ortega Motion to Dismiss") (Doc. No. 119), and Defendants Sarah J. Thomas's

("Thomas") and Carefree Homes I, L.P.'s ("Carefree Homes I") "Motion to Dismiss Plaintiff's

Second Amended Complaint of Defendants Sarah J. Thomas and Defendant Carefree Homes I,

L.P." ("Thomas Motion to Dismiss") (Doc. No. 120). For the reasons set forth herein, each of

the above six Motions to Dismiss is **GRANTED**.

## I.        BACKGROUND

The County of El Paso ("the County") alleges that certain Defendants were involved in a

Racketeering Influenced and Corrupt Organization ("RICO"). *See generally* Pl's Second Am.

Compl. ("Complaint") (Doc. No. 107). The alleged enterprise, through David Escobar

("Escobar"), Martie Jobe ("Jobe"), and Luther Jones ("Jones"), would provide "consulting

services" for clients–"individuals, businesses, or entities having or seeking to do business with

[the County]." *Id.* ¶ 89. To serve the needs of its clients, the alleged enterprise would offer

bribes and other benefits to County officials to secure "favorable resolutions for clients doing, or

seeking to do, business with the County." *Id.* Former El Paso County Commissioner, Elizabeth

Flores ("Flores"), was one such County official. *Id.* ¶ 93. According to the County, Flores

accepted money and other benefits in exchange for favorable votes in her official capacity as

County Commissioner. *Id.* The County alleges that the eighteen defendants in the instant case

took part in one or more of the following four racketeering episodes: Catalina Development,

Fifteen-Minute Lawsuit, Fair Labor Standards Act 207(k) ("F.L.S.A. 207(k)"), and Digitization

of Court Records. *See generally* Compl. For her part, Flores has pleaded guilty to her

involvement in the alleged racketeering activities; however, all remaining Defendants maintain

that they are innocent of the charges. *See id.* ¶¶ 24, 26-27, 85, 100-01, 106, 163, 166, 214, 238,

276. The County alleges that the eight Defendants herein, Catalina Development, Collins,

Arroyos, Carefree Homes, Johnstone, Ortega, Carefree Homes I, and Thomas, were involved in

the Catalina Development episode. *Id.* ¶¶ 239, 249.

On January 27, 1993, the El Paso County Commissioners Court ("Commissioners

Court") passed a motion allowing for the sale of a 381.90-acre parcel of county of land by sealed

bids.[1] *Id.* ¶ 30. In October 1994, the Commissioners Court accepted a bid submitted by Collins

and Catalina Development. *Id.* Shortly thereafter, two commissioners and the County Judge-

elect filed suit to enjoin the sale. *Id.* On December 20, 1994, the 34th Judicial District Court

issued a temporary restraining order enjoining the sale of the land. *Id.* ¶ 31. On January 30,

1995, Collins and Catalina Development filed suit against the County for breach of contract and

for specific performance ("Catalina Development lawsuit"). *Id.* The lawsuit was barred by

sovereign immunity, and summary judgment was granted on behalf of the County. *Id.* ¶¶ 31-32.

Approximately nine years after the attempted sale, in fall 2003, Flores, Bowling IV, and

four other defendants allegedly "discussed and began conspiring to defraud the County of El

Paso and its citizens of the tract of land subject to the *Catalina Development* lawsuit." *Id.* ¶ 36.

According to the County, the six defendants, including Bowling IV, had no legal interest in the

---

[1] The disputed land is located in Section 16, Township 3, Block
79 of the T&P Railroad Survey. Compl. ¶ 31.

property prior to these discussions.  *Id.* ¶ 38.  A joint venture ("Joint Venture"), consisting of

Carefree Homes Inc., L.P. ("Carefree Homes") and Tropicana Homes, Inc. ("Tropicana"), was

formed around this time period.  *Id.* ¶ 40.  The president of Tropicana, Defendant Robert

Bowling III ("Bowling III"), negotiated the assignment of Collins's and Catalina Developments'

interest in the land to the Joint Venture.  *Id.* ¶ 39.  In September or October 2003, Bowling III

entered into a legal and consulting contract with Escobar and Jones in which Escobar and Jones

were "to acquire for the Joint Venture the tract of land from the County."  *Id.* ¶¶ 40-41.

On November 19, 2003, Escobar, acting as Trustee for the Joint Venture, submitted a

settlement offer to the County, offering $10,000 for each of approximately 304 acres, along with

reimbursement to the County of all fees and expenses paid by the County to its outside counsel.

*Id.* ¶ 42.  The County alleges that this offer was forwarded through the United States Postal

Service and/or facsimile.  *Id.* ¶ 115.  On November 20, 2003, Collins and Catalina Development

assigned their interest in the Catalina Development lawsuit to Escobar for $150,000, plus a

fifteen percent equity interest in a joint venture subsequently formed by the assignees of Collins

and Catalina Development called Americas Loops 375, LP ("Americas Loop").  *Id.* ¶ 43.  A later

investor in Americas Loop, Johnstone, purchased a three percent interest in the joint venture for

$200,000 on or about May 4, 2004.  *Id.* ¶ 44.  Based on this contribution, the County asserts that

Americas Loop valued the 304.937 acres at approximately $6,600,000.  *Id.* ¶¶ 45-46.[2]

-------------

[2]                  According to the County, Americas Loops is a Texas limited
partnership.  Originally, Trofree was the General Partner,
owning one percent of the company.  Limited partners were
Carefree Homes I, LP ("Carefree Homes"), with a 40.5%
interest, Tropicana, with a 40.5% interest, Collins, with a 7.5%
interest, Ortega, with a 7.5% interest, and Johnstone, with a
3% interest.  Compl. ¶ 44.  In December 2008, Collins and
Ortega sold their interest in Americas Loop to Tropicana and

On or about November 21, 2003, Escobar, acting as an agent for the Joint Venture, entered into a consulting contract with Joel Guaderrama ("Guaderrama"), individually and in Guaderrama's role as President of CR Enterprises. *Id.* ¶ 116. Guaderrama had previously attempted to obtain the disputed land from the Commissioners Court, and his efforts continued until he entered into the consulting contract with Escobar. *Id.* ¶¶ 119-20. According to the County, the purpose of the contract was to eliminate Guaderrama's competing interest in acquiring the disputed land. *Id.* ¶ 117. Upon the Joint Venture's successful acquisition of the disputed land, Guaderrama would receive $100,000 from the Joint Venture. *Id.* ¶ 47.

On December 1, 2003, the County rejected the settlement offer submitted by Escobar. *Id.* ¶ 48. Three days later, on December 4, 2003, Escobar submitted a second settlement offer to the County. *Id.* ¶ 49. On or about December 9, 2003, the County alleges that Escobar, Jones and Flores met to discuss the second settlement offer. *Id.* ¶ 123. Around this time, Escobar and Jones "agreed to pay money and other benefits to [Flores] in exchange for her favorable vote." *Id.* ¶ 136. The County alleges that Escobar "knowingly misrepresented that the offer he submitted on behalf of the Joint Venture was [] made in good faith as he failed to disclose the conspiracy efforts of the enterprise to defraud the County of the tract of land." *Id.* ¶ 122. On December 15, 2003, the Commissioners Court considered the second settlement offer, but it took no action on the offer at that time. *Id.* ¶ 52. Between December 15, 2003, and December 20, 2003, Flores "requested a special session of the El Paso County Commissioners Court to consider the second settlement offer." *Id.* ¶ 53. The County alleges that Flores requested this

Carefree Homes, giving the latter companies each a 48.5% interest in the joint venture. *Id.* ¶ 44 n.1.

special meeting by email. *Id.* ¶ 128. A special meeting was held on December 22, 2003. *Id.* ¶ 54.

Prior to the vote of the Commissioners Court, Escobar and Jones appeared before the Commissioners Court "and made material misrepresentations to the Court in furtherance of their efforts to defraud the County. . . . [B]oth withheld from the Commissioners Court that they had offered[,] and Betti Flores agreed[,] to accept money and other consideration in exchange for her vote as an El Paso County Commissioners [sic]." *Id.* ¶ 132. Despite the El Paso County Attorney's recommendation to reject the second settlement offer, the offer was accepted by the Commissioners Court, with Flores voting in favor of accepting the offer. *Id.* ¶ 54. That same day, the County entered into an agreement with Escobar as Trustee of the Joint Venture assignees,

> whereby in consideration for the dismissal and release of all claims related to the tract of land and the promise not to seek a writ of certiorari from the United States Supreme Court, the County of El Paso agreed to sell a portion of the tract of land (approximately 304 acres) to the Joint Venture for $3,040,000.00 or the appraised value of the property, whichever is greater.

*Id.* ¶ 55.

In addition, the Joint Venture agreed to reimburse the County for all attorney fees and costs incurred in the Catalina Development lawsuit. *Id.*

Prior to the December 22, 2003, special meeting, the County alleges that Escobar and Jones met with then County Commissioner Charles Scruggs to coerce him to vote in favor of the Catalina Development settlement offer. *Id.* ¶ 51. Escobar and Jones "threatened Commissioner Scruggs with adverse political consequences should he not vote in favor of the settlement." *Id.*

The County further alleges that on or about January 16, 2004, Jones sent an email to

Flores containing a letter addressed to Steve Hughes ("Hughes"), then outside counsel for the County. *Id.* ¶ 138. The letter, which was drafted for Flores's signature, asked Hughes about the appraisal status of the disputed land. *Id.* The email sent by Jones instructed Flores to sign the letter in her official capacity and to forward the letter via facsimile to Hughes. *Id.*

On or about April 9, 2004, Jones, "acting as principal decision maker and coordinator of the enterprise's activities," drafted a letter to Ted Houghton ("Houghton"), an individual who is allegedly familiar with the disposition of public lands. *Id.* ¶¶ 142-44. The letter threatened litigation as a result of Houghton's previous communications with Flores concerning how to maximize the County's profit in its sale of public lands through competitive bidding. *Id.* Jones emailed the letter to Escobar and instructed Escobar to sign the letter and forward it to Houghton. *Id.* ¶ 145. Escobar forwarded the letter on April 4, 2004.[3] *Id.* ¶ 146.

On May 24, 2004, the El Paso County Judge signed a warranty deed conveying the land to Escobar as Trustee for the Joint Venture. *Id.* ¶ 149. On November 15, 2004, Escobar conveyed the land to Americas Loop. *Id.* ¶ 150. In return, Escobar received $580,000 from the Joint Venture for his role as attorney and Trustee. *Id.*

On or about August 26, 2004, Bowling III and Bowling IV delivered campaign contributions to Flores totaling $2,500. *Id.* ¶¶ 151-53. The County claims that this money was "payment for her vote to settle the *Catalina Development* lawsuit" in violation of Texas Penal

---

[3] The dates in the Complaint appear incorrect, as the Complaint states that Jones drafted the letter on April 9, 2004, five days *after* Escobar supposedly forwarded the letter to Houghton on April 4, 2004.

Code § 36.02(a)(1).[4]  *Id.* ¶ 151.  The County alleges that "the Bowling's [sic] collectively paid

[Flores] $2,500.00" in order for the Joint Venture to acquire the disputed property.  *Id.* ¶ 154.

According to the County, these payments were arranged jointly by Jones and Escobar.  *Id.*  The

County alleges that further sums of $2,500 "disguised as campaign contributions" were each paid

by Jones and Escobar to Flores on December 16, 2004, for a total of $7,500.  *Id.* ¶¶ 155-56.

The County asserts that the amount paid by the Joint Venture to the County, $3,200,000[5]

plus attorneys' fees and release of all current and future claims concerning the land, was less than

the tract's true value, which the County estimates to be $6,660,000.  *Id.* ¶ 157.  The County

further alleges that the monetary injuries it sustained as a result of the land transaction were

actually and proximately caused by "the enterprise's fraudulent and racketeering activities."  *Id.* ¶

158.

According to the County, Escobar "failed to disclose the conspiracy efforts of the

enterprise to defraud the County of the tract of land."  *Id.* ¶ 122.  The County also alleges that

"Flores purposely withheld critical information that would likely have prevented a vote on the

settlement offer."  *Id.* ¶ 122.  Had the Commissioners Court known that at least one of its

members had been bribed to accept the settlement offer, the County asserts that it is unlikely that

---

[4]        Under the Texas Penal Code,
           [a] person commits an offense if he intentionally or knowingly offers,
           confers, or agrees to confer on another, or solicits, accepts, or agrees to
           accept from another: (1) any benefit as consideration for the recipient's
           decision, opinion, recommendation, vote, or other exercise of discretion
           as a public servant, party official, or voter.
        TEX. PENAL CODE ANN. § 36.02(a)-(a)(1) (Vernon 2003).

[5]        It is unclear from the County's Complaint how the parties
           agreed upon the $3,200,000 fee.  The agreement states that the
           land would be sold for the greater of $3,040,000 or the
           appraised value of the property.  *See* Compl. ¶ 55.

the Commissioners Court would have accepted the offer. *Id.* ¶ 130.

The County alleges that Americas Loop, Trofree, Tropicana and Bowling III, individually and as an officer and agent for Tropicana, conspired to defraud the County of Flores's honest services and conspired to defraud the County of its property. *Id.* ¶ 239. The County further seeks "equitable relief, pursuant to the doctrine of unjust enrichment." *Id.* ¶ 278. The County alleges that this Court has proper supplemental jurisdiction over its state-law claims under 28 U.S.C. § 1367. *Id.* ¶ 23. The County alleges financial injuries totaling $3,370,000, plus "monies and fringe benefits paid to Betti Flores." *Id.* ¶ 162.

This Order addresses the six Motions to Dismiss filed by eight of the Defendants in this case, all of whom are connected with this case solely through the Catalina Development land deal. These eight Defendants can be divided into two groups: The "Carefree Homes Group" and the "Collateral Group." The composition of each group is set forth below. The Carefree Homes Defendants employed Arroyos and are all connected to each other, and to this case, by being members or affiliates of the Carefree Homes real estate development company. This company entered into a partnership to develop the land in question with Tropicana, which is the real estate company controlled by Bowling III and Robert Bowling IV ("Bowling IV"). *See id.* ¶¶ 22, 40. The Collateral Defendants are connected with each other and to this case principally through their ownership of minor stakes in Americas Loop, the business entity which owns the land in question and is the vehicle for the land's development. Americas Loop is primarily owned and controlled by Carefree Homes and Tropicana. *See id.* ¶ 44.

## A.  The Carefree Homes Group

The identities, activities, alleged actions and procedural posture of the four members of

the Carefree Homes Group are set forth below.

### 1. Arroyos

Arroyos was a day-to-day manager and a twenty-five percent owner of Carefree Homes until August 2007. *Id.* ¶ 37. He allegedly conspired with Jones, Escobar, Flores, Bowling III and Bowling IV to defraud the County of the disputed land. *See id.* ¶ 36. When alleging a conspiracy to commit fraud, the County does not seek recovery against Arroyos on an individual basis, but only in his role as "an officer or agent" for Carefree Homes. *Id.* ¶ 240. However, when alleging its count of unjust enrichment, the County claims that Arroyos acted in an individual capacity, as well as in a representative capacity for Carefree Homes and Carefree Homes I. *Id.* ¶ 278.

On July 23, 2009, Arroyos moved to dismiss the claims against him for failure to state a claim upon which relief may be granted. Arroyos Mot. to Dismiss. The County filed a Response on August 3, 2009, ("Resp. to Arroyos Mot.") (Doc. No. 134), and Arroyos filed a Reply on August 10, 2009, ("Arroyos Reply") (Doc. No. 142).

### 2. Carefree Homes

Carefree Homes is a corporate entity that is part of the Carefree Homes real estate development group. Compl. ¶ 18. The County alleges that it engaged in a conspiracy to commit fraud in connection with the Catalina Development land deal, by and through the acts of its agent, Arroyos. *Id.* ¶ 240. The County also claims that Carefree Homes is liable under a theory of unjust enrichment, again predicated on the acts of its agent, Arroyos. *Id.* ¶ 278.

On July 24, 2009, Carefree Homes moved to dismiss the claims against it. Carefree Homes Mot. to Dismiss. The County filed a Response on August 4, 2009, ("Resp. to Carefree

Homes Mot.") (Doc. No. 138), and Carefree Homes filed a Reply on August 16, 2009, ("Carefree Homes Reply") (Doc. No. 146).

### 3. Carefree Homes I

Carefree Homes I is a business entity that is part of the Carefree Homes real estate development group and is the vehicle for holding Carefree Homes's interest in Americas Loop. Compl. ¶¶ 21, 44. While the County does not allege that Arroyos was acting as an agent for this business entity for the purposes of the conspiracy claim, it does allege that he was acting as its agent for the purposes of the unjust enrichment claim. *Id.* ¶ 278.

On July 24, 2009, Carefree Homes I moved, jointly with Thomas, to dismiss the claims against them. Thomas Mot. to Dismiss. The County filed a Response on August 4, 2009, ("Resp. to Thomas Mot.") (Doc. No. 137), and Carefree Homes I and Thomas jointly filed a Reply on August 16, 2009, ("Thomas Reply") (Doc. No. 145).

### 4. Thomas

Thomas is an employee and executive within the Carefree Homes real estate development group. She is listed as the agent for service of process for both Carefree Homes and Carefree Homes I.. Compl. ¶¶ 11, 18, 21. The County seeks recovery against Thomas on a theory of unjust enrichment, but it does not allege any overt acts on her part, aside from passively receiving a benefit from the allegedly corrupt deal. *See id.* ¶ 280. Thomas has participated jointly in the motion to dismiss filed by Carefree Homes I, as noted *supra* in section I.A.3.

### B. The Collateral Group

The identities, activities, alleged actions and procedural posture of the four members of the Collateral Group are set forth below.

### 1. Collins

Collins is a principal and part owner of Catalina Development. *See* Compl. ¶ 44. With his company, he had originally tried to purchase the land in question from the County in 1993, but the County later enjoined the sale, prompting litigation. *Id.* ¶¶ 30–33. In 2003, Collins was approached by, and entered into negotiations with, Bowling III regarding his interest in the disputed land. *Id.* ¶ 39. He assigned his interest in the land and the lawsuit to the joint venture that would become Americas Loop, in exchange for $150,000 cash and a fifteen percent stake in the joint venture. *Id.* ¶¶ 43–44. He eventually sold his stake in Americas Loop to the major shareholders in that venture, Tropicana Development, Inc. ("Tropicana Development") and Carefree Homes. *Id.* ¶ 44. The County asserts a claim of unjust enrichment against Collins; however, it does not allege any specific overt acts of fraud or conspiracy on his part. *See id.* ¶ 280.

On July 15, 2009, Collins moved, jointly with Catalina Development, to dismiss the claims against them. Catalina Mot. to Dismiss. The County filed a Response on July 27, 2009, ("Resp. to Catalina Mot.") (Doc. No. 126), and Collins and Catalina Development jointly filed a Reply on July 30, 2009, ("Catalina Reply") (Doc. No. 128).

### 2. Catalina Development

Catalina Development is a real estate development business owned and run, at least in part, by Collins. *See* Compl. ¶ 44. Its role in this lawsuit, as well as its filings, parallels those of Collins, as set forth *supra* in section I.B.1. The County does not anywhere explicitly allege any of its causes of action against Catalina, but in its Response to Catalina's Motion to Dismiss, the County argues that Catalina's role as a defendant is spelled out sufficiently clearly in the

pleadings, and is parallel to that of Collins, such that it should continue to be counted as an unjust enrichment defendant.  Resp. to Catalina Mot. 1 n.1.

### 3. Ortega

Ortega is a part owner of Catalina Development.  Compl. ¶ 44.  He apparently had no active role in connection with the assignment of Collins's and Catalina Development's interests in the land and the related lawsuit to Americas Loop, as the County alleges that Bowling III negotiated only with Collins in this connection.  *Id.* ¶ 39.  It is unclear if Ortega received any cash consideration in this regard, but the County alleges that he owned, at least beneficially, an interest in Americas Loop though his ownership interest in Catalina Development.  *Id.* ¶ 44.  Like in the case of Collins, Ortega's stake was also eventually sold to the major owners of that venture, Tropicana Development and Carefree Homes I.  *Id.*  The County claims that Ortega is liable under a theory of unjust enrichment, though it does not allege any specific overt acts on his part.  *Id.* ¶ 280.

On July 24, 2009, Ortega moved to dismiss the claims against him.  Ortega Mot. to Dismiss.  The County filed a Response on August 4, 2009, ("Resp. to Ortega Mot.") (Doc. No. 140), and Ortega filed a Reply on August 16, 2009, ("Ortega Reply") (Doc. No. 147).

### 4. Christopher Johnstone

Johnstone owns three percent of Americas Loop.  Compl. ¶ 44.  He allegedly acquired this stake by paying $200,000 for it in May 2004.  *Id.* ¶ 45.  The County uses this transaction to argue that the fair market value of the land at issue is thus $6,600,000.  *Id.* ¶ 46.  The County claims that Johnstone is liable under a theory of unjust enrichment, and aside from his purchase of ownership interests, it does not allege any other overt acts on his part.  *Id.* ¶ 180.

On July 24, 2009, Johnstone moved to dismiss the claims against him. Johnstone Mot. to

Dismiss. The County filed a Response on August 4, 2009, ("Resp. to Johnstone Mot.") (Doc.

No. 139), and Johnstone filed a Reply on August 16, 2009, ("Johnstone Reply") (Doc. No. 148).

## II.    DISCUSSION

Each of the eight Defendants discussed herein seek dismissal of the instant suit against

them for lack of subject matter jurisdiction over the County's state-law claims. In the alternative,

Defendants motion the Court to decline to exercise supplemental jurisdiction over the County's

state-law claims for reasons set forth in 28 U.S.C. §§ 1367(c). Defendants also seek dismissal of

the instant suit against them for failure to state a claim for which relief may be granted. The

Court addresses these motions in turn.

### C.    Subject matter jurisdiction

As an initial matter, Defendants challenge the Court's subject matter jurisdiction over the

County's state-law claims against them. *See* Arroyos Mot. to Dismiss 20, Carefree Homes Mot.

to Dismiss 2-3, Thomas Mot. to Dismiss 1-2, Catalina Mot. to Dismiss 5-6, Ortega Mot. to

Dismiss 2-3, Johnstone Mot. to Dismiss 3. According to Defendants, the County's state-law

claims 1) do not arise out of the same case or controversy as its federal claim; 2) raise novel or

complex issues of state law, making jurisdiction in appropriate; 3) substantially predominate over

the federal question claim; and 4) present exceptional circumstances or other compelling reasons

for declining jurisdiction. *Id.* 1-5; *see also* 18 U.S.C. §§ 1367(a), 1367(c)(1), 1367(c)(2),

1367(c)(4). The Court will address each of these claims in turn.

#### 1.    Standard

Federal district courts "have original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In addition, federal district courts have supplemental jurisdiction over state-law claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A federal district court may decline to exercise supplemental jurisdiction over a claim if

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Id.* § 1367(c).

## 2. Lack of subject matter jurisdiction under 28 U.S.C. § 1367(a)

The Court indisputably has jurisdiction over the County's civil RICO claim, as Congress has specifically created a private civil remedy for persons injured by violations of the RICO Act. 18 U.S.C.A. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court."). However, Defendants claim that the RICO claims asserted against the RICO Defendants are not so related to the state claims that they "form part of the same case or controversy" under § 1367(a). The Court disagrees. Adjudication of the County's state-law claims require factual determinations similar to those underlying the County's federal claim; namely, whether the Defendants intended to defraud the County of its property rights. Further, the County's state-law claims may give rise to co-conspirator liability for predicate acts taken in furtherance of the conspiracy to commit fraud and, as such, will necessarily have to be adjudicated in order to reach

the merits of the County's civil RICO claim. Even if the conspiracy to commit fraud claim does not give rise to co-conspirator liability for predicate acts, it is arguably "so related" to the County's federal claim that it "form[s] part of the same case or controversy under Article III of the United States Constitution." *See* 28 U.S.C. § 1367(a); *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008) (finding supplemental jurisdiction appropriate because plaintiff's state and federal claims concerned "the same core factual issue"). Both claims relate to the County's sale of its land to the Joint Venture. Both claims involve a similar cast of characters and similar factual determinations. Although these Defendants are not parties to the County's federal claim, § 1367 specifically permits supplemental jurisdiction over claims "that involve the joinder or intervention of additional parties." *See* 28 U.S.C. § 1367(a); *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005) ("[T]he grant of supplemental jurisdiction extends to claims involving joinder or intervention of additional parties.").

### 3. Discretionary exercise of supplemental jurisdiction

Alternatively, Defendants argue that the Court should decline to exercise supplemental jurisdiction over them in the instant case, as permitted by 28 U.S.C. § 1367(c). Arroyos Mot. to Dismiss 21, Carefree Homes Mot. to Dismiss 3-6, Thomas Mot. to Dismiss 3-6, Catalina Mot. to Dismiss 7-8, Ortega Mot. to Dismiss 3-6, Johnstone Mot. to Dismiss 3-6. The Supreme Court has characterized this option as a court's "discretionary choice not to hear the claims despite its subject-matter jurisdiction over them." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 129 S.Ct. 1862, 1867 (2009). The Court does not need to reach this discretionary question, however, because, as discussed herein, the County's claims are dismissed for failure to state a claim under which relief may be granted.

### D. Motion to dismiss for failure to state a claim

In addition to their subject matter jurisdiction challenges, Defendants argue that the County has failed to state a claim for conspiracy to commit fraud and for undue enrichment. Defendants argue that deficiencies in the County's pleading warrant dismissal of both of the County's state-law claims pursuant to Rule 12(b)(6).

#### 1. Standard

A motion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, the court must accept well-pleaded facts as true and view them in a light most favorable to the plaintiff. *Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002)*; Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Still, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted); *see also Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (stating that a court need not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions.").

Though a complaint need not contain "detailed" factual allegations, the "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555 (internal citation omitted). Thus, to survive a motion to dismiss, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Id.* at 570. Nevertheless, "a well-pleaded complaint may proceed even if its strikes a savvy judge that actual proof of those facts is

improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

When a plaintiff alleges fraud or fraudulent concealment, however, a plaintiff's complaint must meet a heightened pleading standard under Rule 9(b). *See* FED. R. CIV. P. 9(b). At a minimum, Rule 9(b) requires a plaintiff to state particulars of "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he [or she] obtained thereby." *Tel-Phonic Servs. Inc. v. TBS Intern., Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992). The Rule 9(b) particularity requirement applies when fraud is alleged as a predicate act in a civil RICO claim. *Id.* at 1138.

### 2. Conspiracy to commit fraud

The County alleges that Arroyos, on behalf of Carefree Homes, conspired with Bowling III, Jones, Escobar and Flores to commit fraud. Compl. ¶¶ 36, 239. Carefree Homes argues that the County has not adequately elaborated on this bare assertion, as required by Rules 8 and 9(b) of the Federal Rules of Civil Procedure, and this constitutes a failure to state a claim upon which relief may be granted, meriting dismissal. Carefree Homes Mot. to Dismiss 7.

The elements of conspiracy, under Texas state law, are: (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result. *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). Texas courts have held that this definition is appropriate when applied to a conspiracy to commit fraud case, with the observation that the underlying fraud must itself be adequately pleaded. *Avery Pharm., Inc. v. Haynes and Boone, L.L.P.*, No. 2-07-317-CV, 2009 WL 279334, at *11 (Tex. Ct. App. Feb. 5, 2009). Assuming that the underlying fraud against the

County committed by the central players in the Catalina Development episode is well pleaded, up to and including satisfying the Rule 9(b) standards, the County must still adequately plead facts which, taken as true, place Carefree Homes, through the actions of its agent, Arroyos, inside the conspiracy. Upon reviewing the County's Complaint, it is clear that the County fails at this task.

To survive a Rule 12(b)(6) motion, a complaint must contain "more than labels and conclusions." *Twombly*, 550 U.S. at 555. The specific factual allegations must "nudge" the legal conclusions "across the line from conceivable to plausible." *Id.* at 570. Even Rule 8 requires that mental elements be pleaded with some factual basis, and not alleged conclusorily. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1954 (2009). While the County adequately alleges the presence of "two or more persons," and fairly sets out a an object for the alleged conspiracy, it fails to allege facts which adequately set out a meeting of the minds between Arroyos and any of the alleged co-conspirators. It is this deficiency which undermines the County's claim.

Elaborating further on the meeting-of-the-minds requirement, Texas law holds that a "[c]ivil conspiracy requires a meeting of the minds between two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex. 1995). Whether one characterizes the Catalina Development episode as a conspiracy to accomplish the unlawful purposes of bribery and fraud, or a conspiracy to accomplish the lawful purpose of buying land, using the unlawful means of bribery and fraud, makes little difference. In either case, the County must allege facts which make it plausible that Arroyos, as agent for Carefree Homes, arrived at a meeting of the minds with at least some other co-conspirators to pursue the aforementioned unlawful means or ends.

Averments of any sort concerning Arroyos, as agent for Carefree Homes, are surprisingly

few and far between for a Complaint that is fifty-seven pages and 318 numbered paragraphs long. There appear to be only twelve paragraphs in which Arroyos's name is even mentioned.[6]  Three of those are simply in the context of identifying parties, and allege no pertinent facts.  Compl. ¶¶ 1, 15, 20.  Two more simply state background facts about ownership interests in land and business entities, and allege no facts about plans or plots.  *Id.* ¶¶ 37–38.  Five make conclusory allegations that certain named persons conspired to defraud or actually defrauded the County, but allege no facts or details in that connection.  *Id.* ¶¶ 36, 108, 239, 278, 280.  Simply repeating a conclusion does not make it so.

Only two paragraphs allege specific facts which could suggest a meeting of the minds, but the alleged facts fail to support the notion that any meeting of the minds actually contemplated unlawful means or ends.  The County alleges that Arroyos, at some point in early fall 2003, agreed with Bowling III and Bowling IV to retain Jones and Escobar "as agents" for the joint venture that was seeking the disputed land.  *Id.* ¶ 240.  The County also subsequently alleges that in 2004 Arroyos delivered $100,000 to Jones, who would then use the money to pay Guaderrama.  *Id.* ¶ 258.  While these facts are broadly compatible with a scenario in which Arroyos was involved in the conspiracy, they are equally compatible with any number of other scenarios, and thus do not "nudge" the case from mere conceivability across the line to "plausible."  *See Twombly*, 550 U.S. at 570.

Notably, paragraph 240 fails to put forth any detail concerning the scope and purpose of the agreement alleged to have been made between Arroyos, Bowling III and Bowling IV to seek the services of Jones and Escobar.  Based on the pleadings, there is no reason to assume that, to

---

[6]          Compl. ¶¶ 1, 15, 20, 36, 37, 38, 108, 239, 240, 258, 278, 280.

Arroyos, the intended purpose of that particular agreement was illegitimate. Subsequent facts, as pleaded, do not shed enough light on the agreement to change this conclusion. While Jones, Escobar, Bowling III and Bowling IV are all alleged to have made campaign contributions to Flores in exchange for favorable treatment in the Catalina Development episode, Arroyos is conspicuously absent from the list of donors. Compl. ¶¶ 243-49. Had Arroyos made a donation, it might be reasonable to infer that the agreement was in fact corrupt, and that Arroyos was aware of this, assented to it, and participated in it. *See* Compl. ¶ 240. Had, alternatively, the County alleged specific details about the agreement or the surrounding circumstances explaining why Arroyos was not going to make a contribution, but was fully aware of the nature of the agreement and had assented to it, then the County might have also managed to plead a claim.

But the facts, as presently alleged, barely state that Arroyos agreed with Bowling III and Bowling IV for any purpose; they do not make it seem plausible that he agreed or undertook to induce the fraud, that he intended a fraud, or that he knew his business partners were contemplating fraud. Similarly, the facts alleged in paragraph 258 do not suggest that Arroyos had any fraudulent purpose in his dealings in the Catalina Development episode. That paragraph simply alleges that Arroyos supplied the money needed to pay off a rival developer, Guaderrama, in order to induce him to drop his interest in developing the land in question. *See* Compl. ¶¶ 117, 258. While this was an important part of the larger scheme, it is nowhere alleged that this was itself illegal, and it does not shed any light on the question of whether Arroyos knew of, and assented to, the larger scheme, particularly the part which involved bribing Flores and defrauding the County.

Under the legal standard cited above, elements involving scienter cannot be sufficiently

pleaded through bare conclusory statements, like the ones that abound in the Complaint. Though Rule 9(b) relaxes the heightened pleading requirements for those elements, under Rule 8 they must be grounded in *some* alleged facts – which is not the case here. *See Iqbal*, 129 S. Ct. at 1954. As discussed above, the two specific facts alleged by the County about Arroyos do not plausibly place him inside the conspiracy, or suggest that he had a meeting of the minds with any of the other parties on the subject of unlawful conduct. The County has therefore failed to state a claim against Carefree Homes on the basis of the actions of its agent, Arroyos.

### 3. Unjust enrichment

The County also seeks to recover against each of the eight Defendants named herein on a theory of unjust enrichment. Compl. ¶¶ 278, 280. According to Texas state law, "[u]njust enrichment, itself, is not an independent cause of action." *Dudley Constr. v. Dawson*, 258 S.W.3d 694, 703 (Tex. Ct. App. 2008). Rather, this doctrine "belongs to the measure of damages known as quasi-contract or restitution," and its purpose is "to place an aggrieved plaintiff in the position he occupied prior to his dealings with the defendant." *Burlington N. R.R. v. Sw. Elec. Power*, 925 S.W.2d 92, 96–97 (Tex. Ct. App. 1996). One of the elements of an unjust enrichment claim is some underlying contact or nexus between the plaintiff seeking the recovery and the defendant from whom the recovery is sought. *Id.* Texas law also demands that, in some way, those dealings must have been inequitable, in favor of the defendant and at the expense of the plaintiff, for an unjust enrichment claim to hold. *See Dudley Constr.*, 258 S.W.3d at 703 (including "fraud, duress or taking of undue advantage"); *see also Burlington N. R.R.*, 925 S.W.2d at 98 n.6 ("Appellee does not aver fraud, accident, mistake, duress or bad faith on the part of the appellant [therefore making unjust enrichment unavailable]."). This can be viewed as

an "active" form of unjust enrichment.

Texas law also reveals that unjust enrichment can touch "passively received" benefits, where the nexus is some related third party's acts against the plaintiff, when it would be "unconscionable for the receiving party to retain" them. *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. Ct. App. 2002). It is not available "merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Id.* at 679-80 (citing *Heldenfels Bros. v. Corpus Christi*, 832 S.W.2d 39, 40 (Tex. 1992)). Rather, it requires a specific justification, such as unconscionability. *Id.*

The County fails to allege wrongful or inequitable acts on the part of several of the Defendants named herein. Regarding Thomas, Collins, Ortega and Johnstone, the County only alleges that they "unjustly benefitted from the fraudulent acts of Betti Flores, Luther Jones and David Escobar" in the Catalina Development episode. Compl. ¶ 280.[7] As such, the County's only theory of recovery can be under the "passively received" prong of unjust enrichment, which requires that it be unconscionable for the receiving party to be allowed to keep the windfall. *See Mowbray*, 76 S.W.3d at 679. But the County does not attempt to plead facts that might support the premise that the benefits Defendants received rose above the level of ordinary windfall and into the realm of unconscionable.

---

[7] Catalina Development is not named at all in the Complaint in this connection; however, the County argues that it should be read into this section, with claims parallel to those alleged against its principal, Collins. Resp. to Catalina Mot. to Dismiss 1 n.1. This may be assumed to be sufficient under Rule 8, which requires the pleading of sufficient facts to make out a claim, not specific theories of law.

In fact, given the facts presented by the County, it is unclear whether any of these Defendants have enjoyed *any* windfall, let alone one that was unconscionable and recoverable under a theory of unjust enrichment. The County has alleged that Collins, Ortega and Catalina Development each owned stakes in Americas Loop, but that these Defendants have since sold their stakes to Carefree Homes and Tropicana Development. Compl. ¶ 44 n.1. The County does not suggest that the price they received for these stakes contained a windfall profit, or, if it did, how that profit came at the expense of the County, instead of the buyers, or how any of that amounts to something unconscionable. Regarding Johnstone, the County makes clear that he paid $200,000 for his three percent stake in Americas Loop, a figure the County uses to arrive at a $6,660,000 valuation for the land. *Id.* ¶ 45. It is difficult to understand how a party receives a windfall profit, which would be unconscionable to retain, by paying full price for something. Regarding Thomas, it is fundamentally unclear what benefit, if any, she received in all of this. The County does not allege that she owns a stake in Americas Loop, or that she has an equity stake in any business entity that itself has a stake in that partnership. Though it is alleged that she has an employment relationship with the Carefree Homes group, as an executive in certain of its corporate entities, there is no suggestion as to how her salary, compensation, or any other benefits were materially affected by the land deal. Thus, the County has not sufficiently alleged that Collins, Ortega, Catalina, Johnstone or Thomas were enriched, let alone that such enrichment was unjust or under unconscionable circumstances.

The County alleges that Arroyos, and derivatively Carefree Homes and Carefree Homes I, committed fraudulent acts in the course of the Catalina Development land deal, and that this

justifies recovery under a theory of unjust enrichment. Compl. ¶ 278.[8] The County's pleading conforms with the "active" version of unjust enrichment, which requires an inequitable affirmative act on the part of a defendant against a plaintiff to provide the underlying basis for recovery. *See Dudley Constr.*, 258 S.W.3d at 703-04. These allegations of affirmative acts, however, suffer from a fatal paucity of detail. As discussed above, the County has failed to allege meaningfully that Arroyos, or any business for which he was an agent, was plausibly involved in the corrupt or fraudulent aspect of the land deal. The pleadings here do not make up for that shortfall. Thus, while these pleadings, in form, allege a standard claim of unjust enrichment predicated on Defendants' inequitable acts, the failure to allege what acts these three Defendants committed warrants dismissal of the County's claims against them.

The question remains whether these three Defendants could be liable under the "passively received" prong of unjust enrichment, and should therefore be forced to return any benefits that accrued to them due to the misdeeds of related others. The question, again, is whether these Defendants actually received something of value, and if so, whether it would be unconscionable for them to retain it.

As to the first question, it is not sufficiently alleged that any dubious gains have accrued to these Defendants, or, if they have, whether they amount to more than transient or illusory gains. The County alleges no facts which show that Arroyos ever owned a stake in the property, in Americas Loop, or in a business entity which held an interest in Americas Loop. *See* Compl.

---

[8] The assertion that Arroyos participated in the fraud in an individual capacity, and as an agent for both Carefree Homes and Carefree Homes I contradicts earlier statements in the pleadings which state that Arroyos participated in the fraud only as an agent for Carefree Homes. *See, e.g.,* Compl. ¶ 36.

¶¶ 43, 44, 56.  The County alleges that, at one point, Arroyos owned twenty-five percent of

Carefree Homes and that he relinquished that stake in August 2007 when he left the company.

Compl. ¶ 37.  But nowhere does the County allege that Arroyos's proceeds from the disposition

of a stake in a corporate entity – which never held the property in question directly or indirectly –

somehow channeled back to him part of the value of the land, and the facts alleged in the

Complaint do not make this a plausible inference.  Without alleging facts to show that he

retained benefits created by the land, the County has not shown how Arroyos was enriched.

Similarly, the County fails to allege facts showing how Carefree Homes benefitted from

the fact that Carefree Homes I, a separate business entity, owns a stake in Americas Loop.

*See* Compl. ¶ 44 (alleging that Carefree Homes I owns a large stake in Americas Loop).  While

the two entities have similar names and overlapping personnel, the County fails to allege facts

that would support the premise that enriching Carefree Homes I would enrich Carefree Homes.

Proximity does not equal entanglement, and without the averment of any particulars on the

subject, it is impossible to conclude that Carefree Homes was actually enriched.

The County does make clear, however, that Carefree Homes I owns a large stake in

Americas Loop.  *See* Compl. ¶ 44.  It thus indirectly owns some of the wealth represented by the

land, and there is no contention that it paid market rate or more for this privilege, as did

Johnstone.  *See Id.* ¶ 45.  If the sequence of events that led to the land being sold to Americas

Loop was fraudulent because of other related people's actions, and the sales price was indeed

inadequate, then there is at least a plausible claim that Carefree Homes I has passively received

something of value due to an underlying inequity.

But there is no allegation that allowing Carefree Homes I to retain its stake in Americas

Loop would be unconscionable, which is a necessary element in "passive" unjust enrichment. *See Mowbray*, 76 S.W.3d at 679. In fact, allowing Carefree Homes I to retain its stake in Americas Loop should actually lead to the derivative disgorgement of any wrongful derivative gains that it has enjoyed so far. Americas Loop, as well as a number of its agents, members and business partners, are parties to the instant suit. Compl. ¶¶ 9, 10, 17, 19, 20. If the fundamental allegations underlying this suit are indeed meritorious, then Americas Loop may be made to disgorge the windfall and return it to the County. Carefree Homes I would thus lose the derivative gain it had previously enjoyed.

Moreover, proceeding against Americas Loop, the business entity which holds title to the land in question, and not its limited partners, seems to be the most appropriate application of unjust enrichment doctrine. Texas law holds that unjust enrichment, being a part of the law of restitution, is meant to secure "the return or restoration of some specific thing to its rightful owner or status." *In re Estate of Wallace*, No. 04-05-00567-CV, 2006 WL 3611277, at *3 (Tex. Ct. App. Dec. 13, 2006) (internal citations and quotation marks omitted). Proceeding against the entity which actually holds the thing to be returned is therefore appropriate. Proceeding against an investor, against whom no plausible averments of inequitable conduct have been made, is not.

Without an adequately alleged active role in the fraudulent scheme, and without alleging facts which suggest unconscionability, Carefree Homes I cannot be separately tried and held separately liable for this alleged unjust enrichment, under either the active or passive theories of unjust enrichment. Excusing it from the case and allowing its fortunes to rest on the liability or innocence of the underlying business entity seems hardly unconscionable; rather, it seems like

the most reasonable course of action.[9]  At the very minimum, since the unconscionability element of passive unjust enrichment is not met on the facts given in the pleadings, this remedy should not be available against Carefree Homes I.

## III.    CONCLUSION

For the reasons set forth above, the following Motions to Dismiss:  Catalina Motion to Dismiss (Doc. No. 109), Arroyos Motion to Dismiss (Doc. No. 114), Carefree Homes Motion to Dismiss (Doc. No. 117), Johnstone Motion to Dismiss (Doc. No. 118), Ortega Motion to Dismiss (Doc. No. 119), and Thomas Motion to Dismiss (Doc. No. 120) are **GRANTED**.

**SO ORDERED.**

**SIGNED** on this 4th  day of December, 2009.

_Kathleen Cardone_
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE

---

[9]      And perhaps, too, the only legal course of action.  A limited partner is not responsible for the obligations of the limited partnership unless it is also a general partner, or participates in the control of the business.  *See Asshauer v. Wells Fargo Foothill*, 263 S.W.3d 468, 473 (Tex. Ct. App. 2008). Allowing recovery directly against the limited partner on a theory of unjust enrichment, for the acts of the partnership or its agents and without wrongdoing on the limited partner's part, would nullify this policy and could greatly disturb commercial relations.